# No. 23-7537

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————————

**United States Securities and Exchange Commission,**

**Plaintiff – Appellee,**

**v.**

**Mykalai Kontilai,**

**Defendant – Appellant,**

**Collector's Coffee, Inc., Los Angeles Dodgers LLC, Doe Individuals 1 through 50, Roe Corporations 1 through 50, Jackie Robinson Foundation, Inc., SDJ Investments, LLC, Adobe Investments, LLC, Darren Sivertsen, Trustee of Sivertsen Family Trust U/A/D 10/01/2022,**

**Defendants.**

———————————————

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
**(The Honorable Gabriel W. Gorenstein presiding)**

———————————————

**APPELLANT'S BRIEF AND SPECIAL APPENDIX**

———————————————

**Cary J. Hansel**
**Ashton Zylstra**
Hansel Law, PC
**2514 North Charles Street**
**Baltimore, Maryland 21218**
**Ph.: 301-461-1040**
**Fax: 443-451-8606**
cary@hansellaw.com
azylstra@hansellaw.com

*Counsel for Appellant*

# TABLE OF CONTENTS

Table of Authorities ............................................................... iii

Jurisdictional Statement ...........................................................1

Statement of the Issues...........................................................1

Statement of the Case............................................................2

Summary of the Argument.........................................................4

Facts .............................................................................8

    I.     The Development of Collector's Coffee, Inc. ......................................8

    II.    Envisioning CCI's Website, Producing CCI's Television Show, and Patenting a Novel, Game-Changing Authenticity Insurance Program .9

    III.   Negotiating Deals with Master Dealers for Collectibles Inventory ....16

    IV.   Purchasing the Jackie Robinson Contracts .........................................18

    V.    Raising Additional Capital through the Sale of Securities ................19

    VI.   An Uncontested Accounting of CCI's Use of Investor Funds for Legitimate Business Expenses .........................................................21

        A.    Mr. Kontilai's Finances During the Time Period .........................23

        B.    Gail Holt's Finances During the Time Period ..............................24

        C.    CCI's Finances During the Time Period........................................25

Standard of Review.................................................................27

Analysis............................................................................27

    I.     The Current Asset Freeze Impermissibly Freezes Untainted and After-Acquired Assets...................................................................27

i

II.      The Current Asset Freeze Impermissibly Fails to Provide for Living Expenses and the Basic Necessities of Daily Living or Criminal Counsel Fees ......................................................................................... 32

III.     The Current Freeze is Overbroad and Significantly Overreaches ...... 41

      A.      The Asset Freeze is Impermissibly Overbroad As It Includes Disgorgement Beyond the Amount the SEC Alleges Mr. Kontilai Personally Received ....................................................................... 42

      B.      The Asset Freeze Impermissibly Fails to Account for Legitimate Business Expenses Despite Uncontroverted Evidence on the Record Demonstrating Such Expenses ....................................................... 46

      C.      As the Disgorgement Portion of the Asset Freeze is Impermissibly Overbroad, the Portion of the Asset Freeze Accounting for Possible Civil Penalties is Also Incorrect ....................................................... 53

Conclusion ....................................................................................................... 58

Request for Oral Argument ............................................................................. 60

Certificate of Compliance ............................................................................... 60

Certificate of Service ...................................................................................... 60

Special Appendix ............................................................................................ 61

# TABLE OF AUTHORITIES

## Cases

*Byrd v. Abate*,
945 F. Supp. 581 (S.D.N.Y. 1996) ...............................................................33, 34

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010) ...................................................................................27

*Dale v. Barr*,
967 F.3d 133 (2d Cir. 2020) .................................................................................27

*Deckert v. Independence Shares Corp.*,
311 U.S. 282 (1940) ...............................................................................................28

*Estelle v. Gamble*,
429 U.S. 97 (1976) .................................................................................................33

*Farmer v. Brennan*,
511 U.S. 825 (1994) ...............................................................................................33

*Fed. Trade Comm'n v. 4 Star Resolution, LLC*,
No. 15-CV-112S, 2016 WL 768656 (W.D.N.Y. Feb. 29, 2016) ......................40

*FTC v. Bronson Partners, LLC*,
654 F.3d 359 (2d Cir. 2011) .................................................................................42

*Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) ...............................................................................................28

*Hutto v. Finney*,
437 U.S. 678 (1978) ...............................................................................................33, 34

*In re Dolen*,
265 B.R. 471 (Bankr. M.D. Fla. 2001) ..............................................................27

*In re Fredeman Litig.*,
843 F.2d 821 (5th Cir. 1988) ...............................................................................29

iii

*Kaley v. United States*,
571 U.S. 320 (2014) ................................................................................ 36-37

*Kirby v. Illinois*,
406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) .................................. 38-39

*Liu v. Sec. & Exch. Comm'n*,
140 S. Ct. 1936, 207 L. Ed. 2d 401 (2020) ................................................ passim

*Luis v. United States*,
578 U.S. 5, 136 S. Ct. 1083, 194 L. Ed. 2d 256 (2016) .............................. 29, 37

*Mullaney v. Wilbur*,
421 U.S. 684 (1975) ................................................................................ 34-35

*Powell v. Alabama*,
287 U.S. 45 (1932) ......................................................................................... 36

*Root v. Railway Co.*,
105 U.S. 189, 26 L.Ed. 975 (1882) .................................................................. 28

*Rothgery v. Gillespie County*,
554 U.S. 191, 128 S.Ct. 2578, 171 L.Ed.2d 366 (2008) ............................... 38-39

*S.E.C. v. Amerindo Inv. Advisors Inc.*,
No. 05 CIV. 5231 RJS, 2014 WL 2112032 (S.D.N.Y. May 6, 2014), aff'd sub
nom. *S.E.C. v. Amerindo Inv. Advisors*, 639 F. App'x 752 (2d Cir. 2016)......... 55

*S.E.C. v. Bremont*,
954 F. Supp. 726 (S.D.N.Y. 1997) .................................................................. 29

*SEC v. Cavanagh*,
445 F.3d 105 (2d Cir. 2006) ........................................................................... 41

*S.E.C. v. Credit Bancorp, Ltd.*,
738 F. Supp. 2d 376 (S.D.N.Y. 2010) ......................................................... 57-58

*SEC v. Duclaud Gonzalez de Castilla*,
170 F.Supp.2d 427 (S.D.N.Y. 2001) ................................................................. 32

iv

*S.E.C. v. FTC Cap. Markets, Inc.*,
   No. 09 CIV. 4755 (PGG), 2010 WL 2652405 (S.D.N.Y. June 30, 2010) ... 30-31

*S.E.C. v. GTF Enterprises, Inc.*,
   No. 10-CV-4258 RA, 2015 WL 728159 (S.D.N.Y. Feb. 19, 2015)............. 54-55

*S.E.C. v. Loomis*,
   17 F. Supp. 3d 1026 (E.D. Cal. 2014).................................................................58

*S.E.C. v. McGinn*,
   No. 10-CV-457 GLS/DRH, 2012 WL 1142516 (N.D.N.Y. Apr. 4, 2012) ........40

*S.E.C. v. Pentagon Cap. Mgmt. PLC*,
   725 F.3d 279 (2d Cir. 2013) ...................................................................... 54-56

*SEC v. Razmilovic*,
   738 F.3d 14 (2d Cir. 2013) ...................................................................................41

*S.E.C. v. Stein*,
   No. 07 CIV. 3125GEL, 2009 WL 1181061 (S.D.N.Y. Apr. 30, 2009) .............32

*S.E.C. v. Wyly*,
   56 F. Supp. 3d 394 (S.D.N.Y. 2014) .................................................................57

*Sec. & Exch. Comm'n v. Aly*,
   No. 16 CIV. 3853 (PGG), 2018 WL 4853031 (S.D.N.Y. Oct. 5, 2018) ......55, 58

*Sec. & Exch. Comm'n v. Fowler*,
   440 F. Supp. 3d 284 (S.D.N.Y. 2020), aff'd as modified, 6 F.4th 255 (2d Cir.
   2021), cert. denied, 142 S. Ct. 590, 211 L. Ed. 2d 367 (2021)..................... 41-42

*Sec. & Exch. Comm'n v. Liu*,
   No. SACV1600974CJCAGRX, 2021 WL 2374248 (C.D. Cal. June 7, 2021), aff'd
   sub nom. *U.S. Sec. & Exch. Comm'n v. Liu*, No. 21-56090, 2022 WL 3645063
   (9th Cir. Aug. 24, 2022), cert. denied sub nom. *Liu v. SEC*, No. 22-751, 2023 WL
   3571511 (U.S. May 22, 2023) .................................................................... 47-48

*Sec. & Exch. Comm'n v. Santillo*,
   No. 18-CV-5491 (JGK), 2018 WL 3392881 (S.D.N.Y. July 11, 2018) ......32, 41

v

*Tilghman v. Proctor*,
125 U.S. 136, 8 S.Ct. 894, 31 L.Ed. 664 (1888)...........................................28, 46

*United States v. Gonzalez-Lopez*,
548 U.S. 140 (2006).................................................................................36

*United States v. Gouveia*,
467 U.S. 180, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)......................................39

*United States v. Pinto-Thomaz*,
357 F. Supp. 3d 324 (S.D.N.Y. 2019) ........................................................ 38-39

*Wheat v. United States*,
486 U.S. 153 (1988).................................................................................36

**Statutes and Rules**

15 U.S.C. § 77t................................................................................ 53-55, 57

15 U.S.C. § 78u.........................................................................28, 46-47, 53-55

28 U.S.C. § 636.........................................................................................1

Fed. R. App. P. 4(a) ....................................................................................1

Fed. R. Civ. P. 73 ......................................................................................1

## JURISDICTIONAL STATEMENT

Appellee United States Securities and Exchange Commission filed suit against Appellant Mykalai Kontilai and Collector's Coffee, Inc. in the United States District Court for the Southern District of New York. On July 1, 2019, the parties consented under 28 U.S.C. § 636(c) for Magistrate Judge Gabriel W. Gorenstein to rule on the SEC's motion for an asset freeze and preliminary injunction. J.A.3204. Accordingly, this Court has jurisdiction to review Judge Gorenstein's ruling pursuant to Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c)(3), which permits a party to "appeal directly to the appropriate United States court of appeals from the judgment of the magistrate judge in the same manner as an appeal from any other judgment of a district court."

On October 4, 2023, Judge Gorenstein issued an Opinion and Order granting the SEC's motion. J.A.3146. Mr. Kontilai timely filed his notice of appeal on October 20, 2023, within 30 days of Judge Gorenstein's order. J.A.3206; Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

1. Did the district court err in failing to exclude untainted and after-acquired assets from the asset freeze, even though the general rule of equity is that a court may not freeze a defendant's assets unrelated to the underlying

litigation, which would include assets unconnected to the wrongdoer's net unlawful profits and assets acquired after the conduct at issue occurred?

2. Did the district court err in failing to include carveouts for living expenses and criminal defense fees in the asset freeze, even though an asset freeze must account for sufficient funds to afford basic necessities to meet the constitutional requirements of due process and must account for criminal defense costs to meet the requirements of the Sixth Amendment right to counsel?

3. Did the district court err in entering an asset freeze in the total amount of $46 million, where the SEC has only alleged that Mr. Kontilai personally received $7.27 million, no party has ever alleged or produced evidence to indicate that Mr. Kontilai personally profited from any investor funds above the $7.27 million, and the district court failed to account for any legitimate business expenses despite both defense and SEC witnesses confirming that such expenses were made?

## **STATEMENT OF THE CASE**

Defendant/Appellant Mykalai Kontilai ("Mr. Kontilai") developed and sought intellectual property protection for a novel collectibles insurance product to be used in conjunction with an online auction house offering collectibles for sale. Through Mr. Kontilai's efforts, some of the largest insurance companies in the world were

2

convinced to offer authenticity insurance for collectibles sold on the platform he envisioned.

The website for buying and selling insured collectibles was the foundation for a multi-media platform surrounding this innovative approach to the market. Mr. Kontilai devoted years of his life to building this platform for Collector's Coffee, Inc. ("CCI"). During this period, he developed a television series to support the marketing of the venture and filmed 17 episodes of the series with well-known personalities like Larry King. Mr. Kontilai also conceptualized and oversaw the creation of an integrated social network to be integrated with the online auction house. Marketing was driven by hundreds of digital media pieces.

Yet, the United States Securities and Exchange Commission (the "SEC") filed suit against Mr. Kontilai in May 2019 alleging that Mr. Kontilai, from his perch atop a budding collectibles empire which raised over $30 million in investor funds, would sacrifice everything for $7.27 million dollars.

Immediately after filing its case, the SEC sought a temporary restraining order *ex parte* to freeze up to $46 million of Mr. Kontilai's assets—an onerous burden for any individual and an extreme request where the SEC has only ever alleged that Mr. Kontilai obtained $7.27 million. This overreach soared to unconstitutional heights as the order made no provisions for Mr. Kontilai's living expenses or criminal defense and purported to unlawfully freeze both after-acquired and untainted funds.

3

The SEC, which had Mr. Kontilai's banking and business records, has always been well aware that Mr. Kontilai has never in his life had $46,121,649.68 in individual assets, or anything close to that.

After preliminary injunction proceedings, the district court granted the SEC's request for a preliminary injunction in its entirety and has imposed a new freeze with the same terms of as the temporary restraining order. This new freeze *also* fails to properly exclude untainted assets and after-acquired assets and fails to include necessary and crucial carveouts for living expenses and Mr. Kontilai's criminal defense costs.

The asset freeze is impermissibly broad and unconstitutional as entered and must be amended to account for Mr. Kontilai's due process and Sixth Amendment constitutional rights, to exclude assets that cannot be permissibly frozen in these circumstances, and to appropriately limit the amount when all factors are considered, including Mr. Kontilai's personal liability and proper reductions for legitimate business expenses. Accordingly, this Court should reverse the decision of the district court and remand for further proceedings.

## SUMMARY OF THE ARGUMENT

On May 14, 2019, the SEC filed suit against Mr. Kontilai and CCI. J.A.0013. That same day, the SEC filed an *ex parte* Motion for Temporary Restraining Order seeking an asset freeze. J.A.0014. On May 16, 2019, the district court granted the

4

SEC's *ex parte* request, entering a temporary restraining order that froze Mr. Kontilai's and CCI's assets "up to the amount of **$46,121,649.68**." J.A.0185-0187.

After remaining in effect for over four years, the district court held a preliminary injunction proceeding to rule on the SEC's motion for a preliminary injunction and continuing asset freeze. J.A.3146. On October 4, 2023, the district court granted the SEC's motion in its entirety, granting a preliminary injunction and freeze in the entire amount requested, the same amount that had been frozen pursuant to the temporary restraining order. J.A.3203.

The preliminary injunction and freeze are erroneous for several reasons. *First*, the district court failed to exclude untainted assets and after-acquired assets from the scope of the freeze. As to after-acquired assets, the district court incorrectly concluded that there was "no need to make a ruling on the question of new earnings" or other after-acquired assets, instead determining that the question could be revisited "[i]f circumstances change." J.A.3197. This ruling is erroneous as there is no legitimate justification for after-acquired assets to be included within a freeze and all after-acquired assets should be excluded from the scope thereof without requiring Mr. Kontilai to file subsequent motions. As to untainted assets, the district court erroneously concluded that it has the authority to freeze assets that are not tainted with any wrongdoing and incorrectly held that "the asset freeze appropriately

encompasses purportedly untainted assets such as those identified by Kontilai." J.A.3195. Both rulings are contrary to law and should be reversed by this Court.

*Second*, the district court erroneously failed to include carveouts for living expenses and criminal counsel fees. As a result, under the current freeze, Mr. Kontilai is unable to spend a single cent on any basic necessity, including food, shelter, or healthcare, and he is unable to pay for his criminal defense, despite the existence of currently pending criminal charges coextensive with this case. As to living expenses, the district court dismissed the entire issue in a footnote, concluding that because Mr. Kontilai's circumstances had changed between the time of briefing the preliminary injunction proceeding and the court's ruling, there was no need to engage in any further consideration of a carveout for basic necessities. J.A.3198. This finding is clearly erroneous: while a change in circumstances may alter the calculation of what amount is appropriate, every individual will always have basic necessities that they require as part of daily living and forbidding individuals from spending even a single penny on food, medical care, or new clothing violates the individual's constitutional due process rights. With respect to criminal counsel fees, the district court incorrectly concluded that there was "no current need" for such a carveout, a legally incorrect conclusion given Mr. Kontilai's current status as a detainee in Germany engaged in extradition proceedings relating to the criminal charges brought in the United States.

6

*Third*, the amount of the freeze is impermissibly overbroad as it holds Mr. Kontilai jointly and severally liable with CCI for both disgorgement and civil penalties and fails to account for legitimate business expenses that both defense and SEC witnesses testified to at the preliminary injunction proceeding. The district court disposed of the issue of legitimate business expenses in another footnote that stated "Kontilai has not offered any competent testimony as to what expenses are actually legitimate," but both defense and SEC witnesses—including witnesses that the district court found credible—testified that such expenses were made. J.A.3193. While the *amount* of legitimate business expenses may be disputed between the parties, there is *no* legitimate contention that no legitimate business expenses were ever made, and it is clearly erroneous for the district court to fail to account for any legitimate expenses at all. As to joint and several liability, the SEC has only ever contended that Mr. Kontilai personally obtained $7.27 million of the total $23 million raised and there is no legitimate basis for the district court or the SEC to contend that Mr. Kontilai ever benefited from the remainder of the raised funds in any manner sufficient to justify joint and several liability.

Accordingly, this Court should reverse the decision of the district court and remand for the district court to (1) properly exclude untainted and after-acquired assets from the freeze, (2) properly include carveouts for living expenses and criminal defense counsel fees, (3) properly account for legitimate business expenses,

7

and (4) properly limit the freeze against Mr. Kontilai to account for the amounts that the SEC alleges Mr. Kontilai personally benefited from and was enriched by.

## FACTS

### I.     The Development of Collector's Coffee, Inc.

Mr. Kontilai incorporated CCI in California on August 13, 2007, J.A.0270, and an identically named CCI in Nevada on November 1, 2007, J.A.0275, and filed to merge the California corporation into the Nevada corporation on February 21, 2008. J.A.0278. From the beginning, Mr. Kontilai was the founder, president, and chief executive officer of CCI. In addition to start-up funds Mr. Kontilai personally provided, Mr. Kontilai continued to loan additional funds to CCI to pay for corporate expenses until the first "infusion of third-party investment capital" in September 2009. J.A.1705. Altogether, Mr. Kontilai provided $**1,696,644.19** in primary source funding from the inception of the company to September 2009. J.A.1705. The loan, adjusted to include a standard rate of interest, totaled **$3,273,347.23** as of April 28, 2021. J.A.1694.

Thus, in the early years of CCI's development, before the first Confidential Private Placement Offering Memorandum was prepared on April 28, 2008, J.A.0464, and the first infusion of capital from that first PPM was received around September 2009, J.A.1705, the capital funding for CCI's operations came from Mr. Kontilai. From the beginning, CCI had corporate expenses such as expenses for the

8

leasing of space, attorneys' fees, and other consultants. J.A.2354. For example, CCI hired a consultant "to run a test kitchen," which involved the development of "products that might go into Collector's Café." J.A.2354-55.

## II. Envisioning CCI's Website, Producing CCI's Television Show, and Patenting a Novel, Game-Changing Authenticity Insurance Program.

The investors were aware that CCI was building out its operations at the time of their investment. As Mr. Jensen, one of the investors, testified, "Mr. Mykalai was very clear on all the big things that were happening," which included the development of the web platform for its products and creating content such as the television show. J.A.2385.

The concept for "Collector's Café" was similar to shows like "Antique Road Show, which was very popular on public television at the time." J.A.2333. The pilot episode was a full hour long and involved multiple collectors selling various collectibles, including, but not limited to, "a guitar that was owned by a famous rocker, … a flag from the Eds Sullivan Show that was – that was signed by the Beatles … [and] a sword that Mr. Kontilai had." J.A.2334.

In 2007, CCI marketed the pilot episode to American Public Television ("APT"). J.A.1425. APT wrote to Mr. Farrell on October 3, 2007 expressing its interest "in offering the series to public television stations nationwide," noting that "[w]e feel the concept has broad, national appeal and will be well-received by public

television station programmers and viewers alike." J.A.1425. APT's Christopher Funkhouser described the show's concept as:

> ***Collector's Café*** puts a contemporary, pop-culture spin on the appraisal of collectibles, and takes viewers behind the scenes to learn the fascinating stories behind each item. … At the ***Collector's Café***, you won't find a random antique that someone uncovers in his attic and is surprised that it's worth thousands. What you *will* find, are *true collectors* – people who have a genuine interest in the memorabilia they present, and often, a fascinating personal story to go along with it. Host Marianne Goen says it best: "Everything has a story behind it."

J.A.1425 (emphasis in original).

As the concept of the television developed, CCI hired Larry King to be the host of the show and the "face" of the company. J.A.2372-73. The exclusive agreement was for Larry King and his wife Shawn King to become global ambassadors and daily TV hosts of the Collectors Café TV Series. Mr. Jensen, one of the investors, met Larry King and Mr. Kontilai at a studio in Los Angeles where CCI was working. J.A.2373. When he toured the studio, Mr. Jensen could tell that CCI was producing both a sizzler reel and the television show in that space. J.A.2373-74. Mr. Jensen was so impressed by what he had seen that "[a]fter this trip, [he] made [his] second investment of $300,000 in CCI." J.A.1652.

As he toured the facility, Mr. Jensen "knew there would be a cost to" developing the studio space and producing the television show" and knew that CCI was spending money on those expenses. J.A.2374. Mr. Jensen had a role in the television show himself: he was a "front man" for "collector technology." J.A.2382.

10

As the front man, or the "collectors coach," Mr. Jensen was involved in the filming of multiple episodes. J.A.2382. As part of the show, Mr. Jensen had the opportunity to interview Bass Rutten, a champion ultimate fighter, a second fighter whose name he could not recall, and a historian of the Los Angeles Dodgers. J.A.2382-83.

Mr. Kontilai was in discussions with HBO and another company from Las Vegas to market the television show. J.A.2427.

There were many expenses involved with filming multiple episodes of the television show, including payments to Aura TV, which filmed the show and provided crew such as the producer and cameramen, payments to the "B or C list folks" that came to be interviewed, and back-end production expenses. J.A.2383-84. CCI spent over **$6 million** in business-related production, media, and marketing expenses, which included substantial amounts paid to companies hired to produce and distribute the television series. J.A.1702. For example, Mr. Kontilai paid Larry King and his wife **$368,796.87** for Mr. King's work as a CCI brand ambassador. J.A.1702.

Mr. Kontilai and CCI also developed a website for the business, which was demonstrated to numerous investors, including Mr. Jensen, during a video call in March 2015. J.A.2376-77. Mr. Jensen, who is a "software person by trade," J.A.2371, testified that the website "looked very good." J.A.2377. It was designed "like a blogger network [that] was to bring people that were collectors together and

11

they could be in kind of a chat group." J.A.2377-78. The website had a graphical user interface with "a lot going on" and logos at the bottom of the screen that "really impressed" Mr. Jensen. J.A.2378. The graphical user interface was "as good" as the GUIs used by eBay or Amazon. J.A.2379. CCI incurred business expenses in connection with the development of the website; all investors were notified in the PPMs that CCI was developing a unique and proprietary Blogger network and had incurred expenses such as hiring Cori Dyer, of Broadcast Blogger Company, as a full-time employee to oversee and manage this entire project. Mr. Kontilai and CCI also hired consultants to assist in the development of the website, including hiring Mr. Cutsey's company, FDM4, to provide website design services in December 2016. J.A.1634. Mr. Coleman, another investor, acknowledged that he was aware that the development costs of the website, including the salaries of consultants and contractors, would be paid with investor funds, and that it had been "declared when [he] signed up." J.A.2266-67. CCI spent at least **$309,887.69** to pay for various software and web development expenses, in connection with the development of CCI's website. J.A.1702.

The investors were informed, through the PPMs, that Mr. Kontilai and CCI were executing an invention that Mr. Kontilai had created. The authenticity insurance program was a novel program designed to address a key problem with the online sale and purchase of collectibles: that "the purchaser is often forced to rely

12

on either the seller's word that the collectible is authentic or a dubious certificate of authenticity." J.A.1260. While other people had attempted to solve this problem, each of the prior programs had "fail[ed] to offer systems and methods for providing a central hub that facilitates the authentication of all collectibles by independent experts in the relevant field, the administration of an insurance policy backing the authenticated collectibles, and the registration of collectibles and insurance policies associated with the collectibles, among other things." J.A.1265.

The program developed by Mr. Kontilai aimed to fill this void and "provid[e] an authenticity guarantee for a collectible offered to potential buyers through a global online marketplace by providing buyers with authentication by a collectible expert dealer and insuring the authenticity of the collectible through an insurance policy underwritten by an established insurance provider." J.A.1266. Mr. Kontilai fully conceptualized and constructed the novel new authenticity insurance program, developing systems and methods for facilitating the program and outlining his invention in a comprehensive patent application titled "Online Auctions with Collectible Authenticity Insurance Systems and Methods." J.A.1259.

Peter Siegel, an expert in the collectibles field, even described the concept as a "game-changer" in the business: "when I first met Mykalai he – the most important thing that got me totally hooked was the authenticity insurance. That, basically, is a game-changer and it's – it's not – never been done in my business. And I started –

13

well, that's, you know, I – I said, if you can pull that off, I – I'm definitely with you. I mean, that's fantastic." J.A.2942. In fact, Mr. Siegel testified that the authenticity program would provide additional value to the collectibles sold by CCI:

> A: This -- the business that I'm in has a lot of -- I wouldn't say a lot, but they have, you know, some bad people. Some things that aren't right. Certain things that will come with a certificate of authenticity that doesn't mean it's real. It just comes with a certificate of authenticity. The fact of having authenticity insurance through major insurance companies, which I was told, you know, is amazing, I mean, that to me would make items worth more money, you know, being that it's backed by insurance companies. People like to hear those big names, you know, 'cause anybody could write a certificate of authenticity and that's what most dealers do, but that doesn't mean it's real.

J.A.2943. This novel program, and the business relationships Mr. Kontilai built while developing and implementing the program, were attractive to investors: Mr. Jensen said that Mr. Kontilai had built impressive business relationships with key players in the industry, including Lloyd's of London and AIG. J.A.2380. Mr. Jensen found those "major relationships" to be even "more impressive to me than the GUI." J.A.2380.

CCI incurred expenses developing this cutting-edge program, including expenses to the insurance companies that partnered with CCI; for example, CCI paid Chubb Insurance **$22,173.24** in connection with the program. J.A.1701.

The investors were also aware that CCI incurred other standard business expenses such as expenses connected to renting office spaces. Mr. Jensen, for example, knew that CCI leased office space in Edmonton, Canada. J.A.2385. He

14

also visited a space in Los Angeles where Mr. Kontilai was working with two programmers. J.A.2385.

CCI also incurred expenses in connection with hosted events and employee salaries. In September 2015, Mr. Jensen attended an event hosted by CCI in New York where he met CCI employees. J.A.2374. Mr. Jensen acknowledged that he "knew that CCI also had some employees and consultants that were working with it to build the company," including the employees that he personally met. J.A.2374-75. Those employees and consultants "would have been offered compensation" by CCI for their services. J.A.2375. Mr. Chapman, who worked as "a consultant for CCI" as part of CCI's "investor relations" admitted that he received "some" checks from the company as payment for his services. J.A.1654, J.A.2434. Mr. Coleman, an executive himself, understood that the company would have employees and consultants that it would need to pay and that the employees would be paid with investor funds. J.A.2265-66.

CCI hosted other events, including several events to show the Jackie Robinson contracts. J.A.2375. In addition to the September 2015 event in New York, CCI hosted events to show the Jackie Robinson contracts in Montreal and in Times Square. J.A.2375. The events were attended by other CCI investors in addition to Mr. Jensen. J.A.2375-76.

15

III.    **Negotiating Deals with Master Dealers for Collectibles Inventory**.

After hearing Mr. Kontilai's vision for CCI, Peter Siegel offered his services as an experienced collectibles dealer to Mr. Kontilai: "You know, he had some visions that were amazing. And I, basically, said to him, look, if you can actually come through with these visions I will definitely be interested in being with you." J.A.2939-40. The concept was for CCI to contract with expert "master dealers" to provide base inventory to sell on CCI's website, which was a unique concept developed by Mr. Kontilai and Mr. Siegel specifically for CCI:

> A: Mykalai and I had come up with some ideas for the dealers, different levels for different -- what do would you call it? For different amounts of inventory for different commitments to the -- to the company. So, a master dealer is an expert in their field whether you sell coins or whether you sell Tiffany lamps, those are so-called master dealers. Those are the dealers that were the ones that -- that obtained that name through that -- he gave -- that's something that Mykalai came up with, the master dealer.

J.A.2940-41. Mr. Siegel then negotiated with numerous potential master dealers on behalf of CCI as "the director of dealer relations," who worked "for Collectors Café to get the dealers" to provide inventory for CCI's website. J.A.2950. As of his deposition on August 30, 2018, Mr. Siegel confirmed that he had verbal commitments from "hundreds" of master dealers who signed short term agreements and were just awaiting the release of CCI's television show to execute longer term master dealer agreements:

16

> A: Verbal commitments I have hundreds. Dealers that we signed up were, basically, for a four-month period. Those were -- those are my experts in my field and everybody signed those contracts except for one person who just had so much work on his plate and didn't get involved, but those were signed. And, you know, basically, everything that I explained to them as far as what's going on, what the future is, et cetera, et cetera, with the company, everybody was ecstatic. So, those are the -- the contracts that we had signed at first. And everybody's been waiting for this television show.

J.A.2941. Mr. Siegel noted that the master dealers were so interested in working with CCI that he had conversations with interested parties consistently through to the date of the deposition. J.A.2941 ("And, you know, it's -- even 'til today, I mean, I get – people say -- I was at a convention last month and it was like, what's going on with Collectors Cafe? What's going on with Collectors Cafe, you know, so.").

Mr. Siegel agreed to operate as a master dealer through CCI, with every piece of GottaHaveIt's inventory mirrored for sale through CCI: "Basically, all my inventory is mirrored once the site's up, which is my pleasure. If it sells it's like, you know, that's incredible, you know. So, all my items that I get that I sell would go up on Collectors Cafe, the new items, and anything that I sell come down, et cetera." J.A.2946. In other words, GottaHaveIt's "entire inventory on [its] website is on Collectors Café's website at the same time." J.A.2948.

Mr. Siegel successfully negotiated with a first set of approximately 15 to 20 master dealers in 2011, who were all well established in the industry and would have provided millions of dollars of inventory upon launch:

> A: All right. So, the dealers that I chose, this 15 to 20 dealers that were first signed up I guess in '11, are probably at least 20 to 30 years in the business, individually have their own businesses and have a tremendous amount of inventory. So, as soon as we launch with those dealers, if we did, we would have had, you know, millions of dollars of inventory just to start because it was their own personal inventory. They had it.

J.A.2951. Mr. Siegel confirmed that CCI had the potential to enter into over 200 exclusive agreements with master dealers to provide about $1 billion of inventory for CCI's website. As the master dealers were just "waiting for [CCI's] television show" before executing the agreements, Mr. Siegel noted that the agreements would have been "easily" obtained following the launch of the show:

> I was aware that we could have easily 200 exclusive contracts when we launched, but roughly $1 billion, yes. We would have had it if we launched the TV show, again, with the website, et cetera, et cetera.

J.A.2955.

Mr. Coleman acknowledged that there was, at a minimum, "a handful of dealers" who had "signed short term agreements" with CCI. J.A.1646. He "believed it to be true" that there were "dealers that CCI had signed up to sell on its anticipated website." J.A.2280.

## IV. **Purchasing the Jackie Robinson Contracts.**

While CCI's business was expanding with hundreds of potential master dealers ready to provide up to a billion dollars of inventory once the television show and the website were launched, Mr. Kontilai and CCI also sought to purchase collectibles inventory owned by CCI itself. In 2013, Mr. Kontilai "facilitated CCI's

18

purchase of the Jackie Robinson contract[s]" for this purpose, working with a collectibles dealer for the source and acquisition of the contracts. J.A.1706. To acquire the contracts, CCI issued promissory notes to three investors with a total principal amount of $6,000,000. J.A.1706-07. Two-thirds of the total principal, or $4,000,000, was "intended to provide short-term liquidity to CCI," and Mr. Vranca determined that the bank transactions appropriately reflected that the majority of those funds were deposited into CCI accounts between September 2013 and August 2014. J.A.1707. The remaining $2,000,000 of the principal amount was used to purchase the Jackie Robinson contracts. J.A.1707. In total, CCI spent **$3,168,367.81** to source, purchase, and store collectibles, which included, but was not limited to, the Jackie Robinson contracts. J.A.1701.

In November 2013, CCI obtained an appraisal of the value of the Jackie Robinson contracts from Christie's which estimated the value to be $25,000,000. J.A.1707. A little more than a year later, in January 2014, CCI obtained a second appraisal from Seth Kaller, who estimated the value to be $36,000,000. J.A.1707. Both valuations were disclosed to potential investors.

## V.   <u>Raising Additional Capital through the Sale of Securities</u>.

Although Mr. Kontilai originally provided most of the initial capital for CCI, CCI ultimately began to raise capital from third-party investors as it developed its

operations. In total, CCI raised **$30,794,514.24** in investor contributions. J.A.1689.[1]

CCI also received funds from other sources, such as third-party payments, cash deposits, and check or wire deposits. J.A.1690.

It was standard practice at CCI "to send a PPM and its amendments to individuals interested in investing" for review before investment. J.A.1655. If the individual decided to invest, the individual "would sign and return the PPM and amendments." J.A.1655.

At the outset, the PPMs established that the purpose of raising investor funds was to fund the company through the initial stages of expansion and for ***all general purposes*** associated with such expansion:

> THESE SECURITIES ARE BEING OFFERED BY COLLECTOR'S COFFEE, INC. (SOMETIMES REFERRED TO HEREAFTER AS THE "COMPANY") FOR THE GENERAL PURPOSE OF RETIRING EXISTING COMPANY DEBT AND FUNDING INITIAL INFRASTRUCTURE, OPERATING CAPITAL AND PHASE 1 EXPANSION OF THE COMPANY AND ITS WHOLLY OWNED SUBSIDIARY COMPANIES.

J.A.0392; J.A.0464.

The PPMs set explicit suitability standards for the sophistication and risk tolerance of any potential investors:

> THE SHARES OFFERED HEREBY INVOLVE A HIGH DEGREE OF RISK TO THE INVESTORS AND SHOULD BE PURCHASED

---

[1] The SEC's allegations in this case relate to only a portion of the total contributions raised.

20

> ONLY BY PERSONS WHO CAN AFFORD TO LOSE THEIR
> ENTIRE INVESTMENT.
>
> …
>
> IT IS INTENDED THAT THE RECIPIENT HAVE SUFFICIENT
> SOPHISTICATION TO BE THOROUGHLY FAMILIAR WITH
> HIGH RISK INVESTMENTS.

J.A.0393-94; J.A.0465-66. In addition, the PPM specifically limited the

authorization for anyone—*even Mr. Kontilai*—to provide any representations

outside those explicitly written:

> NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY
> INFORMATION OR MAKE ANY REPRESENTATIONS
> CONCERNING THIS INVESTMENT OTHER THAN THE
> INFORMATION AND REPRESENTATIONS CONTAINED IN
> THIS CONFIDENTIAL MEMORANDUM.

J.A.0393; J.A.0465. Crucially, the PPMs made explicitly clear to potential investors

that it was *not warranting to the accuracy or completeness of any representation*

*made by any person that was not a part of the PPM itself*. J.A.0393; J.A.0465.

## VI. An Uncontested Accounting of CCI's Use of Investor Funds for Legitimate Business Expenses.

Stefano Vranca, a Certified Fraud Examiner who holds a B.A.Sc. in

Economics, performed a financial and accounting analysis of CCI's records in this

case, and submitted an expert report presenting his findings. J.A.1686. Mr. Vranca

has considerable experience in forensic accounting reviews and fraud investigations

and has conducted such investigations in other cases involving investor and

shareholder disputes. J.A.1686.

In coming to his conclusions, Mr. Vranca examined "all available bank and credit card transactions data" for CCI as well as "transactions to/from accounts held by CCI as well as individuals who were allegedly affiliated with CCI," including Mr. Kontilai, his wife, Veronica Kontilai, and Gail Holt. J.A.1686.

Mr. Vranca's report is uncontested. Mr. Vranca is the *only* expert witness designated by any party in this case that has provided an expert accounting of any of the financial accounts at issue in this case.

Mr. Vranca ultimately concluded that, between April 11, 2006 and May 17, 2019 (the "Time Period"), CCI obtained a total of **$30,794,514.24** of investor contributions. J.A.1689. Of those funds, the vast majority were deposited into accounts held by CCI: **$30,308,402.30** was deposited into CCI accounts, **$418,611.94** was deposited into accounts held by Mr. Kontilai, and **$67,500** was deposited into an account held by Gail Holt. J.A.1689. There were other sources of funds that were deposited in CCI's accounts as well, including payments from third parties, cash deposits, check and wire deposits, and transfers between the accounts. J.A.1690. Mr. Vranca determined that the total amount of investor contributions made between 2014 and 2018, the time at issue in this case, totaled **$23,183,438.30**. J.A.1698. Amounts paid for expenses totaled **$27,005,248.06**. J.A.1691. Of that amount, a total of **$25,463,555.47** was determined by Mr. Vranca to be business-related expenses. J.A.1691. The business-related expenses were paid in part from

22

accounts held by Mr. Kontilai (totaling approximately **$3 million**) and accounts held by CCI (totaling **$22,983,659.09**). J.A.1691.

###### A.   <u>Mr. Kontilai's Finances During the Time Period.</u>

During the Time Period, Mr. Kontilai was compensated for his work as founder, president, and chief executive officer in the amount of **$4,008,909.03**. J.A.1693. The amounts deposited to Mr. Kontilai's accounts from CCI and/or withdrawn in cash by Mr. Kontilai during the Time Period were found to be as follows:

| | |
|---|---|
| Deposits from CCI Accounts into Kontilai Accounts: | **$10,899,557.73** |
| Cash Withdrawn from CCI Accounts by Kontilai: | **$1,746,000.00** |
| Total Funds from CCI to Kontilai: | **$12,645,557.73** |

J.A.1694. Mr. Kontilai subsequently used a considerable portion of these funds on CCI's behalf, totaling the following amounts:

| | |
|---|---|
| Business-Related Expenses Paid by Kontilai: | **$3,000,000.00** |
| Transfers from Kontilai to CCI: | **$2,363,301.47** |
| Outstanding Balance of 2007 Loan: | **$3,273,347.23** |
| Total Funds used by Kontilai for CCI's Benefit: | **$8,636,648.70** |

J.A.1694. The remaining difference—**$4,008,909.03**—accounts for Mr. Kontilai's compensation during this time. While Mr. Kontilai was not compensated during this time at a steady annual rate, the sporadic distributions paid to Mr. Kontilai (when

dividing the total amount paid over the 13 years represented in the Time Period) would total approximately $308,377.62 per year. As Mr. Vranca noted, Mr. Kontilai's compensation was not a regularly "salary" but instead operated as "sporadic distributions," which included "reimbursements for moneys loaned by Mr. Kontilai to CCI and expenses." J.A.1707-08.

### B. Gail Holt's Finances During the Time Period.

During the Time Period, Ms. Holt received transfers from CCI into her personal accounts, which accounted for more than two-thirds of all deposits into her accounts during this time. Ms. Holt then subsequently withdrew a considerable portion of the total funds in her personal accounts in cash, totaling approximately 80% of the total funds present:

Deposits from CCI Accounts to Holt Accounts: **$5,339,293**

J.A.2112.

Cash Withdrawals from Holt Accounts: **$5,735,640**

J.A.2113. Unlike Mr. Kontilai, Ms. Holt never transferred any funds from her accounts back to any CCI-held account. J.A.2113.

*No one* has been able to trace what Ms. Holt subsequently did with those funds—no shred of evidence exists to suggest that Ms. Holt ever subsequently gave those funds to any other person, much less Mr. Kontilai in particular. Ms. Holt herself was unable to recall any withdrawal with specificity, stating that she made

24

"so many withdrawals" she couldn't "remember specifically any." J.A.3110-11. Ms. Holt *claimed* that she gave the withdrawn cash to Mr. Kontilai, which she claims to remember years later because "for the most part he was always there." J.A.3112.

This explanation is absurd, and Ms. Holt admitted numerous times that she never asked for or was provided any type of receipt, email, text message, or other written confirmation that any of these alleged cash transfers ever actually occurred. For example, Ms. Holt acknowledged that there is no "receipt from that or any sort of document that would verify that's what [she] did with the cash." J.A.3117. In relation to another set of transfers, Ms. Holt acknowledged again that she had no evidence of what happened to the cash that she withdrew. J.A.3119-22.

Ms. Holt has been unable to provide any evidence that she ever gave Mr. Kontilai a single cent. Ms. Holt acknowledged that no receipts, emails, text messages, or any other documentation of any kind existed to support her allegations. J.A.3063. Ms. Holt also did not ask Mr. Kontilai to provide anything to document the alleged transactions. J.A.3067.

## C. CCI's Finances During the Time Period.

Mr. Vranca reviewed the entirety of the available financial data for CCI's finances during the Time Period and concluded that CCI expended a total of **$27,005,248.06** for expenses during the 13-year period. J.A.1701. Of the total amount of expenses paid, Mr. Vranca confirmed that a *minimum* of **$25,463,555.47**

25

were business-related expenses. J.A.1701. Mr. Vranca identified these business-related expenses in several different categories, as follows:

| | |
|---|---|
| Business-Related Costs for Collectibles: | **$3,168,367.81** |
| Business-Related Costs for Insurance Coverage: | **$2,816,388.67** |
| Business-Related Costs for Legal Expenses: | **$2,494,669.19** |
| Business-Related Costs for Production, Media, and Marketing: | **$6,083,872.84** |
| Business-Related Costs for Talent, Beauty, and Cleaning Costs: | **$799,663.66** |
| Business-Related Costs for Business Development Expenses: | **$2,096,537.97** |
| Business-Related Costs for Finance, and Consulting Services: | **$1,129,974.59** |
| Business-Related Costs for Operations Expenses: | **$650,807.62** |
| Business-Related Costs for Software and Web Development: | **$309,887.69** |
| Business-Related Costs for Labor and Healthcare Costs: | **$97,132.64** |
| Business-Related Costs for Real Estate Costs: | **$2,587,429.07** |
| Business-Related Costs for Stock Purchases: | **$166,666.60** |
| Business-Related Costs for Miscellaneous Services: | **$62,361.35** |
| Business-Related Costs for Business-Related Credit Cards: | **$2,999,795.77** |

J.A.1701-03. While Mr. Vranca noted that there were miscellaneous "other charges" totaling **$375,105.35** and credit card charges that appeared to be personal totaling **$1,166,587.24**, these amounts are vastly eclipsed by the "$3.0 million of CCI's business-related expenses" paid by Mr. Kontilai. J.A.1704.

## STANDARD OF REVIEW

A district court's grant of a preliminary injunction is reviewed under the abuse of discretion standard. *See Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010) ("This Court reviews the grant of a preliminary injunction for abuse of discretion."). However, all questions of law, including questions of constitutional law, are reviewed *de novo*. *See Dale v. Barr*, 967 F.3d 133, 138 (2d Cir. 2020) ("We review questions of law, including constitutional claims, de novo."). As all issues raised in this appeal are questions of law, this Court should review all issues herein under the *de novo* standard of review.

## ANALYSIS

### I. The Current Asset Freeze Impermissibly Freezes Untainted and After-Acquired Assets.

There are two categories of funds that the current freeze currently covers: untainted funds and after-acquired assets. It is impermissible for the asset freeze to cover either type of assets.

An injunction cannot freeze assets that are not derived from illegal acts in violation of the conduct prohibited by the injunction. *See In re Dolen*, 265 B.R. 471, 484 (Bankr. M.D. Fla. 2001) ("To the extent that the [FTC] seeks to enforce the preliminary injunction to enjoin the debtor's use of her post-petition earnings, it goes beyond 'a reasonable measure to preserve the status quo pending final

27

determination' of the merits of the district court action.") (quoting *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 287-88 (1940)). The SEC is authorized to seek only "equitable relief that may be appropriate or necessary for the benefit of investors," which does not include assets untainted by or obtained after the alleged wrongdoing. 15 U.S.C. § 78u(d)(5).

The Supreme Court recently noted that while the principles of equity seek to ensure that a wrongdoer does not "make a profit out of his own wrong," *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1943, 207 L. Ed. 2d 401 (2020) (quoting *Root v. Railway Co.*, 105 U.S. 189, 207, 26 L.Ed. 975 (1882)), equity principles simultaneously establish that a "wrongdoer should not be punished by 'pay[ing] more than a fair compensation to the person wronged.'" *Liu*, 140 S. Ct. at 1943 (quoting *Tilghman v. Proctor*, 125 U.S. 136, 145–146, 8 S.Ct. 894, 31 L.Ed. 664 (1888)). The remedy, therefore, is "tethered to a wrongdoer's net unlawful profits," and does not extend beyond that strictly limited scope. *Id.* As Courts cannot use their equitable powers to ensure that a potential remedy at law is collectible, *see Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), and the SEC cannot seek an equitable remedy such as disgorgement beyond the alleged unlawful profits at issue, the injunction cannot freeze assets that are untainted by the claims alleged by the SEC in this case.

The reason that untainted assets cannot be frozen is simple: a defendant's property interest in tainted assets is imperfect, as the ownership of the tainted assets is disputed. But a defendant's property interest in untainted assets is clear—those assets belong to the defendant, free and clear:

> The relevant difference consists of the fact that the property here is untainted; i.e., it belongs to the defendant, pure and simple. In this respect it differs from a robber's loot, a drug seller's cocaine, a burglar's tools, or other property associated with the planning, implementing, or concealing of a crime. The Government may well be able to freeze, perhaps to seize, assets of the latter, "tainted" kind before trial. As a matter of property law the defendant's ownership interest is imperfect. The robber's loot belongs to the victim, not to the defendant.
>
> …
>
> The property at issue here, however, is not loot, contraband, or otherwise "tainted." It belongs to the defendant.

*Luis v. United States*, 578 U.S. 5, 12–13, 136 S. Ct. 1083, 1090, 194 L. Ed. 2d 256 (2016); *S.E.C. v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997) ("the Commission is not entitled to freeze assets unrelated to its investigation.").

Any preliminary injunction entered in this case must also exclude after-acquired assets. An injunction cannot freeze assets that came into existence after the entry of the freeze. *In re Fredeman Litig.*, 843 F.2d 821, 824 (5th Cir. 1988) ("The general federal rule of equity is that a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment."). This is because the freeze must be strictly limited to the "wrongdoer's net unlawful profits." *Liu*, 140 S. Ct. at 1943. As after-

29

acquired assets are, by definition, obtained after the alleged wrongdoing occurred, those assets are clearly separate and distinct from any alleged profits that could have resulted from the wrongdoing and it would be impossible for the SEC to "demonstrate that the frozen funds are traceable to fraud." *S.E.C. v. FTC Cap. Markets, Inc*., No. 09 CIV. 4755 (PGG), 2010 WL 2652405, at *7 (S.D.N.Y. June 30, 2010).

In sum, the asset freeze impermissibly freezes untainted assets, including, but not limited to, settlement funds connected to a wrongful death suit arising from the wrongful death of Mr. Kontilai's mother, and after-acquired assets, including, but not limited to, any income from any future job Mr. Kontilai may obtain and loans or gifts from friends and family.

Any funds originating from settlements in the wrongful death suit are clearly untainted. Mr. Kontilai has not touched any of those funds, and none of those funds have been commingled into any of Mr. Kontilai's accounts. The right to receive those funds arises from Mr. Kontilai's status as next of kin for his mother and is completely unrelated to any allegation pled by the SEC in this case. As a disgorgement order is directly "tethered to a wrongdoer's net unlawful profits" and cannot encompass assets untainted by the alleged wrongdoing, *Liu*, 140 S. Ct. at 1943, these funds would not be available to satisfy any future disgorgement order.

30

Since the purpose of a freeze is to maintain the status quo, there is no purpose to freezing assets that are not available to satisfy a potential future judgment.

There is similarly no legitimate reason to freeze after-acquired assets, which are easily distinguishable from the funds and accounts the SEC identified in its request for an asset freeze. Mr. Kontilai desires to find a job, receive gifts and/or loans from family and friends, and otherwise obtain assets so that he has a way to earn a living and pay for his basic necessities. If Mr. Kontilai were to start a job tomorrow, any money that he received as part of his salary could be easily kept separate and distinct from any frozen funds, and as such funds are not available to satisfy any disgorgement order, it would be inappropriate to include those funds within the scope of any preliminary injunction order. It is the SEC's burden to demonstrate that funds it seeks to freeze are "traceable to fraud." *FTC Cap. Markets, Inc*., 2010 WL 2652405, at *7. As assets acquired after the alleged wrongdoing are clearly not traceable to that wrongdoing, such funds cannot be frozen by an injunction.

As the district court failed to exclude untainted assets and after-acquired assets from the asset freeze, this Court should reverse the decision of the district court.

**II.    The Current Asset Freeze Impermissibly Fails to Provide for Living Expenses and the Basic <u>Necessities of Daily Living or Criminal Counsel Fees</u>.**

When the SEC seeks to freeze the assets of a defendant, "the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief." *SEC v. Duclaud Gonzalez de Castilla*, 170 F.Supp.2d 427, 429 (S.D.N.Y. 2001). "The touchstone of the inquiry is equity." *S.E.C. v. Stein*, No. 07 CIV. 3125GEL, 2009 WL 1181061, at *1 (S.D.N.Y. Apr. 30, 2009). "Although the central purpose of an asset freeze is to preserve funds to satisfy a potential disgorgement order, courts routinely carve out modest sums from asset freeze orders when necessary to meet the defendant's reasonable living expenses." *Sec. & Exch. Comm'n v. Santillo*, No. 18-CV-5491 (JGK), 2018 WL 3392881, at *3 (S.D.N.Y. July 11, 2018) (unfreezing $5,000 per month for living expenses because "Santillo and his family do not have sufficient funds outside the asset freeze to satisfy their living expenses because all of Santillo's assets are currently subject to the freeze" and "Santillo cannot be expected to live and support his family with no money at all.").

To be constitutional, an asset freeze ***must*** account for sufficient funds for an individual to pay for basic necessities such as food, shelter, and healthcare, and to provide an individual facing criminal process with sufficient funds to pay for criminal counsel. The asset freeze entered by the district court accounts for neither

32

of these, violating Mr. Kontilai's constitutional right to the necessities of daily living and constitutional right to counsel.

To ensure that the preliminary injunction order meets the basic standards of due process, Mr. Kontilai must be able to buy food, housing, clothing, healthcare, and any other necessities. Denying Mr. Kontilai, the ability to purchase the basic necessities of life would deny Mr. Kontilai even the most basic rights that are afforded to convicted criminals. At a minimum, convicted criminals are guaranteed food. *See Hutto v. Finney*, 437 U.S. 678, 683-85 (1978) (finding prison conditions including a severely limited diet of "fewer than 1,000 calories a day" to be unconstitutionally cruel and unusual punishment and stating that the Eighth Amendment requires prisoners to be treated according to "today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). Convicted criminals are guaranteed shelter, healthcare, and safety. *Byrd v. Abate*, 945 F. Supp. 581, 585 (S.D.N.Y. 1996) ("The Eighth Amendment imposes duties on prison officials to ensure that inmates receive "adequate food, clothing, shelter, and medical care, and [in addition, prison officials] must 'take reasonable measures to guarantee the safety of the inmates.' ") (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).

Without funds, Mr. Kontilai is unable to purchase any food at all—far less than the 1,000 calories-a-day diet that was found to be unconstitutionally cruel and

33

unusual punishment in *Hutto*. Without funds, Mr. Kontilai cannot obtain a safe place to sleep at night—even though this Court in *Byrd* found that convicted criminals were entitled to shelter and reasonable security measures. Without funds, Mr. Kontilai cannot obtain medical care for anything, whether he breaks his leg, catches the coronavirus, or develops a life-threatening condition. This cannot be a constitutional standard for a man convicted of *nothing* to be denied the basic necessities ensured by the constitution for convicted criminals.

By failing to exclude funds for daily necessities from their request for a preliminary injunction, the SEC seeks to shift the burden of proof to Mr. Kontilai to *prove* that he should be permitted to pay for food and shelter. But it is the SEC's burden to establish that they are entitled to a preliminary injunction and establish the appropriate scope of that injunction—not Mr. Kontilai's. It is the SEC's obligation to request a preliminary injunction that respects Mr. Kontilai's constitutional rights and ensures that Mr. Kontilai has access to funds to pay for the basic necessities for daily living. The SEC is not permitted to purposefully request and obtain an inappropriately overbroad injunction and require Mr. Kontilai to ask for exceptions to regain enough funds to pay for food and shelter. This Court should require the SEC to ask for a constitutional, permissible order at the start—one that accounts for Mr. Kontilai's constitutional rights and basic daily needs. *See Mullaney v. Wilbur*,

34

421 U.S. 684 (1975) (the government violates due process when it shifts burdens of proof or persuasion onto the accused).

The district court declined to even consider living expenses, and as a result the total amount Mr. Kontilai is currently permitted to spend on any basic necessity is zero. Under the current terms of the asset freeze, he is not permitted to spend even a single penny to pay for healthcare, for food, for new clothing, or any other item or service he may need to survive. The district court declined to consider this issue solely based on Mr. Kontilai's change in circumstances between the initial briefing and the time the order was rendered, stating that "it appears that Kontilai's needs with regard to 'basic necessities' have drastically changed now that he is in custody." J.A.3198-3199. But Mr. Kontilai's need for funds to pay for basic necessities has not disappeared since he was arrested and detained in Germany—his needs have simply changed. Yet the district court has failed to account for *any* basic necessities at all. At a minimum, this Court should reverse the decision of the district court and remand for further proceedings to determine an appropriate amount to release from the asset freeze to account for necessary living expenses.

The district court also failed to provide any funds for Mr. Kontilai's criminal defense. Any preliminary injunction entered must also account for funds required for Mr. Kontilai's criminal defense that are over and above the matters covered by his insurance policies. The general rule of equity requires that an individual be

35

permitted funds for criminal counsel as strictly freezing every single dime available violates the individual's Sixth Amendment right to counsel. By significantly limiting Mr. Kontilai's resources, the court limits Mr. Kontilai's choice of counsel and the type of counsel that can be prepared in Mr. Kontilai's defense. Mr. Kontilai may be forced to hire less experienced counsel if that is the only counsel he is able to afford, and he may not be able to hire counsel with relevant experience. Mr. Kontilai may not be able to hire an attorney capable of handling the massive amount of documentation and discovery involved in cases such as these or an attorney who is able to prepare an effective defense. Lawyers who are retained on limited budgets also tend to have fewer resources than lawyers with full access to their clients' untainted, after-acquired funds.

Traditional Sixth Amendment jurisprudence champions the right of the individual to retain a lawyer of his or her choice. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006) (Sixth Amendment commands "that the accused be defended by the counsel he believes to be best"); *Wheat v. United States*, 486 U.S. 153, 159 (1988) (Sixth Amendment protections include "the right to select and be represented by one's preferred attorney"); *Powell v. Alabama*, 287 U.S. 45, 53 (1932) ("[A] defendant should be afforded a fair opportunity to secure counsel of his own choice."). As Chief Justice Roberts has observed, "[a]n individual facing serious criminal charges brought by the United States has little but the Constitution

and his attorney standing between him and prison. He might readily give all he owns to defend himself." *Kaley v. United States*, 571 U.S. 320, 341 (2014) (Roberts, C.J., dissenting). The Supreme Court has plainly held that "pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." *Luis*, 578 U.S. at 10. Permitting the district court to freeze Mr. Kontilai's assets without providing a carveout for criminal counsel fees will result in the deprivation of Mr. Kontilai's ability to select a criminal defense attorney of his own choosing and severely limit Mr. Kontilai's ability to prepare his criminal defense, thereby depriving Mr. Kontilai of his Sixth Amendment rights.

Mr. Kontilai does have access to limited funds for his criminal defense as part of the insurance coverage that he holds. However, the insurance funds do not cover all elements of his criminal defense, and the Sixth Amendment right to counsel ensures Mr. Kontilai access to funds to pursue the best defense that he is able to obtain. Accordingly, Mr. Kontilai requests access to funds needed to pay for any expenses related to his criminal defense that are over and above the matters paid for by his insurance policy.

As noted above, the SEC sought to shift the burden of proof to Mr. Kontilai to prove that he should be permitted to funds to pay for his criminal defense by failing to exclude funds for Mr. Kontilai's criminal defense from their overbroad request for a preliminary injunction, which the district court granted wholesale. But

as stated previously, it is the *SEC's* obligation to request a constitutional injunction that does not infringe on Mr. Kontilai's Sixth Amendment rights—it is not Mr. Kontilai's burden to chip away at an unconstitutional injunction to ensure that he has enough funds for his criminal defense.

Mr. Kontilai is currently detained in Germany and in the process of litigating extradition proceedings pursuant to the Interpol Red Notice sought by the United States in connection with the criminal charges coextensive with this case. The district court denied any carveout on the basis that Mr. Kontilai has not demonstrated any "current need" for such funds—but that is incorrect on its face. J.A.3198. the right to Sixth Amendment protection attaches "after the time that adversary judicial proceedings have been initiated." *United States v. Pinto-Thomaz*, 357 F. Supp. 3d 324, 337 (S.D.N.Y. 2019) (quoting *Kirby v. Illinois*, 406 U.S. 682, 688-89, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)). In a traditional case, this initiation may occur at the defendant's "initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." *Id.* (quoting *Rothgery v. Gillespie County*, 554 U.S. 191, 213, 128 S.Ct. 2578, 171 L.Ed.2d 366 (2008)).

In *Rothgery*, the Supreme Court noted the hallmark elements that indicate when a criminal process has "commenced":

38

We have, for purposes of the right to counsel, pegged commencement to " 'the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment,' " *United States v. Gouveia*, 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (plurality opinion)). The rule is not "mere formalism," but a recognition of the point at which "the government has committed itself to prosecute," "the adverse positions of government and defendant have solidified," and the accused "finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Kirby*, supra, at 689, 92 S.Ct. 1877.

554 U.S. at 198.

The government has clearly committed itself to prosecution here. The United States government filed formal charges against Mr. Kontilai, unsealed the indictments, and then sought an Interpol Red Notice requesting that any other nation arrest Mr. Kontilai if he were to be discovered within their borders. In essence, the United States government issued a warrant for Mr. Kontilai's arrest. Mr. Kontilai was arrested pursuant to that Red Notice—the "warrant" requested by the United States government—in Germany. Pursuant to his arrest on the Red Notice, Mr. Kontilai has made appearances in German court where he has learned of the charges against him that were raised in the Red Notice and where his liberty has been subjected to severe restriction—indefinite detention—based upon Germany's arrest of Mr. Kontilai *at the United States' request*. *See Pinto-Thomaz*, 357 F. Supp. 3d at 337. The United States has actively sought Germany's assistance with the arrest and it has actively requested his extradition pursuant to the Red Notice—there is every

39

indication that the United States has "committed itself to prosecute" and has "solidified" its position adverse to Mr. Kontilai, while Mr. Kontilai is now "immersed in the intricacies of substantive and procedural criminal law" to defend himself from the United States' charges in the extradition proceedings.

Courts have applied a three-factor test to determine if it should permit assets to be unfrozen to pay for a civil litigant's criminal defense costs:

> [W]here a defendant in a civil enforcement action seeks to lift an asset freeze to retain counsel in a parallel criminal action, a court must determine whether (1) the defendant has demonstrated a need for the relief; (2) if so, the defendant has demonstrated that the assets for which release is sought are traceable to criminal activity; and (3) the defendant has shown that the value of the assets sought to be released is reasonable.

*Fed. Trade Comm'n v. 4 Star Resolution, LLC*, No. 15-CV-112S, 2016 WL 768656, at *1 (W.D.N.Y. Feb. 29, 2016) (quoting *S.E.C. v. McGinn*, No. 10-CV-457 GLS/DRH, 2012 WL 1142516, at *3 (N.D.N.Y. Apr. 4, 2012)). All three of these elements have been met here: Mr. Kontilai has demonstrated a need for funds, as he is currently in German custody facing extradition and criminal charges in the United States co-extensive with the allegations in this case, Mr. Kontilai has demonstrated that the assets that he seeks, the settlement proceeds from the litigation arising out of his mother's death, is untainted and has never touched his hands and is not traceable to any alleged criminal activity, and the value of the settlement proceeds is imminently reasonable when compared to criminal defense expenses for cases as

40

complex as Mr. Kontilai's. "A defendant may seek to unfreeze assets to pay for attorneys' fees in any criminal action if the defendant can establish that the assets are not traceable to fraud." *Santillo*, 2018 WL 3392881, at *5.

Accordingly, the district court erred in failing to provide any carveouts to the asset freeze to account for (1) costs of basic necessities and (2) criminal counsel fees. The failure to provide any carveout at all for these expenses violates Mr. Kontilai's constitutional due process rights and right to criminal counsel. This Court should reverse the decision of the district court and remand for further proceedings.

## III.   The Current Freeze is Overbroad and Significantly Overreaches.

District courts generally have "broad equitable power to fashion appropriate remedies" if the SEC succeeds in proving any federal securities law violations at trial, which includes "ordering that culpable defendants disgorge their profits." *Sec. & Exch. Comm'n v. Fowler*, 440 F. Supp. 3d 284, 295-296 (S.D.N.Y. 2020), aff'd as modified, 6 F.4th 255 (2d Cir. 2021), cert. denied, 142 S. Ct. 590, 211 L. Ed. 2d 367 (2021) (quoting *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013)). For a disgorgement order, there must be "factfinding by a district court to determine the amount of money acquired through wrongdoing." *Fowler*, 440 F. Supp. 3d at 296 (quoting *SEC v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006)). The purpose of disgorgement is strictly limited to "forcing a defendant to give up the amount he was unjustly enriched," and is not intended to compensate victims or to punish

defendants. *Id*. For the SEC to seek disgorgement, it must first meet its burden to "show that its calculations reasonably approximate[ ] the amount of the defendants' unjust gains." *Id*. (quoting *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 368 (2d Cir. 2011)). If the SEC meets its burden, the burden then shifts to the defendant to demonstrate that the SEC's figures are inaccurate. *Id*.

Thus, the preliminary injunction granted against Mr. Kontilai in the amount of $46,121,649.68 is inappropriate and overbroad for two reasons: *first*, the SEC has only ever alleged that Mr. Kontilai personally received a small portion of the investor funds at issue. *Second*, the district court failed to account for any legitimate business expenses despite uncontroverted evidence on the record demonstrating that such expenses were made.

### A. The Asset Freeze is Impermissibly Overbroad As It Includes Disgorgement Beyond the Amount the SEC Alleges Mr. Kontilai Personally Received.

In the Amended Complaint, the SEC alleged that "Kontilai misappropriated more than $6.1 million," including "funneling approximately $1.9 million to his personal bank accounts, and withdrawing another $4.2 million in cash." J.A.0196. The SEC's request for an asset freeze in excess of $46 million, however, is based on the *total amount* of investor funds received by CCI in the relevant period—this figure ignores the fact that *even if* the SEC's allegations are true, the amount Mr. Kontilai was "unjustly enriched" cannot exceed the amount that the SEC claims he

42

personally received. In granting an asset freeze in the total amount requested, the district court, like the SEC, ignored the distinction between investor funds allegedly received by *CCI* and investor funds allegedly received by *Mr. Kontilai*. This failure to account for how much *Mr. Kontilai personally* may have been unjustly enriched renders the asset freeze impermissibly overbroad. Any disgorgement order entered against Mr. Kontilai must be strictly limited to the amount that *Mr. Kontilai* was unjustly enriched. Mr. Kontilai and CCI are, in fact, not the same person and do not have the same assets.

At the preliminary injunction stage, the SEC amended its allegations to increase the amount it alleges Mr. Kontilai personally received from the $6.1 million stated in the Amended Complaint to $7.27 million. J.A.3193. But even accepting the SEC's allegations at face value, its allegations fall far short of justifying the scope of the asset freeze granted by the district court. In its opinion, the court noted that the full amount of the asset freeze requested "was calculated by taking the total amount CCI raised from investors and adding an additional equal amount on the ground that the additional amount could be assessed against defendants as a civil penalty should the SEC prevail." J.A.3191. In other words, the $46 million figure was calculated by using the $23,060,824.84 million of total raised investor funds which the district court concluded could be subject to disgorgement from either Mr.

Kontilai or CCI under joint and several liability and doubling that amount to account for the harshest of possible civil penalties.

But joint and several liability does not apply here and nothing in *Liu* supports penalizing Mr. Kontilai personally for any alleged wrongful profits obtained by the company. In fact, in *Liu*, the Supreme Court explicitly noted that applying joint and several liability in these instances "could transform any equitable profits-focused remedy into a penalty":

> The SEC additionally has sought to impose disgorgement liability on a wrongdoer for benefits that accrue to his affiliates, sometimes through joint-and-several liability, in a manner sometimes seemingly at odds with the common-law rule requiring individual liability for wrongful profits. *See*, *e.g.*, *SEC v. Contorinis*, 743 F.3d 296, 302 (CA2 2014) (holding that a defendant could be forced to disgorge not only what he "personally enjoyed from his exploitation of inside information, but also the profits of such exploitation that he channeled to friends, family, or clients"); *SEC v. Clark*, 915 F.2d 439, 454 (CA9 1990) ("It is well settled that a tipper can be required to disgorge his tippee's profits"); *SEC v. Whittemore*, 659 F.3d 1, 10 (CADC 2011) (approving joint-and-several disgorgement liability where there is a close relationship between the defendants and collaboration in executing the wrongdoing).

*Liu*, 140 S. Ct. at 1949. The Supreme Court refrained from establishing any bright-line rule for when joint and several liability was appropriate and when it would be impermissibly punitive because it was not necessary given the facts of *Liu*. *Id*. ("the Court need not wade into all the circumstances where an equitable profits remedy might be punitive when applied to multiple individuals.").

44

But it is easy to distinguish this case from *Liu*. In *Liu*, the "petitioners were married," and both individuals were involved in the business entities that they formed together. *Id*. Crucially, "[p]etitioners did not introduce evidence to suggest that one spouse was a mere passive recipient of profits. Nor did they suggest that their finances were not commingled, or that one spouse did not enjoy the fruits of the scheme, or that other circumstances would render a joint-and-several disgorgement order unjust." *Id*. By contrast, it is unquestionable that Mr. Kontilai did not personally receive the majority of the investor funds raised. No party, including the SEC, has ever alleged or produced any evidence to indicate that Mr. Kontilai ever personally touched a dime more than the $7.27 million the SEC claimed he received during the preliminary injunction proceedings and no party, including the SEC, has ever alleged or produced any evidence to indicate that Mr. Kontilai's personal finances and CCI's business finances were commingled. Without Mr. Kontilai ever personally touching a cent of investor funds over $7.27 million, it is impossible for any party to contend that he personally "enjoy[ed] the fruits of" those funds. This situation is far from Liu, where the individuals were married with commingled finances—it would be extraordinarily unjust and incredibly punitive to impose joint and several liability for disgorgement here, where there is no evidence or even the barest allegation that Mr. Kontilai personally received or benefitted from almost $19 million of the investor funds at issue.

45

**B.     The Asset Freeze Impermissibly Fails to Account for Legitimate Business Expenses Despite Uncontroverted <u>Evidence on the Record Demonstrating Such Expenses</u>.**

In addition, the asset freeze fails to account for legitimate business expenses, which must be deducted from any disgorgement amount. As the Supreme Court has held:

> Courts may not enter disgorgement awards that exceed the gains "made upon any business or investment, when both the receipts and payments are taken into the account." *Goodyear*, 9 Wall. at 804; see also Restatement (Third) § 51, Comment *h*, at 216 (reciting the general rule that a defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement). Accordingly, courts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5). A rule to the contrary that "make[s] no allowance for the cost and expense of conducting [a] business" would be "inconsistent with the ordinary principles and practice of courts of chancery." *Tilghman*, 125 U.S. at 145–146, 8 S.Ct. 894; cf. *SEC v. Brown*, 658 F.3d 858, 861 (CA8 2011) (declining to deduct even legitimate expenses like payments to innocent third-party employees and vendors).

*Liu*, 140 S. Ct. at 1949–50. In a footnote, the district court dismissed the entire concept of legitimate business expenses, stating that "[a]lthough Kontilai argues that the asset freeze must account for deductions that will be assessed against the disgorgement amount for legitimate costs incurred by CCI and Kontilai …. Kontilai has not offered any competent testimony as to what expenses are actually legitimate." J.A.3193. The district court made no attempt at all to discount any business expenses at all from the total amount requested.

46

Where there are obvious legitimate business expenses, it is clear error to fail to discount those expenses from a total disgorgement amount. In *Liu*, the Supreme Court noted that the district court "declined to deduct expenses on the theory that they were incurred for the purposes of furthering an entirely fraudulent scheme." *Liu*, 140 S. Ct. at 1950. But even then, the Supreme Court noted that there were some expenses that were so obviously business expenses—such as "lease payments and cancer-treatment equipment"—that the Court remanded the issue to the district court to reconsider "whether including those expenses in a profits-based remedy is consistent with the equitable principles underlying § 78u(d)(5)." *Id*.

The *Liu* case also involved the sale of securities pursuant to a private offering memorandum, which resulted in "at least 50 investors" purchasing securities which totaled "over $26 million." *Sec. & Exch. Comm'n v. Liu*, No. SACV1600974CJCAGRX, 2021 WL 2374248, at *2 (C.D. Cal. June 7, 2021), aff'd sub nom. *U.S. Sec. & Exch. Comm'n v. Liu*, No. 21-56090, 2022 WL 3645063 (9th Cir. Aug. 24, 2022), cert. denied sub nom. *Liu v. SEC*, No. 22-751, 2023 WL 3571511 (U.S. May 22, 2023). The district court originally imposed a disgorgement amount of the entirety of the amount raised from investors on the theory that expenses should not be deducted because those expenses "were incurred for the purposes of furthering an entirely fraudulent scheme." 140 S. Ct. at 1950. But the Supreme Court overturned that decision, holding that the court must actively

47

consider "whether expenses are legitimate or whether they are merely wrongful gains under another name" and deduct all legitimate expenses to properly determine the amount actually "gained." *Id*. On remand, the district court subtracted administrative expenses and business expenses, expenses that the court concluded "arguably have value independent of fueling a fraudulent scheme." *Liu*, 2021 WL 2374248, at *5 (quoting *Liu*, 140 S. Ct. at 1950).

The district court determined that defense expert forensic accountant witness Stefano Vranca's report was "essentially worthless" and that he would completely reject Mr. Vranca's opinions regarding "the 'business-related' expenses incurred by CCI." J.A.3158. But despite dismissing Mr. Vranca's report as "essentially worthless," the opinion nevertheless cherry-picked and credited the portions of his report that would support the SEC's narrative and fill in gaps in the SEC's evidence. But it cannot be both ways—either Mr. Vranca's calculations, which resulted from a comprehensive review of millions of pages of financial documents and independent reconstruction of CCI's finances, are credible, or they are not. The opinion cannot rely on Mr. Vranca's report only where it *substantiates* pieces that the SEC failed to prove and ignore it where it *disproves* the SEC's allegations.

For example, the opinion *credited* Mr. Vranca's report with respect to his calculations of expenses charged to CCI's credit cards. The SEC alleged that Mr. Kontilai and CCI "indiscriminately used company cards for personal expenditures,"

48

but failed to present even a scintilla of evidence to support that allegation. J.A.3169. The opinion covered the SEC's evidentiary lapse by crediting Mr. Vranca's report, stating that "[e]ven the defendants' expert witness estimated that personal expenses constituted over $1.1 million of the charges on Kontilai's company credit cards." *Id*. And then, without citation to any evidence at all, the opinion noted that "[a]s the SEC observed, this number is unlikely to represent the full scope of Kontilai's personal expenditures." *Id*. But the SEC presented ***no evidence at all*** to support that allegation, which was simply accepted by the opinion wholesale and without question.

But the opinion *discredited* Mr. Vranca's report with respect to his calculations of business expenditures, even though the existence of business expenditures was confirmed by the SEC's own witnesses and are uncontroverted by any party. It took a black-and-white approach to this issue, determining that the entirety of Mr. Vranca's testimony must be disregarded and as a result *none* of the funds CCI or Mr. Kontilai ever paid to third parties could have been for legitimate business expenses. But while the SEC has challenged Mr. Vranca's calculation of certain business expenses, *no party* has ever alleged that no legitimate business expenses were ever made and it is illogical to contend that *not a single penny* was ever spent for a legitimate business purpose.

Yet the opinion, while seemingly admitting that "Courts must deduct legitimate expenses," J.A.3193 (quoting *Liu*, 140 S. Ct. at 1950), dismisses this issue in its entirety. The opinion ignores that (1) many of these expenses are self-evident on their face, (2) Mr. Vranca independently corroborated many business expenditures that are legitimate on their face, and (3) the SEC's own witnesses, credited by the opinion, confirmed that CCI spent funds on legitimate business expenses.

Mr. Vranca was able to independently corroborate many of the business expenditures, such as expenses paid towards insurance policies held by CCI, legal expenses, production, media, and marketing expenses, operations expenses such as utilities, packaging, shipping, and office supplies, software, electronics, web development costs, and labor and employment costs. J.A.2628-31. Mr. Vranca did not see any indication that any of these expenses were personal to Mr. Kontilai, and, crucially, the SEC presented no evidence to the contrary. *Id*. Many of these expenses were *self-evidently* legitimate business expenses:

> A. There are many expenses such as, you know, the purchase of media, media production, money paid to Mr. Larry King, the development of the TV show, YouTube presentation, different type of constructions, payments made to vendors or people that work at the company, like Mr. Chapman and others.
>
> Q. And the website?
>
> A. Website, and so on and so forth. There is millions of dollars of expenses that I have bank account payments, checks, and wire transfer,

actual people that worked in those companies that receive the money that we independently researched, address of those companies, website researches of those companies, and so on and so forth.

J.A.2625-26.

It is difficult to imagine how funds spent on insurance policies held by CCI, or funds paid to Larry King for services rendered, or funds paid to develop a website and a television show could be considered *personal expenses*. These were legitimate business expenditures on the business ventures that the investors *knew* and *expected* would be made.

For example, the expenses related to the development of CCI's website, which was demonstrated to numerous investors, including Mr. Jensen, during a video call in March 2015. J.A.2376-77. Mr. Jensen, who is a "software person by trade," J.A.2371, testified that the website "looked very good." J.A.2377. It was designed "like a blogger network [that] was to bring people that were collectors together and they could be in kind of a chat group." J.A.2377-78. The website had a graphical user interface with "a lot going on" and logos at the bottom of the screen that "really impressed" Mr. Jensen. J.A.2378. The graphical user interface was "as good" as the GUIs used by eBay or Amazon. J.A.2379. Mr. Kontilai and CCI also hired consultants to assist in the development of the website, including hiring Mr. Cutsey's company, FDM4, to provide website design services in December 2016. J.A.1634. Mr. Coleman acknowledged that he was aware that the development costs of the

51

website, including the salaries of consultants and contractors, would be paid with investor funds, and that it had been "declared when [he] signed up." J.A.2266-67.

Or the television show: Mr. Jensen, one of the investors, met Larry King and Mr. Kontilai at a studio in Los Angeles where CCI was working. J.A.2373. When he toured the studio, Mr. Jensen could tell that CCI was producing both a sizzler reel and the television show in that space. J.A.2373-74. Mr. Jensen was so impressed by what he had seen that "[a]fter this trip, [he] made [his] second investment of $300,000 in CCI." J.A.1652. As he toured the facility, Mr. Jensen "knew there would be a cost to" developing the studio space and producing the television show" and knew that CCI was spending money on those expenses. J.A.2374. Mr. Jensen had a role in the television show himself: he was a "front man" for "collector technology." J.A.2382. As the front man, or the "collectors coach," Mr. Jensen was involved in the filming of multiple episodes. J.A.2382. As part of the show, Mr. Jensen had the opportunity to interview Bass Rutten, a champion ultimate fighter, a second fighter whose name he could not recall, and a historian of the Los Angeles Dodgers. J.A.2382-83.

This is just a small sampling of the evidence elicited from "credited" witnesses that confirmed that CCI spent funds on legitimate business expenses. That the opinion ignored these expenses *without even addressing them* is erroneous on its face.

52

Accordingly, Mr. Vranca's calculations of CCI's business expenditures were corroborated, at least in part, by the SEC's own witnesses. J.A.3157. And yet the opinion simply ignored this evidence. This Court should reverse the decision of the district court and remand for further proceedings to ascertain the appropriate amount of legitimate business expenses that must be excluded from the total disgorgement amount.

    **C.**    **As the Disgorgement Portion of the Asset Freeze is Impermissibly Overbroad, the Portion of the Asset Freeze <u>Accounting for Possible Civil Penalties is Also Incorrect</u>.**

As the disgorgement portion of the asset freeze amount is impermissibly overbroad, the civil penalty calculation is similarly erroneous.

Civil penalties may be available if the SEC succeeds in proving a violation of the Securities Act or the Exchange Act. The two Acts have virtually identical civil penalty provisions, which assess three tiers of violations depending on the circumstances of the alleged violation. 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B). For a natural person, the civil monetary penalty under each tier is capped at the greater of the tier amount or the gross amount of pecuniary gain to the defendant—for Tier 1, the cap for natural persons is $5,000, for Tier 2, the cap for natural persons is $50,000, and for Tier 3, the cap for natural persons is $100,000. 15 U.S.C. § 77t(d)(2)(A)-(C); 15 U.S.C. § 78u(d)(3)(B)(i)-(iii). These penalties are

not intended to compensate victims and are paid directly to the United States Treasury. 15 U.S.C. § 77t(d)(3); 15 U.S.C. § 78u(d)(3)(C).

Once again, the district court imposed the harshest possible civil penalty calculation—double the amount of possible disgorgement—based on the opinion's determination that "given Kontilai's total control of the operations of CCI, the SEC has shown that Kontilai benefitted from investor funds to the same extent as CCI, and thus that the civil penalty may be as much as the total intake from investors." J.A.3194. But this determination is incorrect as a matter of law.

This Court has reversed the imposition of civil penalties assessed jointly and severally. *See S.E.C. v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 287 (2d Cir. 2013) ("We also must reverse the district court's decision to impose joint and several liability for the amount of the civil penalty as an error of law."). This is because the statutory language requires any civil penalty to be assessed separately as to each defendant: "The statutory language allowing a court to impose a civil penalty plainly requires that such awards be based on the "gross amount of pecuniary gain *to such defendant*." *Id*. at 288 (quoting 15 U.S.C. § 77t(d)(2)) (emphasis in original). Accordingly, there is no room in the statutory language for any interpretation where a civil penalty is imposed jointly and severally. *Id*.

The relevant statutes "provide that for each violation **the maximum penalty may not exceed the greater of the maximum pecuniary gain for each defendant**

54

or the statutory maximum penalty as adjusted for inflation." *S.E.C. v. GTF Enterprises, Inc.*, No. 10-CV-4258 RA, 2015 WL 728159, at *4 (S.D.N.Y. Feb. 19, 2015) (citing 15 U.S.C. §§ 77t(d), 78u(d)(3), 80b–9(e)). The question, therefore, is twofold: *first*, what each defendant's respective "maximum pecuniary gain" is alleged to be, and *second*, whether *Mr. Kontilai* can be penalized for *CCI's* alleged pecuniary gains.

A defendant's "maximum pecuniary gain" has been frequently assessed in light of the total ill begotten proceeds calculated for disgorgement. *See Sec. & Exch. Comm'n v. Aly*, No. 16 CIV. 3853 (PGG), 2018 WL 4853031, at *5 (S.D.N.Y. Oct. 5, 2018) (imposing a civil penalty in the same amount as the disgorgement amount); *Sec. & Exch. Comm'n v. Penn*, No. 14-CV-581 (VEC), 2018 WL 4378444, at *7 (S.D.N.Y. Sept. 14, 2018) (same); *GTF Enterprises,* 2015 WL 728159, at *4 (calculating "gross pecuniary gain" based on the disgorgement amount); *S.E.C. v. Amerindo Inv. Advisors Inc.*, No. 05 CIV. 5231 RJS, 2014 WL 2112032, at *11 (S.D.N.Y. May 6, 2014), aff'd sub nom. *S.E.C. v. Amerindo Inv. Advisors*, 639 F. App'x 752 (2d Cir. 2016) ("[a] defendant's gross amount of pecuniary gain is similar to that defendant's disgorgement amount.").

As more fully outlined above, since the *Pentagon Cap.* decision, the Supreme Court has significantly limited the calculation of "ill-begotten gains" for the purpose of disgorgement. Specifically, the Supreme Court instructed that "[c]ourts may not

enter disgorgement awards that exceed the gains made upon any business or investment, when both the receipts and payments are taken into the account." *Liu*, 140 S. Ct. at 1949–50. In essence, a court must "deduct legitimate expenses" and consider the amount of the individual defendant's personal ill begotten gain before it arrives at the appropriate figure for the purpose of disgorgement. *Id*. Accordingly, the opinion's conclusion that the appropriate "total pecuniary gain" of Mr. Kontilai is $23,060,824.84 is erroneous.

The opinion's analysis presupposes that Mr. Kontilai and CCI are, essentially, the same entity. That CCI's alleged conduct—regardless of *who* at the company the SEC alleged to have acted or omitted to act, *who* drafted the private placement memorandums or disseminated them or spoke with investors or made certain decisions regarding the payment of business expenses from raised capital— is imputable to Mr. Kontilai the same as if *Mr. Kontilai* had taken that action himself. But that analysis is the one that was expressly rejected by this Court in *Pentagon Cap.*, where this Court made clear that civil penalties are calculated *per defendant* based on *that defendant's* alleged conduct. *Pentagon Cap.*, 725 F.3d at 287–88. To find otherwise would effectively overrule *Pentagon Cap.* and impose a civil penalty on Mr. Kontilai that effectively holds him jointly and severally responsible for CCI's conduct and the conduct of other officers, employees, and agents working on CCI's behalf.

To find otherwise would also run contrary to the plain language of the statutes, Congress's legislative intent, common law, and would be unconstitutional. The penalty is capped at "the gross amount of pecuniary gain **to such defendant** as a result of the violation." 15 U.S.C. § 77t(d)(2)(C) (emphasis added). It is in the plain language that the penalty assessed must be individualized and that one defendant is not to be punished for the wrongdoing of another. If Congress's intent had been to hold one defendant liable for the wrongdoing of another, it would have said so. It did not. Further, an asset freeze based on such a civil penalty as applied in this case would be unconstitutional, as he would have no funds available to pay for his basic needs and without funds he would be unable to pay for counsel of his choice for his criminal defense as guaranteed under the Sixth Amendment. *See* supra. Finally, a freeze based on such a penalty would be untethered from any alleged wrongdoing and, thus, violating the Fourteenth Amendment.

In any event, no civil penalty is appropriate in this case as a "penalty would be unduly harsh under the circumstances," as "the disgorgement and prejudgment interest awarded … will be staggering" without adding in a penalty amount. *S.E.C. v. Wyly*, 56 F. Supp. 3d 394, 433 (S.D.N.Y. 2014). The possibility of criminal restitution and incarceration also counsels against imposing additional civil penalties. *See S.E.C. v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 391 (S.D.N.Y. 2010) ("Furthermore, the Court finds that the penalties of disgorgement, criminal

restitution, incarceration, and injunction against future violations imposed on Rittweger are sufficient to deter future illegal conduct. A further penalty at this time is inappropriate."); *S.E.C. v. Loomis*, 17 F. Supp. 3d 1026, 1033 (E.D. Cal. 2014) ("Loomis acted with a high degree of scienter, soliciting over $11 million in investments, which he used largely to fund his other businesses. Nevertheless, he is facing criminal charges carrying the potential of a substantial term of imprisonment, large fines, and restitution. … Given the magnitude of other civil and criminal penalties Loomis faces, the court declines to impose a civil penalty."). The purpose of a civil penalty is "the dual goal of punishing the individual violator and deterring future violations," both of which are accomplished where there are other significant penalties imposed on the defendant. *Aly*, 2018 WL 4853031, at *4.

## CONCLUSION

For the forgoing reasons, this Court should reverse the decision of the district court granting a preliminary injunction and asset freeze against Mr. Kontilai in the amount of $46,121,649.68.

Respectfully submitted,


_____/s/ Cary J. Hansel_____
Cary J. Hansel
Ashton Zylstra
HANSEL LAW, P.C.
2514 North Charles Street
Baltimore, Maryland 21218
Tel: (301) 461-1040
Fax: (443) 451-8606
Cary@hansellaw.com
azylstra@hansellaw.com

*Counsel for Appellant*

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests oral argument.

                                   /s/ Cary J. Hansel
                                  Cary J. Hansel

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32 and contains 13,971 words, excluding the parts of the brief exempted from the word count by Fed. R. App. P. 32(f). The foregoing brief complies with the typeface requirements of Fed. R. App. P. 32 and was prepared with proportionately spaced type and a typeface of 14-point Times New Roman.

                                   /s/ Cary J. Hansel
                                  Cary J. Hansel

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 19th day of January, 2024, the foregoing brief was filed with the Court's CM/ECF system which shall effect service on all parties so entitled.

                                   /s/ Cary J. Hansel
                                  Cary J. Hansel

# No. 23-7537

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————————

**United States Securities and Exchange Commission,**

**Plaintiff – Appellee,**

**v.**

**Mykalai Kontilai,**

**Defendant – Appellant,**

**Collector's Coffee, Inc., Los Angeles Dodgers LLC, Doe Individuals 1 through 50, Roe Corporations 1 through 50, Jackie Robinson Foundation, Inc., SDJ Investments, LLC, Adobe Investments, LLC, Darren Sivertsen, Trustee of Sivertsen Family Trust U/A/D 10/01/2022,**

**Defendants.**

———————————————

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
**(The Honorable Gabriel W. Gorenstein presiding)**

———————————————

**APPELLANT'S BRIEF AND SPECIAL APPENDIX**

———————————————

**Cary J. Hansel**
**Ashton Zylstra**
**HANSEL LAW, PC**
**2514 North Charles Street**
**Baltimore, Maryland 21218**
**Ph.: 301-461-1040**
**Fax: 443-451-8606**
**cary@hansellaw.com**
**azylstra@hansellaw.com**

*Counsel for Appellant*

## **SPECIAL APPENDIX**

Doc. No. 1284, Memorandum and Opinion, October 4, 2023 ...........................0001

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES SECURITIES AND          :
EXCHANGE COMMISSION,
                                      :
                    Plaintiff,                    OPINION AND ORDER
                                      :
      -against-                                   19 Civ. 4355 (VM) (GWG)
                                      :
COLLECTOR'S COFFEE, INC., et al.,
                                      :
                    Defendants.
--------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

  The United States Securities and Exchange Commission ("SEC") brought this case

against defendants Collector's Coffee, Inc. ("CCI") and Mykalai Kontilai ("Kontilai"), alleging

violations of federal securities laws.  See Amended Complaint, filed Nov. 4, 2019 (Docket

# 134) ("Am. Compl.").  Kontilai's wife, Veronica Kontilai, was named as a "relief defendant"

due to her alleged receipt of illicit funds.  See id. ¶ 8.  Before the Court is the SEC's motion for a

preliminary injunction and asset freeze.[1]  Also before the Court is Kontilai's motion for a

modification of the asset freeze currently in place.[2]  For the reasons that follow, the SEC's

motion is granted and Kontilai's motion is denied.

---

  [1]  Proposed Findings of Fact and Conclusions of Law, filed Mar. 21, 2023 (Docket # 1185) ("SEC Proposed Findings"); Memorandum of Relief Defendant Veronica Kontilai, filed Apr. 18, 2023 (Docket # 1199) ("Veronica Kontilai Mem."); Proposed Findings of Fact and Conclusions of Law, filed Apr. 18, 2023 (Docket # 1200) ("Kontilai Proposed Findings"); Amended One-Page Brief Joining in Docket 1200, filed Apr. 19, 2023 (Docket # 1202) ("CCI Mem."); Reply, filed May 9, 2023 (Docket # 1217) ("SEC Reply").

  [2]  See Notice of Motion, filed May 9, 2023 (Docket # 1218); Memorandum of Law, filed May 9, 2023 (Docket # 1219) ("Kontilai Freeze Mem."); Opposition, filed May 23, 2023 (Docket # 1230) ("SEC Freeze Opp."); Reply, filed May 30, 2023 (Docket # 1232) ("Kontilai Freeze Reply").

I.      BACKGROUND

As previously summarized by this Court, the SEC has alleged a broad range of

wrongdoing by Kontilai and CCI related to the use of investor funds.  See United States S.E.C. v.

Collector's Coffee, Inc., 2021 WL 1956369, at *1-3 (S.D.N.Y. May 17, 2021).  In short, the SEC

alleges that Kontilai and CCI misappropriated investor funds, misrepresented CCI and its assets

to prospective investors, attempted to impede the SEC's investigation of those violations, and

fabricated evidence in support of their position.  See Am. Compl.  The SEC alleges six statutory

violations: (1) that CCI and Kontilai violated section 10(b) of the Exchange Act, and Rule 10b-

5(b), by making fraudulent misstatements and omissions in connection with the sale or purchase

of securities, id. ¶¶ 171-73; (2) that CCI and Kontilai violated section 17(a)(2) of the Securities

Act through the same fraudulent misstatements and omissions, id. ¶¶ 174-76; (3) that CCI and

Kontilai's actions amount to a prohibited fraudulent scheme under section 10(b) and Rule 10b-

5(a) and (c), id. ¶¶ 177-79; (4) that these same actions violated section 17(a)(1) and (3), id. ¶¶

180-82; (5) that CCI and Kontilai's actions violated Rule 21F-17 of the Exchange Act, id. ¶¶

183-85; and (6) that Veronica Kontilai received funds traceable to CCI and Kontilai's violations,

and those funds must be equitably disgorged, id. ¶¶ 186-89.[3]

The complete history of the SEC's request for a temporary restraining order and

preliminary injunction was previously recounted by this Court in United States S.E.C. v.

Collector's Coffee Inc., 2021 WL 266284, at *1-2, 7 (S.D.N.Y. Jan. 27, 2021).  In brief, on May

16, 2019, the court issued a temporary restraining order freezing assets held by Kontilai and CCI

---

[3]  The conduct alleged is also the subject of pending criminal charges against Kontilai.
See Colorado Indictment, filed Nov. 12, 2020 (Docket # 637-1); Nevada Indictment, filed Nov.
12, 2020 (Docket # 637-2).  Kontilai has been detained in Germany as a result of those charges.
See Letter from C. Hansel, filed Apr. 24, 2023 (Docket # 1210) ("Notification of Arrest").

2

up to the amount of $46,121,649.68.  Temporary Restraining Order, filed May 16, 2019 (Docket # 12) ("TRO").  On November 13, 2019, the parties consented to the undersigned presiding over the preliminary injunction hearing.  See Notice, Consent, and Reference, dated Nov. 13, 2019 (Docket # 143).  On December 9, 2019, shortly before the preliminary injunction hearing was to take place, the parties stipulated to an injunction and asset freeze under the terms of the TRO pending a hearing on the SEC's request for a preliminary injunction.  See Order, filed Dec. 9, 2019 (Docket # 175).  That order added a freeze as to the assets of Veronica Kontilai as a relief defendant.  Id. at 4.

Neither side sought to have an adjudication of the SEC's motion for a preliminary injunction until May 2022 when Kontilai filed opposition papers to the SEC's preliminary injunction motion, which had been filed two and a half years earlier, see Memorandum of Law in Opposition, filed May 9, 2022 (Docket # 1014), and then requested an evidentiary hearing on that motion, see Letter from C. Hansel, filed May 21, 2022 (Docket # 1028).

Ultimately, the Court held the hearing on November 7, 2022, January 24, 2023, and February 21, 2023.  See Transcript, dated Nov. 7, 2022 (Docket # 1129) ("Nov. 7 Tr."); Transcript, dated Jan. 24, 2023 (Docket # 1161) ("Jan. 24 Tr."); Transcript, dated Feb. 21, 2023 (Docket # 1168) ("Feb. 21 Tr.").

II.    FACTS

A.    Hearing Testimony

The Court heard testimony from eight witnesses.  The SEC called Edward Little, Richard Coleman, Gary Ferrell, Kirk Jensen, David Chapman, Michael Cutsey, and Jacqueline Moessner.  See Nov. 7 Tr.  CCI called Stefano Vranca.  Jan. 24 Tr.  Neither Kontilai nor Veronica Kontilai called any witness.

3

**S.A.0003**

We first summarize the relevant parts of each witness's testimony and later make credibility determinations.

 1.  Edward Little

Little was an attorney retained by Kontilai to represent him in this case, although Little eventually withdrew from the representation.  Nov. 7 Tr. at 7:20-8:9.  Little's firm was not responsible for maintaining the Collectors Café website and email domain, and the firm had no control over "anything related to paying or maintaining [the] platforms."  Id. at 19:5-20:5.  Little had "many conversations directly with [] Kontilai" regarding the documents contained on CCI email accounts, but the firm never gained access to potential discovery materials.  Id. at 21:5-23:21.

 2.  Gary Ferrell

Ferrell was the CEO of a company called Public Media, which was owned by Ferrell and Kontilai.  Nov. 7 Tr. at 102:16-103:2.  Ferrell had full control of Public Media's finances, and the only connection between Public Media and CCI was that CCI paid Public Media $450,000 to produce a pilot episode for CCI's "Collector's Café" television program.  Id. at 103:15-104:11.  The payments for this pilot were made by Kontilai, rather than by an account in CCI's name.  Id. at 142:14-143:22.  Neither CCI nor Kontilai ever made a loan to Public Media, id. at 104:12-25, and Public Media was not "a predecessor to Collector's Coffee in any way," id. at 107:1-3.

Ferrell also served in corporate roles for CCI, including as secretary and treasurer, and as a company director.  Id. at 110:22-111:3.  Ferrell was a director "from the very beginning," and served continuously on the board during the year 2007, id. at 111:4-5, 20-25, although the board never actually met, id. at 153:5-6.  Kontilai was likely the majority shareholder of CCI at the time and would not have needed board approval for "all decisions."  Id. at 154:14-24.

4

To Ferrell's knowledge, Gail Holt was never named chairman of CCI's board, and was not "associated with CCI in any way" in 2007. Id. at 112:12-21. Ferrell reviewed a series of documents purporting to remove Ferrell from the CCI board and appoint Gail Holt, see Board & Shareholder Resolutions, annexed as Ex. 54 to PHPFF (Docket # 1052-58),[4] but stated that he had never been removed as secretary to his knowledge, and had no knowledge of Gail Holt's supposed appointment as chairman, id. at 126:7-127:17. The board had not entered into an employment agreement with Kontilai, id. at 129:14-20, and had never authorized payment of a salary to Kontilai, id. at 130:8-131:5. The board had not approved any agreement allowing Kontilai or Veronica Kontilai to pay down any supposed loans or credits to CCI by using company credit cards for personal expenses. Id. at 131:9-24. Ferrell was not aware of a 2007 convertible note agreement for $4 million between CCI and Gail Holt, nor of a $1.411 million note between CCI and Kontilai. Id. at 132:13-134:23.

3.   David Chapman

Chapman served on the board of directors for CCI for a period beginning in 2009, and later served as an "investor relations" consultant between 2013 and 2018. Declaration of David Chapman, dated Oct. 21, 2022 (Docket # 1093-5) ("Chapman Decl."), ¶¶ 2-3. Although he was a member of CCI's board of directors, Chapman did not attend any board meetings. Nov. 7 Tr. at 238:21-239:3. Chapman was not aware of "any compensation paid or owed by [CCI] to [] Kontilai" and was not aware of any loans from Kontilai to CCI. Chapman Decl. ¶ 2.

Chapman was aware of emails and oral statements in which Kontilai told prospective

---

[4] "PHPFF" refers to the SEC's pre-hearing proposed findings of fact and conclusions of law. See Proposed Findings of Fact, filed June 24, 2022 (Docket # 1052). Any exhibits to this document cited in this Opinion and Order were later admitted at the preliminary injunction hearing.

investors that Kontilai had not taken salary from CCI.  Id. ¶ 4.  On one occasion, he heard

Kontilai tell investor Richard Coleman that CCI had "10-year contracts with hundre[d]s of

dealers and $3.5 billion in inventory" and that "the contracts signed by Jackie Robinson[5] were

worth $36 million."  Id. ¶ 14.  Kontilai often sent private placement memoranda ("PPMs") and

investment information directly to investors, and although Chapman communicated with

investors from time to time, "Kontilai paid close attention to what prospective and existing

investors were told and . . . controlled what [Chapman] was permitted to say."  Id. ¶¶ 8-10.

       4.    Richard Coleman

Coleman invested roughly $1.25 million into CCI on behalf of a trust.  Declaration of

Richard Coleman, dated Oct. 20, 2022 (Docket # 1093-3) ("Coleman Decl."), ¶ 2.  Coleman

received numerous written representations from CCI and Kontilai regarding his investment.  Id.

¶ 3.  These included two subscription agreements and an April 28, 2008 PPM.  Id.; see Email

from L. Feliciano to R. Coleman, dated July 28, 2016 (Exhibit 64) (attaching July 2016

subscription agreement); Email from L. Feliciano to R. Coleman, dated Jul 28, 2016 (Exhibit 65)

(attaching 2008 PPM); Email from L. Feliciano to R. Coleman, dated Jul 28, 2016 (Exhibit 66)

(attaching amendment to 2008 PPM); Email from L. Feliciano to R. Coleman, dated Apr. 3, 2017

(Exhibit 68) (attaching March 2017 subscription agreement).[6]  Kontilai made oral

representations to Coleman regarding CCI's use of investor funds, including that Kontilai

himself did not take a salary, id. ¶¶ 4, 10, and that CCI had "no debt," id. ¶ 7.  Coleman would

---

    [5]  "The sole asset of any value held by CCI are [] two contracts signed by Jackie
Robinson, which CCI bought in 2013 for $2 million."  United States S.E.C. v. Collector's
Coffee, 2023 WL 3575428, at *1 (S.D.N.Y. May 22, 2023), adopted, 2023 WL 3862662
(S.D.N.Y. June 7, 2023).

    [6]  Exhibits numbered 61 and higher were admitted at the preliminary injunction hearing
but were not filed on the docket.

have "seriously questioned" his investment had he known it would be used to provide cash to Kontilai "for any purpose," and would have "requested an audit" if he had known CCI owed any debts.  Id. ¶¶ 14-15.  However, Coleman did not have personal knowledge of whether Kontilai took a salary from CCI and while he was aware that Kontilai intended to "make money from CCI," he believed that would be accomplished through "return on [Kontilai's] investment." Nov. 7 Tr. at 69:1-70:14.  Coleman was never told that Kontilai considered Kontilai's own investment in CCI to be a loan.  Coleman Decl. ¶ 16.  Kontilai's representation that CCI "had signed 10-year agreements with 580 dealers" was "important" to Coleman in choosing to invest. Id. ¶ 18.

CCI "never disclosed" to Coleman that it had granted the rights to portions of the contracts signed by Jackie Robinson ("Jackie Robinson Contracts") to other parties or that it had commissioned the $36 million valuation of those Contracts.  Id. ¶¶ 21-25.  However, he was aware that "another investor" in CCI "was involved with the [C]ontracts," and that investor would likely be entitled to "some priority interest" in the event of a sale.  Nov. 7 Tr. at 76:14-77:17.  Coleman never asked Kontilai or CCI about this "priority" positioning, but "what was told to the investors was [that] there was a significant amount of money, up to $36 million . . . . And [Coleman's] belief was that a majority of that would go to the investors, even if somebody else had the routes to some of that funding first."  Id. 80:5-81:3.

5.    Kirk Jensen

Jensen invested a total of $500,000 in CCI.  Declaration of Kirk Jensen, dated Oct. 23, 2023 (Docket # 1093-4) ("Jensen Decl."), ¶ 2.  Kontilai represented to Jensen on a conference call that either Kontilai or CCI owned the Jackie Robinson Contracts, Nov. 7 Tr. at 202:21-203:4, which were valued between $25 million and $36 million, id. at 214:2-6.  Jensen

understood it was "possible" that other parties had an interest in the Contracts, but believed "they were associated with CCI as [a] whole."  Id. at 205:11-18.  Jensen did not ask whether there were "senior investors" entitled to a portion of the Contracts' sale.  Id. at 210:20-211:12.

Kontilai represented to Jensen that CCI had no debt, no inventory costs, and more than $3 billion of merchandise available.  Jensen Decl. ¶ 3.  Kontilai and CCI later represented that CCI had contracts with around 400 "master dealers," which Jensen considered "very impressive."  Id. ¶¶ 4-5.  CCI sent Jensen the PPM and amendments, which made similar representations regarding the Contracts and their valuation, CCI's debt and costs, and the "master dealer" contracts.  Id. ¶ 6; see Email from L. Feliciano to M. Kontilai, dated Oct. 12, 2017 (Exhibit 84) (forwarding email from Jensen with attachment of signed 2008 PPM, 2009 amendment, and March 2015 subscription agreement).  Jensen was never told that Kontilai took a salary, that CCI had "granted significant rights to [the] proceeds of the sale of the [Contracts] to third-parties," or that Kontilai had received undocumented payments from CCI.  Id. ¶ 8.  Jensen stated that this information "would have been important" to his decision to invest.  Id.

In 2017, Jensen entered into a settlement with CCI, one term of which prohibited him from "contact[ing] the Securities and Exchange Commission or other state, federal, or local government agencies" to complain of conduct by Kontilai or CCI.  Jensen Decl. ¶ 18.

6.  Michael Cutsey

Cutsey invested $900,000 in CCI, and led efforts by his own company to design the CCI website.  Declaration of Michael John Cutsey, dated Oct. 21, 2022 (Docket # 1093-1) ("Cutsey Decl."), ¶¶ 2-3.  Kontilai represented to Cutsey that "CCI owned the Jackie Robinson [C]ontracts," which were "valued at $36 million," and "never disclosed a lower valuation . . . or the possibility that entities other than [] CCI had ownership interests in the [C]ontracts."  Id. ¶¶

8

16-18.  Kontilai also told Cutsey "that he was not taking a salary from CCI," "that he had invested $5 million of his own funds in the company," and that "CCI had no debt."  Id. ¶¶ 20-21, 23-24.  Finally, Kontilai represented to him that CCI had "hundreds of dealers" committed to supplying CCI's website, but in the course of preparing CCI's website, Cutsey was aware of only "one dealer."  Id. ¶ 11.  Cutsey would have known if additional dealers had been contracted due to his role in creating the web platform for CCI's sales.  Id. ¶ 12.

Cutsey spoke to Kontilai "countless times" about his investment and worked with Kontilai to communicate information to other prospective investors.  Id. ¶¶ 5, 7-8.  On behalf of Kontilai, Cutsey told investors that Kontilai "was not taking a salary," and referenced CCI's supposed "dealer assets."  Id. ¶ 7.  Cutsey also reviewed a "Corporate Update" for Kontilai which repeated the same representations.  Id. ¶¶ 8-9; see Email from Kontilai to Cutsey, dated Mar. 8, 2017 (Exhibit 72) ("Corporate Update") (attaching Corporate Update slideshow).  Kontilai was the "sole source" of Cutsey's information for both presentations.  Id. ¶¶ 7-8.

7.    Jacqueline Moessner

Jacqueline Moessner, an SEC attorney, testified as to various documents offered into evidence that are summaries of other evidence in the record.  See Nov. 7 Tr. at 261; Declaration of Jacqueline Moessner, filed Oct. 24, 2022 (Docket # 1093-6) ("Moessner Decl.").  Moessner supervised and directed the SEC's efforts to compile a "schedule of transactions" based on "voluminous records" relating to this case, "including statements, deposits, credits, wire transfer[s], and account authority information for bank accounts of [CCI], Mykalai Kontilai, and Gail Holt."  Moessner Decl. ¶¶ 2-3.  She explained how these "schedules" were compiled, and summarized the process used to obtain the evidence submitted by the SEC.  Id. ¶¶ 3-21.

**S.A.0009**

8. <u>Stefano Vranca</u>

The only witness called by the defendants was Stefano Vranca.

Vranca was retained by CCI to "perform a forensic reconstruction of the records that were made available to [him] and build a database that . . . identified business expenses as well as capital contribution [to CCI]."  Jan. 24 Tr. at 7:20-8:10.  The documents he reviewed included bank and credit card statements, deposit and withdrawal slips, wire receipts, cancelled checks, and financial statements.  <u>See</u> Amended Expert Witness Report of Stefano Vranca, dated Apr. 28, 2021, annexed at *20 to Declaration of Stefano Vranca (Docket # 1094-1) ("Vranca Report"), ¶¶ 7-10.  Vranca testified that "if there was an allegation that a document was not authentic" he "didn't rely on it."  Jan. 24 Tr. at 14:8-11.  However, he stated in his report that he did rely on a "convertible note agreement" that supposedly showed that Kontilai had invested $1.411 million into Public Media, <u>see</u> Vranca Report ¶ 10(d) & n.3, the validity of which the SEC disputes, <u>see</u> SEC Proposed Findings at 2, 19.

Vranca concluded that investor contributions to CCI totaled $30,794,514.24.  Vranca Report ¶ 15(a).  He identified $4,008,909.03 in "net compensation" received by Kontilai from CCI, which he defined as "deposits made into accounts held by Mr. or Mrs. Kontilai ($10.9 million) plus cash withdrawals from accounts held by CCI for the benefit of Mr. Kontilai ($1.746 million), less money potentially owed to Mr. Kontilai from CCI in relation to: business-related expenses incurred by Mr. or Mrs. Kontilai on behalf of CCI ($3.0 million); additional investments made by Mr. or Mrs. Kontilai into CCI ($2.4 million); and the outstanding balance of the December 2007 loan by Mr. Kontilai to Public Media ($3.3 million)."  <u>Id.</u> ¶ 21.  He also identified transfers of "roughly $5.3 million" from CCI to Gail Holt, a CCI employee.  <u>Id.</u> ¶ 23.

Vranca determined that Kontilai and Veronica Kontilai had incurred "$3.0 million" in

"business-related expenses." <u>Id.</u> ¶ 21.  At the hearing, Vranca testified that the following accurately described his method for determining that such expenses were "business-related" and thus should be offset against the total amount of money extracted from CCI by Kontilai and Veronica: "these expenses, in the grossest sense, are expenses that businesses incur, and . . . based on the size of the business, this could be a reasonable expense." <u>See</u> Jan. 24 Tr. at 34:3-25.  But Vranca "ha[d] absolutely no idea whether [any given expense] was a proper or legitimate expense." <u>Id.</u>  Vranca explained that "if [an item in his report] [is] marked as an expense," his analysis for that item had consisted of determining whether "it [was] possible that at least a portion of [the item] could be a business expense," and "then [he] threw that on the business-related expenses line for [] Kontilai and CCI." <u>Id.</u> at 42:10-16.  Thus, Vranca attributed to business-related expenses all payments to credit card companies from Kontilai's personal accounts, <u>id.</u> at 43:7-21; all payments to restaurants, <u>id.</u> at 44:10-15; and any "entertainment" or "beauty" expenses, <u>id.</u> at 55:4-12.  In making his assessment, Vranca "didn't seek to obtain any information from [] Kontilai, Veronica Kontilai, Gail Holt, or anybody at CCI regarding whether [the expenses] were business related." <u>Id.</u>

As to the purported $1.411 million "convertible note," Vranca examined a loan agreement dated December 2007, in which CCI "agree[d] to repay . . . debts . . . incurred by Kontilai" in the form of a "loan to Public Media." Vranca Report ¶ 52.  Vranca did not know "if the document [was] legitimate or anything of that nature," Jan. 24 Tr. at 66:22-67:4, and did not know "whether or not that document actually reflect[ed] what actually occurred," <u>id.</u> at 68:24-69:3.  Vranca compiled a list of $1.411 million in "deposits into CCI accounts" that "appear to relate to [] Kontilai's loan to Public Media," and calculated that the amount owed on that loan was roughly $3.3 million as of the date of his report. <u>Id.</u> ¶ 53.  The exhibit prepared by Vranca

indicates that all of these deposits were made into accounts held by Public Media, rather than CCI.  See Deposits into CCI Accounts Relating to $1.411 Million Loan, annexed as Ex. 10 to Vranca Report (Docket # 1094-1) ("Public Media Deposits").  Vranca considered Public Media to be a "predecessor firm[]" to CCI, Vranca Report ¶ 3, but gave no explanation as to why.  Vranca did not attempt to verify that the payments at issue were loans — or even that the payments were made by Kontilai — because he "was advised by [CCI] counsel that the document of the loan was not an issue," Jan. 24 Tr. at 78:12-79:2, but if he had been told that "Kontilai never loaned money to Public Media, that Gail Holt was never chairman of the board, that the deposits referenced in that loan agreement were not from Mykalai Kontilai, and that that loan agreement appeared fabricated," he "would not have counted initial capital contribution as capital infusion" into CCI, id. at 79:12-20.

    B.    <u>Findings of Fact Relevant to Disputed Issues and Credibility Determinations</u>

    1.    <u>Hearing Witnesses</u>

The Court finds Coleman, Jensen, and Cutsey (the "Investors") to be entirely credible. The Investors' testimony is supported to some degree by documentary evidence, including the PPMs and Business Plans, and the Investors testified consistently with one another regarding the representations made by Kontilai and CCI.

Likewise, the Court credits Gary Ferrell's testimony regarding CCI and Public Media, David Chapman's testimony regarding CCI and his role there, and Edward Little's testimony regarding his representation of Kontilai.  Notably, the defendants have advanced no reason that these witnesses' testimony should not be given credence.

As to Moessner, we note that she was not offered as an expert witness in this case, and despite Veronica Kontilai's claim that she "acted as an <u>ad</u> <u>hoc</u> expert," <u>see</u> Veronica Kontilai

Mem. at 7, in fact Moessner merely testified as to the preparation of certain exhibits as permitted

by Fed. R. Evid. 1006.  In that capacity, we find that her testimony was credible.

With regard to Vranca, we find his report to be essentially worthless.  Vranca testified

that his method of determining that CCI expenses were for the benefit of CCI consisted of simply

questioning whether such an expense could conceivably be made for the benefit of a company

CCI's size, without any sort of investigation or analysis as to whether the expenses were

legitimate or actually made for CCI's benefit.  See Jan. 24 Tr. at 34:3-25 (Vranca "ha[d]

absolutely no idea" whether expenses were "proper or legitimate" and merely determined that

"these expenses, in the grossest sense, are expenses that businesses incur.").  Thus, his opinions

as to the "business-related" expenses incurred by CCI are rejected.  Likewise, we do not credit

Vranca's opinion that Kontilai contributed $1.411 million to CCI through Public Media, nor that

the purported loan is now worth $3.3 million.  See Vranca Report ¶ 53.  Vranca conceded that he

relied on CCI's representation that the loan document was genuine and that if he had been told of

the SEC's concerns regarding the document, he would not have considered it to be a "capital

infusion" into CCI.  Jan. 24 Tr. at 78:12-79:20.  Vranca also undertook no investigation as to

whether the payments into Public Media that made up the purported "loan" were, in fact, made

by Kontilai, rather than any other individual or business.  Id. at 78:18-21.

2.   Adverse Inference for Kontilai

To avoid being subpoenaed to appear at the preliminary injunction hearing, Kontilai

stipulated that he would have invoked his Fifth Amendment right against self-incrimination if

questioned regarding numerous topics relating to the operation of CCI.  See Letter from T. Miller

& C. Hansel, filed Aug. 31, 2022 (Docket # 1065) ("Fifth Am. Let.").  The SEC now asks that

the Court draw an adverse inference from Kontilai's invocation of that right.  See, e.g., SEC

13

Proposed Findings at 70.  Kontilai and CCI argue that the Court need not and should not draw

such an inference.  See Kontilai Proposed Findings at 94; CCI Mem.[7]

 "A court may draw an adverse inference against a party who asserts his Fifth Amendment

privilege in a civil matter, because the invocation of the privilege results in a disadvantage to

opposing parties by keeping them from obtaining information they could otherwise get."  S.E.C.

v. Suman, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010) (citing Baxter v. Palmigiano, 425 U.S. 308,

318 (1976); Collazos v. United States, 368 F.3d 190, 203-04 (2d Cir. 2004)) (additional citations

omitted).  "It is firmly established that 'an adverse inference is equally to be drawn where the

government is a party to a civil proceeding.'"  Id. (quoting S.E.C. v. Tome, 638 F. Supp. 629,

632 (S.D.N.Y. 1986)).  Likewise, "[c]ourts routinely draw adverse inferences in connection with

preliminary injunction proceedings."  CF 135 Flat LLC v. Triadou SPV N.A., 2016 WL

5945912, at *4 n.7 (S.D.N.Y. June 24, 2016); see John Paul Mitchell Sys. v. Quality King Distr.,

Inc., 106 F. Supp. 2d 462, 471 (S.D.N.Y. 2000) (allowing Fifth Amendment adverse inference

on preliminary injunction).  Even where an "overlapping criminal investigation or proceeding" is

pending, a civil defendant runs the risk of an adverse inference if he invokes the Fifth

Amendment.  See Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 97-98 (2d Cir.

2012) ("A defendant in a civil proceeding who invokes the Fifth Amendment as a result of an

overlapping criminal investigation or proceeding risks the adverse inference arising from his or

her assertion of the privilege.") (punctuation and citation omitted).

 "The determination whether to draw an adverse inference from a Fifth Amendment claim

and the scope of the inference are within the discretion of the court."  Donoghue v. Retrophin,

---

[7]  CCI's memorandum of law contains no argument but merely joins in Kontilai's
proposed findings.  See CCI Mem.

Inc., 2015 WL 13882435, at *2 (S.D.N.Y. July 20, 2015) (citing Brink's Inc. v. City of New York, 717 F.2d 700, 710 (2d Cir. 1983)).  "The decision . . . will turn at least in major part on whether invocation of the privilege has prevented the other side from obtaining relevant information." Id. (citing United States v. Certain Real Prop. & Premises Known as 4003-4005 Fifth Ave., 55 F.3d 78, 84 (2d Cir. 1995)).  An adverse inference is designed to "balance[] the equities" when a party is deprived of evidence, see Suman, 684 F. Supp. 2d at 387, and must "be only one of a number of factors the factfinder will consider and [] be given no more weight than the facts of the case warrant," Louis Vuitton, 676 F.3d at 97-98; accord S.E.C. v. Calabrigo, 2022 WL 2704103, at *5 (S.D.N.Y. July 11, 2022).  However, if supported by the facts of the case, "an adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader."  LiButti v. United States, 178 F.3d 114, 120 (2d Cir. 1999) (citing United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 153-54 (1923)).

Here, we have no reason to doubt that the adverse inference will serve to balance the equities in this case.  Kontilai is represented by counsel, and the decision to invoke the privilege represents an informed assertion of Kontilai's interest in not having inculpatory testimony used against him.  This decision was surely made with knowledge of the risk involved and cannot insulate him from an adverse inference in this proceeding.  Although Kontilai protests that the SEC's prior questioning of him at depositions should suffice to prevent any disadvantage to the SEC, the SEC has not had the opportunity to question Kontilai on the defendants' theory of the case as it now stands, nor on the opinions advanced by CCI's expert witness.  Accordingly, we find that an adverse inference may be drawn from Kontilai's refusal to appear and answer

**S.A.0015**

questions relating to the issues in this case.[8]

III.    LEGAL STANDARD

"It is 'well established' that Section 22(a) of the Securities Act of 1933 and Section 27 of

the Securities Exchange Act of 1934 'confer general equity powers upon the district courts' that

are 'invoked by a showing of a securities law violation.'"  Smith v. S.E.C., 653 F.3d 121, 127

(2d Cir. 2011) (quoting S.E.C. v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1103 (2d Cir.

1972)).  "The equitable standards that apply in private injunction actions are not the same as

those that apply in SEC actions because the injunctions the SEC seeks are 'creatures of statute.'

We do not require a showing of irreparable harm . . . instead it is 'enough if the statutory

conditions for injunctive relief were made to appear.'"  City of New York v. Golden Feather

Smoke Shop, Inc., 597 F.3d 115, 120 (2d Cir. 2010) (quoting S.E.C. v. Mgmt. Dynamics, Inc.,

515 F.2d 801, 808 (2d Cir. 1975)).  Thus, "[t]o obtain a preliminary injunction enjoining future

violations of securities laws, the SEC must make a 'clear showing' of both (1) the likelihood of

success by establishing a prima facie case of a past violation of the securities laws, and (2) a

'reasonable likelihood' of future violations absent the injunction."  S.E.C. v. Gonzalez de

Castilla, 145 F. Supp. 2d 402, 414 (S.D.N.Y. 2001) (quoting S.E.C. v. Unifund SAL, 910 F.2d

1028, 1037 (2d Cir. 1990)); accord S.E.C. v. Telegram Grp., Inc., 448 F. Supp. 3d 352, 364

(S.D.N.Y. 2020).

By contrast, the SEC's request for an asset freeze is subject to a lower standard.  See

---

[8]  Kontilai requests that, if the Court is "inclined to adopt any adverse inferences," it
should instead stay the determination of this motion until after the conclusion of Kontilai's
criminal trial.  Kontilai Proposed Findings at 102.  The district court, however, has already ruled
that the trial of this matter need not be stayed in light of Kontilai's current circumstances, see
Order, dated May 26, 2023 (Docket # 1231).  In any event, the request is nonsensical since a stay
would simply result in the existing injunction and asset freeze remaining in place for an
indefinite period— precisely the outcome opposed by Kontilai in this motion.

S.A.0016

Calabrigo, 2022 WL 2704103, at *4 ("The SEC need not make as substantial a showing to obtain

an asset freeze as it must to obtain a preliminary injunction.").  "Where an asset freeze is

involved, the SEC must show either a likelihood of success on the merits, or that an inference

can be drawn that the party has violated the federal securities laws."  Smith, 653 F.3d at 128

(citation omitted).

The power to issue an asset freeze is not "limited to assets held solely by an alleged

wrongdoer, who is sued as a defendant in an enforcement action."  Id.  "Rather, 'federal courts

may order equitable relief against a person who is not accused of wrongdoing in a securities

enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a

legitimate claim to those funds.'"  Id. (quoting S.E.C. v. Cavanagh, 155 F.3d 129, 136 (2d Cir.

1998)).  "In such cases, the burden rests with the [SEC] to show that the funds in the possession

of the relief defendant are ill-gotten."  Id. (citation omitted).

## IV.   DISCUSSION

### A.   Preliminary Injunction

#### 1.   Likelihood of Success on the Merits

To obtain the preliminary injunction it seeks, the SEC must demonstrate that it is likely to

succeed on the merits of its claims.  See Gonzalez, 145 F. Supp. 2d at 414.  A ruling in this case

on an SEC motion for partial summary judgment has already determined that Kontilai and CCI

violated Rule 21F-17 of the Exchange Act, 17 C.F.R. § 240, which prohibits actions taken "to

impede an individual from communicating directly with the [SEC] . . . about a possible securities

law violation."  See United States S.E.C. v. Collector's Coffee Inc., 2021 WL 5360440, at *4

(S.D.N.Y. Nov. 17, 2021) ("21F-17 Decision").  The SEC's remaining allegations concern

violations of the Exchange Act, 15 U.S.C. § 78j, Section 10(b); 17 C.F.R. § 240, Rules 10b-5(a)-

(c) and Rule 21F-17; and Section 17(a) of the Securities Act, 15 U.S.C. §§ 77(a)(1)-(3). <u>See</u>
<u>Am. Compl.</u> ¶¶ 171-85. We first examine the law under which the SEC seeks its injunction then
discuss its application to the facts of this case.

a. <u>Governing Securities Law</u>

Section 10(b) of the Securities Act makes it unlawful "for any person, directly or
indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or
of any facility of any national securities exchange . . . [t]o use or employ, in connection with the
purchase or sale of any security . . . any manipulative or deceptive device or contrivance in
contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. §
78j(b). A regulation promulgated under this statute, Rule 10b-5, states that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce, or of the mails or of any facility of any
> national securities exchange,
>> (a) To employ any device, scheme, or artifice to defraud,
>> (b) To make any untrue statement of a material fact or to omit to state a
>> material fact necessary in order to make the statements made, in the light
>> of the circumstances under which they were made, not misleading, or
>> (c) To engage in any act, practice, or course of business which operates or
>> would operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Finally, Section 17(a) of the Securities Act states that:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the
> use of any means or instruments of transportation or communication in interstate
> commerce or by use of the mails, directly or indirectly—
>> (1) to employ any device, scheme, or artifice to defraud, or
>> (2) to obtain money or property by means of any untrue statement of a
>> material fact or any omission to state a material fact necessary in order to
>> make the statements made, in light of the circumstances under which they
>> were made, not misleading; or
>> (3) to engage in any transaction, practice, or course of business which
>> operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

18

To prove that CCI and Kontilai violated Section 10(b) and Rule 10(b)-5, the SEC must show that the defendants "(1) made a material misrepresentation or a material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." S.E.C. v. Pentagon Cap. Mgmt. PLC, 725 F.3d 279, 285 (2d Cir. 2013) (quoting S.E.C. v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999)).  A misrepresentation or omission is material where "a reasonable investor would have considered [it] significant in making investment decisions." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); accord S.E.C. v. Riel, 282 F. Supp. 3d 499, 520 (S.D.N.Y. 2017)).  "In a securities fraud case, the plaintiff may establish scienter by either '(1) showing the defendants' motive and opportunity to perpetrate fraud, or (2) alleging strong circumstantial evidence of conscious misbehavior or recklessness.'" Riel, 282 F. Supp. 3d at 520 (quoting Iowa Pub. Emp.'s Ret. Sys. v. Deloitte & Touche LLP, 919 F. Supp. 2d 321, 331 (S.D.N.Y. 2013)).  "The requirements for a violation of Section 17(a) apply only to a sale of securities but in other respects are the same as Section 10(b) and Rule 10b-5, except that 'no showing of scienter is required for the SEC to obtain an injunction under [Section 17] (a)(2) or (a)(3).'" Pentagon, 725 F.3d at 285 (quoting Monarch, 192 F.3d at 308).

As to deceptive or manipulative acts, "[c]ourts analyze claims brought under subsections (a) and (c) of Rule 10b-5 together, and often describe claims brought under these sections as alleging 'scheme liability.'" S.E.C. v. Rio Tinto plc, 2019 WL 124493, at *15 (S.D.N.Y. Mar. 18, 2019) ("Rio Tinto I") (citing S.E.C. v. Kelly, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011)).  In order to prove "scheme liability," the SEC must show that defendants "participated in an illegitimate, sham or inherently deceptive transaction where their conduct or role had the purpose and effect of creating a false appearance." S.E.C. v. Sason, 433 F. Supp. 3d 496, 508 (S.D.N.Y.

2020) (citing S.E.C. v. CKB168 Holdings, Ltd., 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016)).

Thus, a scheme liability claim requires the SEC to prove "that defendants: (1) committed a

deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with

scienter." Id. "With respect to the first element, the SEC needs to show that what occurred was

an 'inherently deceptive act' and not just a misleading statement." S.E.C. v. Penn, 225 F. Supp.

3d 225, 235 (S.D.N.Y. 2016). Thus, the "act" must include something other than the misleading

or deceptive statements required for 10b-5(b). See generally S.E.C. v. Rio Tinto plc, 41 F.4th 47

(2d Cir. 2022) ("Rio Tinto II"). "Conduct that is deceptive only because of a subsequent

material misstatement may be actionable under [Rule] 10b-5(b) but cannot be shoehorned into a

claim for scheme liability under [Rule] 10b-5(a) and (c)." Penn, 225 F. Supp. 3d at 235 (citing

S.E.C. v. Garber, 959 F. Supp. 2d 374, 381 & n.47 (S.D.N.Y. 2013)).

        "As with Rule 10b-5, subsections (1) and (3) of Section 17(a) apply to scheme

liability . . . . [N]umerous courts have held that the elements of a claim under Section 17(a) are

'essentially the same' as those for claims under Rule 10b-5." Kelly, 817 F. Supp. 2d at 345

(S.D.N.Y. 2011) (quoting Monarch, 192 F.3d at 308)). As noted above, "no showing of scienter

is required for the SEC to obtain an injunction under . . . [Section 17](a)(3)." Pentagon, 725 F.3d

at 285.

                    b.    Securities Violations by CCI and Kontilai

        The SEC's assertion that Kontilai and CCI made misrepresentations and omissions

centers on the following conduct with regard to investors and prospective investors: (1) that

Kontilai repeatedly claimed he was not taking a salary, but in fact received money from the

company on numerous occasions; (2) that Kontilai and CCI claimed they had secured a large

number of "master dealers" who were contractually bound to sell products on CCI's website,

though such contracts did not exist; (3) that Kontilai and CCI represented that the company had "no debt" and was initially funded by Kontilai's investments, but made substantial payments to Kontilai that they now attribute to purported loans; and (4) that Kontilai and CCI falsely represented that the sale of the Jackie Robinson Contracts was likely to generate between $25 and $36 million for CCI and its investors. See SEC Proposed Findings at 21-41. SEC's allegation of "deceptive acts" revolves largely around Kontilai and CCI's alleged misappropriation of investor funds, which the SEC contends was initially concealed via Kontilai's fabrication of documents. See id. at 3-21, 42-45.

We next address the evidence adduced by the SEC, Kontilai, and CCI at the preliminary injunction hearing.

i.     Misappropriation of Funds

Kontilai and CCI withdrew a net amount of at least $2.1 million in cash from CCI bank accounts between April 1, 2014 and December 21, 2018. See Summary of Cash Transactions from CCI Accounts, annexed as Ex. 18 to PHPFF (Docket # 1052-18) ("CCI Cash Summary") ($2,170,545.14 in net cash withdrawals). Contemporaneous notations on the bank statements provide various explanations for these withdrawals, including references such as "Collectibles Purchase" for over $1 million of withdrawals. See id. at Lines 69, 71, 73-75, 77-80, 84.

Additional funds were sent by CCI to Gail Holt, who worked with Kontilai at CCI, and who testified she withdrew the funds and delivered them to Kontilai. Between June 19, 2014 and June 25, 2014, for instance, CCI transferred $1.1 million to Holt, and Holt withdrew the same total amount in cash, less $500. See Transfers from Collectors Café to Holt and Selected Cash Transactions in Holt Accounts, annexed as Ex. 20 to PHPFF (Docket # 1052-20) ("Holt Transfer Summary"), at Lines 47-57. Holt testified at her deposition that she delivered the withdrawn

cash to Kontilai, as she did on each occasion that CCI transferred money to her account.  See Deposition of Gail Holt, dated Oct. 7, 2020, annexed as Ex. 43 to PHPFF (Docket # 1052-47) ("Holt Dep."), at 52:10-13 ("Q: The money that was deposited in your account, where did it go? A: Back to Mykalai [Kontilai].  I took out cash and gave it to Mykalai.").[9]  Defendants do not contest that CCI transferred more than $5 million to Holt in total, see Kontilai Proposed Findings at 27, though Kontilai claimed that these transfers were intended for Holt to "hold[] onto . . . almost like a piggybank until [CCI] found a next major asset that [CCI] wanted to buy." Deposition of Mykalai Kontilai, dated Sept. 24, 2020, annexed as Ex. 42 to PHPFF (Docket # 1052-46) ("Second Kontilai Dep. Excerpt"), at 117:13-118:18.

Contrary to Kontilai and CCI's justifications for these two sets of withdrawals, Kontilai himself testified that the Jackie Robinson Contracts were the only collectibles CCI ever purchased, see Deposition of Mykalai Kontilai, dated Apr. 16, 2018, annexed as Ex. 41 to PHPFF (Docket # 1052-45) ("First Kontilai Dep. Excerpt"), at 362:13-16 ("Q: Collectors Café didn't make any collectibles purchases?  A: No, not that I recall, other than the Jackie Robinson contracts."), and investors were never informed that investor money would be used by anyone to purchase collectibles for any reason, see Jensen Decl. ¶ 16; Coleman Decl. ¶¶ 12-13.  In fact, CCI represented to investors that one key aspect of its proposed business was that CCI would not buy or own collectibles.  Jensen Decl. ¶ 3(d); Coleman Decl. ¶ 5; Cutsey Decl. ¶ 14; see Collectors Café Business Plan, annexed as Ex. 12 to PHPFF (Docket # 1052-12) ("2014

---

[9]  Holt's deposition testimony was made part of the record of the preliminary injunction hearing even though she did not testify.  See Letter from C. Hansel, dated Feb. 17, 2023 (Docket # 1163).  We credit her testimony given that Kontilai has refused on Fifth Amendment grounds to answer any questions regarding the conduct that Holt testifies to, her testimony is consistent with other evidence in the record, and her testimony is more plausible than the explanations offered by the defendants.

Business Plan"), at *9 ("Collectors Café will collect commissions . . . each time a collectible

sells through our portal.  Most importantly, this happens with NO COST OF GOODS.").

When asked about the cash withdrawals and the notations describing them, Kontilai

testified that the withdrawals he made were repayments of debt owed by CCI to Kontilai, but

could not identify the amount of money CCI owed him or the amount of money CCI had repaid

on those debts.  See First Kontilai Dep. Excerpt at 361:19-365:10; see also Second Kontilai Dep.

Excerpt at 62:14-63:14.  Thus, the notion that these were repayments of debts was obviously

false.  In any event, Kontilai and/or CCI previously represented to investors that the company

had no debt during the relevant period between 2014 and 2018, and never informed investors that

investor money might be used to pay Kontilai.  Jensen Decl. ¶¶ 3(c), 16; Coleman Decl. ¶¶ 7, 12-

13; Cutsey Decl. ¶¶ 23, 26; see 2014 Business Plan at *11 ("The company is debt free . . . .").

Indeed, the sole evidence that any debt was owed by CCI to Kontilai comes in the form of

purported "convertible note agreements" for $5 million and $1.411 million that were likely

fabricated.  See Convertible Note Agreement, dated June 11, 2007, annexed as Ex. 16 to PHPFF

(Docket # 1052-16) ("$5 Million Note"); Convertible Note Agreement, dated Dec. 31, 2007,

annexed to Board and Shareholder Resolutions at *53 (Docket # 1052-58) ("$1.411 Million

Note").  We discuss these documents in greater detail below.  See Section IV(A)(1)(b)(ii).

An additional $1 million was transferred from CCI to Holt in three transactions between

July 10 and 11, 2018.  See Holt Transfer Summary at Lines 58, 60-61.  Kontilai testified that the

July 2018 transfers to Holt were in partial settlement of a threatened lawsuit in which Holt

planned to demand the repayment of an investment made by her or her family.  See Second

Kontilai Dep. Excerpt at 93:16-97:5.  However, Kontilai testified in May 2018 — two months

before these transfers — that although Holt had "at least seven figures in equity investment," the

supposed loan Holt made to CCI had "been paid."  <u>See</u> First Kontilai Dep. Excerpt at 330:21-

332:24.  The defendants have not identified any documentation suggesting that Holt made either

a loan to or an investment in CCI.

Kontilai and CCI also transferred a net amount of at least $1.9 million from CCI bank

accounts to Kontilai's bank accounts between April 1, 2014 and December 21, 2018.  <u>See</u>

Summary of Transactions to Kontilai from Collectors Café Bank Accounts, annexed as Ex. 19 to

PHPFF (Docket # 1052-19) ("CCI Transfer Summary") ($1,909,284.00 in net transfers).

Contemporaneous notations for these transfers include references to: (i) "salary" and

"compensation" for $1.1 million of transfers, <u>see id.</u> at Lines 4, 6-7; (ii) "partial repayment" of

notes, <u>id.</u> at Lines 41, 43; and (iii) "Corporate Housing," <u>id.</u> at Line 3.  The notations for "salary"

and "compensation" appear on transfers made days after Kontilai received a letter sent by

counsel for Kirk Jensen and certain other investors, which alleged Kontilai and Collectors Café

engaged in fraud.  <u>Compare id.</u> (transfers on March 20, March 21, and April 20, 2017); <u>with</u>

Letter from T. Dennin to Kontilai, dated Mar. 17, 2017, annexed as Ex. 28 to PHPFF (Docket #

1052-28) (March 17, 2017 letter alleging that "the offer and sale of [CCI] shares violated

numerous provisions under the federal securities and common law").  As already discussed,

Kontilai and CCI had previously represented to investors that Kontilai did not — and would not

— take a salary.  <u>See</u> Coleman Decl. ¶¶ 4, 10; Cutsey Decl. ¶ 7, 20.

Finally, Kontilai and CCI indiscriminately used company cards for personal expenditures.

Even the defendants' expert witness estimated that personal expenses constituted over $1.1

million of the charges on Kontilai's company credit cards.  Vranca Report ¶¶ 44-45.  As the SEC

observed, this number is unlikely to represent the full scope of Kontilai's personal expenditures,

because Vranca's methodology did not account for any expenses that could even hypothetically

have served a business purpose.  See, e.g., Jan. 24 Tr. 42:10-16 ("Q: So is it accurate to say that

given it is possible that at least a portion of this could be a business expense[,] [y]ou . . . assumed

it was a business expense, and then you threw it on the business-related expenses line . . . ?  A:

As far as I recall, if it's marked as an expense, yes, the answer is yes.").

        Kontilai did not testify at the preliminary injunction hearing and instead stipulated that he

would have invoked his Fifth Amendment right against self-incrimination if questioned

regarding these withdrawals.  See Fifth Am. Let.  Thus, we draw an inference that any truthful

testimony he would have given would have been adverse to his interests in this case.

                    ii.        Purported Loans & Employment Contract

        The SEC issued subpoenas to Kontilai and CCI seeking copies of employment

agreements and any contracts related to the distributions from CCI to Kontilai.  See Moessner

Decl. ¶¶ 8, 13.  The last of these subpoenas was sent on February 16, 2018.  Id. ¶ 8.  Gail Holt

testified that in April 2018, Kontilai told her that he planned to create a document related to his

employment at CCI.  See Holt Dep. at 143:18-145:9.  Kontilai then asked Holt to send him a

copy of her signature so that Kontilai could recreate her signature on an employment agreement.

Id. at 142:4-144:22.  She sent Kontilai a digital copy of her signature to serve as a "model."  Id.

at 142:4-143:11.

        On May 14, 2018, Kontilai and CCI produced a document purporting to be an

employment agreement between Kontilai and CCI.  See Employment Contract, dated May 14,

2007, annexed as Ex. 15 to PHPFF (Docket # 1052-15) ("Kontilai Contract"); see Letter from

Andrew Ceresney, dated May 14, 2018, annexed as Ex. 51 to PHPFF (Docket # 1052-55)

("Ceresney Let.") ("In response to the Subpoena, we are sending you a disc containing . . . . [a]

copy of Mykalai Kontilai's employment agreement").  The document purports to be dated May

14, 2007, and bears a signature attributed to "Ultimate Collector Inc. (Gail Holt, Chairman)."

See Kontilai Contract at 13. Tellingly, despite the 2007 date, the document contains a watermark

reading: "©2002-2018 Law Depot.com®." Id.

Indeed, in October 2018, counsel for Holt represented that this was not an original

document, but instead had been "recreated" based on a lost document, Moessner Decl. ¶ 17, and

Holt later testified that the signature on the document was "not [her] writing," but that she had

given Kontilai permission to affix a version of her signature "[b]ecause [Kontilai] asked [and]

said that he . . . had lost . . . the original employment agreement." Holt Dep. at 141:16-143:23.

Further, Holt testified that to her knowledge she was never Chairman of "Ultimate Collector," id.

at 115:11-20, which was CCI's corporate name in 2007, see Am. Compl. ¶ 19; Kontilai Ans. ¶

19. Gary Ferrell testified that he served continuously on the board during that year, Nov. 7 Tr. at

111:20-25, and to his knowledge Gail Holt was never named chairman of CCI's board and was

not "associated with CCI in any way" in 2007, id. at 112:12-21. Ferrell also testified that to his

knowledge the board had not entered into an employment agreement with Kontilai. Id. at

129:14-20. Robert Sparks was counsel for CCI in 2007, see Deposition of Robert Sparks, dated

Oct. 16, 2020, annexed as Ex. 52 to PHPFF (Docket # 1052-56) ("Sparks Dep."), at 27:11-15,

and testified that "[t]o the best of [his] knowledge, [he] never heard the name 'Gail Holt' until

2010, [or] [20]11," and Kontilai had never told him that Holt was a board member in 2007, id. at

26:24-27:5.

Also on May 14, 2018, Kontilai and CCI produced a document purporting to be a

"convertible note evidencing Mykalai Kontilai's loan to [CCI]." Ceresney Let.; see $5 Million

Note. Like the Employment Agreement, the $5 Million Note lists Holt as the Chairman of

Ultimate Collector and purports to contain her signature. $5 Million Note at *1, 4. The $5

Million Note is accompanied by a document purporting to be a Bank of America statement, which lists a $5 million deposit made by Kontilai into CCI's bank account on June 11, 2007. Id. at *5-6. The document contains mathematical errors, including the deduction of a $65 withdrawal from the $5 million balance, which results in a listed "Ending Balance" of $4,999,065 (rather than the accurate total of $4,999,935). Id. The bank statement the SEC obtained from Bank of America for the same account shows a deposit of only $1,000 on June 11, 2007. See Bank of America Statement, dated June 29, 2007, annexed as Ex. 17 to PHPFF (Docket # 1052-17). We thus find that the purported $5 Million Note is fabricated.

On May 16, 2018, Kontilai testified that he lent the company $5 million in the "first note." First Kontilai Dep. Excerpt at 153:5-7. About two weeks later, on June 1, 2018, Kontilai wrote a check to himself from CCI's bank account in the amount of $250,000. BankUnited Check No. 238, dated June 1, 2018, annexed as Ex. 50 to PHPFF (Docket # 1052-54). The memo line on the check reads: "Partial Repayment of 5MM Note." Id.

An additional document purporting to be a "convertible note agreement" between CCI and Kontilai, dated December 31, 2007, reflects a purported loan by Kontilai in the amount of $1,411,142.02. See $1.411 Million Note. The document again lists Gail Holt as "Chairman," this time of "Collector's Coffee, Inc.," and bears a signature attributed to "Gail Holt Chairman of the Board." Id. at *1, 4. Defendants' expert Vranca attributes the amount reflected in this note to payments made by Kontilai to Public Media, which Vranca describes as CCI's predecessor. See Vranca Report ¶¶ 3, 52-53; Public Media Deposits. Public Media CEO Gary Ferrell testified that he had no knowledge of this note, Nov. 7 Tr. at 134:8-135:4, and identified the deposits into Public Media's account as including less than $400,000 contributed by Kontilai, which he testified were payment for his creation of a pilot T.V. program for Collectors Café, not a loan to

S.A.0027

Public Media, id. at 108:13-109:19.  Ferrell testified that neither Kontilai nor CCI ever loaned

any amount of money to Public Media, and that Public Media was not a predecessor to CCI.  Id.

at 104:12-21, 106:21-107:3.  We thus conclude that this purported "convertible note agreement"

was fabricated.  Again, this conclusion is bolstered by Kontilai's invocation of his Fifth

Amendment privilege with respect to these matters.

iii.    False and Misleading Statements to Investors

Between April 1, 2014, and at least January 30, 2018, Kontilai and CCI disseminated

PPMs and Business Plans to potential investors that described the company's plans for the use of

investor funds.  None of the statements disclosed that CCI intended to provide Kontilai

personally with funds through transfers, cash withdrawals, or credit card usage.  Nor did they

disclose that payments would be made for the purposes that Kontilai now claims: that is, for the

purchase of collectibles by Kontilai or Holt, the payment of salary to Kontilai, or the repayment

of the purported loans at issue here.  Kontilai and Collectors Café also made affirmative

statements to potential investors that Collectors Café did not and would not pay or owe a salary

to Kontilai.

CCI used two versions of their PPM between 2014 and 2018.  See Answer and

Affirmative Defenses to the Amended Complaint, filed Mar. 6, 2020 (Docket # 241) ("Kontilai

Ans."), ¶ 25.  The first, created in 2008 and amended three times, represents that "upon funding

of this MEMORANDUM" Kontilai would receive a onetime payment of $300,000 and a stock

bonus plan "as compensation for past services," and makes no other statement about salary for

future services.  See Confidential Private Placement Offering Memorandum, dated Apr. 28,

2008, annexed at *3 to Ex. 6 to PHPFF (Docket # 1052-6) ("First PPM"); First Amendment,

dated Mar. 9, 2009, annexed at *56 to Ex. 6 to PHPFF (Docket # 1052-6); Second Amendment,

28

**S.A.0028**

dated Nov. 8, 2009, annexed at *60 to Ex. 6 to PHPFF (Docket # 1052-6); Third Amendment,

dated Jan. 31, 2010, annexed at *63 to Ex. 6 to PHPFF (Docket # 1052-6).  The First PPM makes

no mention of an ongoing salary for Kontilai or other personal use of CCI funds by Kontilai.  See

generally id.  The document states that Kontilai "has approximately $600,000 in Promissory

Notes still outstanding," First PPM at *51, a number that appears to include the $400,000

payment made to Public Media for the Collector's Café T.V. pilot program, see id.  The second

PPM, also dated April 2008 but heavily amended in 2015, see Kontilai Ans. ¶¶ 27-28, states that

CCI intends to use investor money for "developing the Company infrastructure, related legal

costs, and to develop and growth [sic] the integrated social network and auction portal,"

Confidential Private Placement Offering Memorandum, dated Apr. 28, 2008, annexed at *2 to

Ex. 7 to PHPFF (Docket # 1052-7) ("Second PPM"); see Email from L. Feliciano to D.

Chapman, dated July 13, 2017, annexed as Ex. 8 to PHPFF (Docket # 1052-8) (annexing

amendments to the Second PPM) ("Second PPM Amendments").  The Second PPM contains no

notices regarding outstanding "promissory notes."  See generally id.  It goes on to note that

"[f]unds may also be used for broad purposes of general growth opportunities at the election of

the CEO," id. at *9, but does not refer to a salary for Kontilai, debt owed to Kontilai, or other

personal use of funds by Kontilai.

     Both PPMs contain a disclaimer to the effect that CCI "may use some of the private

offering proceeds for . . . satisfaction of outstanding company debt in the form of promissory

notes held by individuals, including officers and directors, as it deems appropriate."  First PPM

at *42; see Second PPM at *12.  Both PPMs also contain a disclaimer that "no person has been

authorized to give any information or make any representations concerning this investment other

than the information and representations contained in this confidential memorandum."  First

PPM at *4; Second PPM at *3.

CCI's "Business Plans," issued in 2014 and 2016, both included statements representing that investor funds would be used "for the General Purpose of increasing Operating Capital of the Company, in preparation for initial growth and launch of our website, national television shows and completion of the retail center and television studio at Caesar's Palace." 2014 Business Plan at 2; Business Plan, annexed as Ex. 13 to PHPFF (Docket # 1052-13) ("2016 Business Plan"), at *3. Neither plan states that CCI intends to use investor money to provide Kontilai with a salary or other funds. See 2014 Business Plan, 2016 Business Plan. As noted, CCI and Kontilai represented on multiple occasions that Kontilai had not and would not take a salary. E.g., Coleman Decl. ¶ 4; Cutsey Decl. ¶¶ 7, 10, 20; see also Corporate Update at *11 ("Collector's Café's founder & CEO, Mykalai Kontilai . . . has not taken a salary to-date"); Email from Kontilai to Cutsey, dated Dec. 5, 2016, annexed as Ex. 35 to PHPFF (Docket # 1052-35) (instructing Cutsey to tell investors Kontilai was "[d]oing all of this work for no salary . . . so our investment can try to stay non-diluted.").

Kontilai also repeatedly told potential investors that he had made substantial investments in Collectors Café. For example, Kontilai stated to Coleman during a July 2016 call that CCI had no debt, and that Kontilai owned 62% of the company and had invested $8 million. Coleman Decl. ¶¶ 7, 16. Coleman understood from Kontilai's statement that Kontilai would "earn returns from his investment just like an investor would." Id. ¶ 16. Kontilai did not state or suggest that his investment was a loan and did not provide any document showing that he made a loan. Id. ¶ 16. Similarly, during a conference call in 2015, Kontilai told Jensen and others that Collectors Café had no debt and that Kontilai funded operations with his own investments. Jensen Decl. ¶ 3(c).

Defendants stated to investors in their 2017 Corporate Update that Kontilai "invested several million dollars personally." Corporate Update at *11. Similarly, during a December 5, 2016, conference call in which Kontilai and Collectors Café sought more funding from investors, at Kontilai's instruction Cutsey told potential investors that Kontilai invested his own money. Cutsey Decl. ¶ 7. Kontilai himself repeated to Cutsey and other investors on multiple occasions that he had invested $5 million of his own funds in the company. Id. ¶ 21. Kontilai concedes that he indicated to investors that he had invested "some of his own money." Kontilai Ans. ¶ 44. As discussed in the previous section, the initial PPM indicates only that Kontilai loaned CCI $600,000, and the only written evidence of any investment or loan by Kontilai beyond that number — the convertible notes — was fabricated.

Defendants claim that CCI owed Kontilai a debt of several million dollars. See, e.g., Kontilai Proposed Findings at 84-85 ("[T]he outstanding balance of the loan made in 2007 added to the various transfers Mr. Kontilai made from his personal accounts to CCI total $5,636,648.70"). The primary documents offered by defendants as evidence of Kontilai's purported loan are the "convertible notes" and the annexed Bank of America statement, along with Vranca's opinion that deposits into Public Media accounts were in fact loans to CCI from Kontilai. See Section IV.A.1.b.ii. above. Kontilai could only "speculate" in his deposition as to the amounts owed to him for the purported debt, suggesting that no records of these "loans" were kept by CCI. See Second Kontilai Dep. Excerpt at 62:19-63:14. The initial PPM reflects only a $600,000 loan by Kontilai, see First PPM at *51, which is less than half of the "loan" amount reflected in the smaller "convertible note," see $1.411 Million Note. By 2014, the beginning of the period at issue here, CCI claimed to be debt free. See 2014 Business Plan at 10. Defendants repeatedly represented to investors after that point that the company had no debt. See, e.g.,

31

**S.A.0031**

Jensen Decl. ¶ 3; Coleman Decl. ¶ 8; Cutsey Decl. ¶ 24; 2016 Business Plan at *11.  We thus find that Kontilai was not owed any money by CCI during the period at issue.

CCI's investors testified that these representations were material to their decision to invest.  Coleman testified that the representations regarding Kontilai's purported investment were "important" because "it meant that [] Kontilai not only had skin in the game, but was also motivated to make the company work."  Coleman Decl. ¶ 17.  Coleman testified that if he had known of CCI's purported debt to Kontilai he would have "requested an audit" before investing. Id. ¶ 15.  Likewise, Cutsey testified that Kontilai's purported investment "signified that [] Kontilai was very confident in the CCI business plan" and was thus "significant" to Cutsey. Cutsey Decl. ¶ 22.  Cutsey testified that if he had known of CCI's purported debts, he "would have asked for additional information," and would not have invested "without a reasonable explanation for the debt or other financial information showing that repayment was feasible."  Id. ¶ 25.

CCI also represented to investors that its revenue was inextricably tied to auction sales on CCI's website.  See Kontilai Ans. ¶ 53 (admitting that "at least two versions of a Collectors Café business plan stated that '[t]hrough its online auction business, Collectors Café will collect commissions, (approximately 20% from buyers and 20% from dealers/sellers) each time a collectible sells through our portal'"); 2014 Business Plan at 8; 2016 Business Plan at *11-12. To emphasize the likely profitability of that website, CCI and Kontilai made written and oral statements to investors about the number of dealers who had committed to sell products in partnership with CCI.  In amendments to the PPMs sent to investors, Kontilai and CCI represented that CCI continued to execute "additional inventory contracts" with "Dealers" and

"Master Dealers."[10]  Second PPM Amendments at *4, 14, 17, 20; see also Coleman Decl. ¶ 19.

Jensen testified that sometime after February 2015, CCI represented it had entered into "master

dealer contracts locking approximately 400 master dealers into exclusive, perpetual contracts."

Jensen Decl. ¶¶ 3-4.  "[J]ust before" Jensen's first investment, CCI sent Jensen a PPM stating

that it "had inventory contracts with Master Dealers."  Id. ¶ 6.  Coleman testified that before his

first investment, Kontilai stated in a July 2016 phone call that CCI had signed 10-year

agreements with 580 dealers.  Coleman Decl. ¶¶ 2, 18.  Cutsey stated that Kontilai had

represented there were "hundreds of dealers who had committed to supply inventory for the CCI

website," Cutsey Decl. ¶ 11, and had Cutsey prepare a document for investors that represented

CCI had a "massive dealer inventory," id. ¶ 10(a); see Corporate Update at *5.  Defendants

represented to investors that the total inventory on CCI's site was valued over $3 billion.  See

Jensen Decl. ¶ 3(f); Coleman Decl. ¶ 18.

        In fact, these statements were false.  Kontilai testified that the company had not signed

"anybody" to a Master Dealer contract as of May 2018, First Kontilai Dep. Excerpt at 191:11-

192:2, and had not even offered a Master Dealer contract to anyone, id. at 193:2-5.  Kontilai also

testified that of ordinary (non-"Master") dealers, CCI had "approximately 13 or 14 . . . on written

contracts," id. at 174:3-8, and that the inventory on CCI's website was limited to offerings from

"[s]omewhere under five" dealers in total, id. at 187:25-188:7.  Kontilai testified that a

collectibles dealer named Peter Siegel was responsible for "getting dealers, [and] getting verbal

commitments."  Id. at 174:10-12.  Siegel testified, however, that as of August 2016, he did not

believe CCI had either "580 dealers" or "3.5 billion in inventory."  Deposition of Peter Siegel,

---

        [10]  A "Master Dealer" agreement is a long-term agreement under which a dealer would
agree to make their collectibles available for sale exclusively through CCI.  See First Kontilai
Dep. Excerpt at 191:11-192:3.

dated Oct. 28, 2020, annexed as Ex. 46 to PHPFF (Docket # 1052-50) ("Siegel Dep."), at

374:22-375:16. Siegel testified that he was not aware of any executed 10-year exclusivity

contracts between CCI and dealers, nor of any contract longer than six months with any dealer.

Id. at 413:23-414:21. Cutsey, who was responsible for the creation of CCI's website, testified

that he was aware of only one dealer in the time that he worked on the site. Cutsey Decl. ¶ 11.

      Investors credibly testified that the representations regarding inventory and master

dealers were material to their decision to invest. Cutsey stated that the "promise of exclusive

access to dealers and their inventory was one of the most compelling features of CCI," id. ¶ 13,

particularly because "CCI's revenue stream depended upon it getting 40% margins from the sale

of the inventory, without ever having to buy the inventory," id. ¶ 14. Coleman stated that the

supposed Master Dealer contracts were "important" to him because "it meant that this inventory

was available to generate a return on investment sooner rather than later," Coleman Decl. ¶ 19,

and averred that if he had known that CCI's dealer contracts were limited to "short term

agreements," he "would have likely reconsidered investing in whole or in part," id. ¶ 20. Jensen

explained that he "liked the idea that the master dealers were locked in to . . . 'perpetual' and

'exclusive' agreements with CCI," which was one element of a "very impressive" pitch by CCI.

Jensen Decl. ¶ 5.

      Finally, Kontilai and Collectors Café acquired the Jackie Robinson Contracts for $2

million in 2013. See Kontilai Ans. ¶ 64; Am. Compl. ¶ 64. CCI and Kontilai represented to

investors and potential investors that (i) Collectors Café owned contracts signed by Jackie

Robinson; and (ii) the contracts had been appraised at between $25 and $36 million. See, e.g.,

Coleman Decl. ¶¶ 21-22; Cutsey Decl. ¶¶ 16-17; Jensen Decl. ¶¶ 3(b), 6(b), 12; Nov. 7 Tr. at

214:2-6; see also Kontilai Ans. ¶ 63 (admitting the Amended Complaint's allegation that

"Collectors Café and Kontilai represented to investors and potential investors that (i) Collectors Café owned contracts signed by Jackie Robinson; and (ii) the contracts had been appraised at $36 million"). In a February 2015 amendment to the Second PPM, for instance, CCI stated that it had "acquired a collectibles asset which has been appraised at $36,000,000" which was "likely to generate millions of dollars of additional cash flow upon its liquidation." Second PPM Amendments at *6; see Spreadsheet, annexed as Ex. 33 to PHPFF (Docket # 1052-33) ("Investor Contributions") (listing dates on which investors received the Second PPM and amendments). The same document stated that CCI had received valuations for the Contracts from "both Christies Auction House and Seth Kaller Inc., a leading appraiser of legacy historical documents[,] who issued written appraisals of 25 million and 36 million dollars respectively." Id. at *10.

There were no bona fide "appraisals," however. Seth Kaller testified that he was retained to create a "marketing document that was ultimately written as an appraisal . . . that came up with a value [or] a sales price for [the Contracts]." Deposition of Seth Kaller, dated Oct. 20, 2020, annexed as Ex. 47 to PHPFF (Docket # 1052-51) ("Kaller Dep."), at 72:3-12. Kaller testified that "it was pre-agreed that the appraisal . . . would support" a $36 million valuation. Id. at 82:3-11. Kaller testified that he did his "appraisal" in return for an agreement that he would receive 5% of the price "actually paid to [CCI] from the sale or auction of the [Contracts]." Id. at 76:13-24. CCI instructed Kaller not to disclose the percentage he was owed. Id. at 77:23-78:4. The record does not reflect that Christie's Auction House ever prepared an appraisal of the Contracts' auction value; instead, Christie's proposed the $25 million figure as a suggested "private-sale asking price" for a "limited number of potential buyers." See Letter from F. Wahlgren to Kontilai, dated Nov. 11, 2013, annexed as Ex. 48 to PHPFF (Docket # 1052-52)

("Christie's Let.").  Kaller described a "private-sale asking price" as an amount "below which [Christie's] would not offer to sell it" to private parties.  See Kaller Dep. at 242:2-7.

Jensen testified that the purported value of the Contracts was "very significant" to him as an investor "because [he] believed that [his] investment in the company was covered as long as CCI owned such a valuable asset."  Jensen Decl. ¶ 12.  He testified that he was never informed that Kaller's estimate was based on a number given by CCI, or that Christie's had not given a formal appraisal, and "would have considered this information very important when assessing the actual value of the company's assets."  Id. ¶¶ 14-15.  Cutsey testified that "[t]he high valuation . . . of the [Contracts]" was an "important representation[] because [it] made [Cutsey] feel confident that [his] investments were protected and would be recouped when the [C]ontracts were auctioned."  Cutsey Decl. ¶ 19.  Likewise, Coleman testified that the "statements about the Jackie Robinson [C]ontracts were important to [him] when considering [whether] to invest because it meant that [the] company had sufficient assets to repay [Coleman's] investment if the company failed."  Coleman Decl. ¶ 26.

iv.   <u>Analysis</u>

SEC has shown a likelihood of success on the merits of its securities claims.

First, the SEC has shown that Kontilai and CCI "(1) made a material misrepresentation or a material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."  See Pentagon, 725 F.3d at 285.  Kontilai and CCI's statements about the use of investor funds, Kontilai's purported investment and the company's lack of debt, the company's collectibles inventory and "Master Dealer" contracts, and the appraisal of the Jackie Robinson Contracts all represent misrepresentations or omissions that satisfy the first element.

36

**S.A.0036**

Although Kontilai and CCI represented in the PPM that the company's use of funds would be used for the company's "growth," Second PPM at *9, it did not mention payments to Kontilai personally. More to the point, Kontilai repeatedly avowed to investors that he had not and would not receive a salary. These representations proved to be false and misleading when Kontilai actually received funds from CCI, including payments for what he designated, either at the time or retrospectively, as salary.[11] See CCI Transfer Summary. Likewise, defendants' representations that Kontilai had invested millions are belied by the sheer absence of any evidence of such an investment, and are irreconcilable with Kontilai's current claim that payments from CCI were in partial repayment of loans.

Defendants' representations as to inventory and the "Master Dealer" contracts were false, as Kontilai himself acknowledged when he conceded that no ten-year "Master Dealer"

---

[11] Kontilai argues that the SEC has failed to demonstrate that the funds received by Kontilai were "investor funds" much less "funds contributed by [] Coleman, [] Cutsey, or [] Jensen, the only three investors at issue in this case." See Kontilai Proposed Findings at 78-79. As to the latter point, the SEC's testimony from a limited number of investors was sufficiently representative for this preliminary injunction hearing, particularly when combined with the evidence that PPMs, Business Plans, and other communications bearing the alleged false statements were sent to a much broader group of investors and potential investors. As to whether the funds were "investor funds," there is no legal requirement that the SEC perform asset tracing for this purpose. See S.E.C. v. Wyly, 71 F. Supp. 3d 399, 405 (S.D.N.Y. 2014) ("[T]he Second Circuit has held that district courts are not required to 'trace specific funds' to specific violations when ordering disgorgement.") (quoting S.E.C. v. Rosenthal, 426 F. App'x 1, 3 (2d Cir. 2011) ("Imposing such a tracing requirement would allow a[ ] . . . defendant to escape disgorgement by spending down illicit gains while protecting legitimately obtained assets or, as was the case here, by commingling and transferring such profits.")); accord S.E.C. v. Ahmed, 72 F.4th 379, 407 (2d Cir. 2023) ("[T]he district court is not required to 'trace' ill-gotten gains to specific assets in [defendant's] possession — any of his own assets may be liquidated to satisfy his disgorgement obligation."). In any event, the SEC correctly points out that "[i]nvestor funds and company funds were the same during the period of April 2014 through 2018" because "[t]here was no other source of funds." SEC Reply at 17. Indeed, CCI's expert identifies no revenue earned by the company during that period, see generally Vranca Report, and the net numbers used by the SEC in calculating Kontilai's takings already account for any funds transferred into the company by Kontilai during that period, see SEC Reply at 17 (citing CCI Cash Summary; Holt Transfer Summary; CCI Transfer Summary).

agreements had been signed.

Finally, there is no evidence that CCI ever obtained an actual "appraisal" from either Christie's or Kaller, and the higher valuation that CCI advertised to investors was in fact based on a minimum price set by CCI prior to the valuation, and made by an "appraiser" who had a clear interest in the sale price, none of which was disclosed to investors.

Each of these statements was material, as evidenced by investor testimony that they in fact considered the representations "important" or "significant" to their investment decision. Jensen Decl. ¶¶ 5, 12, 14-15; Coleman Decl. ¶¶ 17, 19-20, 26; Cutsey Decl. ¶¶ 13-14, 19, 22; see generally Riel, 282 F. Supp. 3d at 520.  Although Kontilai argues that the SEC has failed to demonstrate that this was material to all investors, Kontilai Proposed Findings at 67, any reasonable investor would view these representations, both collectively and individually, as significantly altering the "total mix" of information available to investors, see Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) ("[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.") (citation omitted).

Kontilai argues the statements to investors are not actionable under the "bespeaks caution" doctrine.  Kontilai Proposed Findings at 79.  This doctrine is a "corollary of the well-established principle that a statement or omission must be considered in context."  Iowa Pub. Employees' Ret. Sys. v. MF Global, Ltd., 620 F.3d 137, 141 (2d Cir. 2010) (citation omitted). Under this doctrine, "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading."  Id. (citing P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 96-97 (2d

Cir. 2004).  The Second Circuit has warned, however, that the "bespeaks-caution doctrine

applies <u>only</u> to statements that are forward-looking."  <u>Id.</u> at 142 (emphasis added) (citing <u>Daum</u>,

355 F.3d at 96-97 n.3); <u>accord</u> <u>Cheng v. Canada Goose Holdings, Inc.</u>, 2021 WL 3077469, at *7

(S.D.N.Y. July 19, 2021).  The false and misleading statements at issue here were not projections

regarding CCI's success, which an ordinary investor should take with a grain of salt.  <u>See</u>

<u>Abramson v. Newlink Genetics Corp.</u>, 965 F.3d 165, 173 (2d Cir. 2020)) (no reasonable investor

would rely on "indefinite statements of corporate optimism").  Instead, they were largely

statements of CCI's current status or past actions to which the doctrine does not apply.  Any

statements as to future actions — such as the claim that Kontilai would not take a salary — were

unaccompanied by any cautionary language and were the sort of statements that could properly

be taken at face value.[12]

Kontilai also argues that "to any extent the SEC relies on oral statements made by Mr.

Kontilai to any investor, any reasonable investor would understand that those statements should

not be relied upon when assessing the investment risk," because of certain disclaimers in the

PPMs, <u>see</u> Kontilai Proposed Findings at 82, including one stating that "no person has been

authorized to give any information or make any representations concerning this investment other

than the information and representations contained in this confidential memorandum," First PPM

at *4; Second PPM at *3.  This argument carries no weight, however, because the SEC need not

prove here that investors relied upon CCI or Kontilai's statements.  <u>See</u> <u>Pentagon</u>, 725 F.3d at

285 (elements of section 10(b) and Rule 10b-5(b) claim do not include reliance); <u>United States v.</u>

---

[12]  The doctrine would not protect these statements anyway given that CCI and Kontilai plainly knew they were false.  <u>See</u> <u>In re Prudential Sec. Inc. P'ships Litig.</u>, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("cautionary language does not protect material misrepresentations or omissions when defendants knew they were false when made").

Vilar, 729 F.3d 62, 89 (2d Cir. 2013) ("[T]he long established law of our Circuit, and nearly every other circuit, is that, when the government (as opposed to a private plaintiff) brings a civil or criminal action under Section 10(b) and Rule 10b-5, it need only prove, in addition to scienter, materiality, meaning a substantial likelihood that a reasonable investor would find the omission or misrepresentation important in making an investment decision, and not actual reliance.").[13]

As to scienter, Kontilai and CCI obviously knew their conduct was deceptive or acted recklessly with regard to the statements, given Kontilai's personal knowledge of the matters on which he was speaking.  See Riel, 282 F. Supp. 3d at 520.  Defendants' use of investor funds provides ample motive for these misrepresentations, as defendants appropriated millions of dollars from company coffers.  Defendants' explanation for these transfers relies upon documents that we find have been fabricated.  As discussed, the supposed "convertible notes"

---

[13]  Even where reliance must be proven, "the issue of reasonable reliance requires that we consider the entire context of the transaction . . . .  Standing alone, therefore, a general disclaimer . . . is not sufficient as a matter of law to preclude reasonable reliance on material factual misrepresentations, even by a sophisticated investor."  FIH, LLC v. Found. Cap. Partners LLC, 920 F.3d 134, 141 (2d Cir. 2019) (punctuation and citation omitted).  Where an extremely broad disclaimer is accompanied by misrepresentations that alter the overall context of a transaction, courts have thus found that the disclaimer does not as a matter of law preclude a finding of reasonable reliance.  See, e.g., Hallett v. Stuart Dean Co., 481 F. Supp. 3d 294, 307 (S.D.N.Y. 2020) ("While 'there may be circumstances where a general disclaimer or merger clause, together with an extensive roster of specifically negotiated factual warranties and representations, can lead to a conclusion that, in the particular circumstances of a case, no reasonable jury could find reasonable reliance' on an oral representation, for the most part 'general disclaimers are insufficient to defeat reasonable reliance on material misrepresentations as a matter of law.'") (quoting FIH, 920 F.3d at 141, 145); Xia, 2022 WL 17539124, at *22 (E.D.N.Y. Dec. 8, 2022) (where defendants cited "individual disclaimers in the offering memoranda that stated that their enterprise might not be profitable," the court considered these unpersuasive because the offering memoranda contained misstatements that "as a whole" would have given an unrealistic impression of likely profits, noting that "[d]efendants cannot rely on boilerplate disclaimers as a contractual escape hatch or to avoid liability under the securities laws") (citing S.E.C. v. Telegram Grp., Inc., 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020) ("Disclaimers, if contrary to the apparent economic reality of a transaction, may be considered by the Court but are not dispositive.")).

owed to Kontilai by CCI are unsupported by any contemporaneous evidence, and no individual

other than Kontilai has testified that they ever existed.  Likewise, no contemporaneous evidence

of Kontilai's supposed employment agreement exists that would corroborate his claims of

entitlement to a salary.  Each of the documents supposedly endorsed by Gail Holt as "Chairman

of the Board" is fabricated, given that neither CCI's then-counsel nor its sole other listed board

member had heard of Holt at the time, much less knew of her supposed appointment as the

board's chair.  Holt testified as to Kontilai's efforts to create these documents after the SEC had

commenced its investigation, and Kontilai has refused to testify regarding the matter, suggesting

that his answers would have been adverse to him.  The existence of scienter is equally obvious as

to the many other misrepresentations CCI and Kontilai made.

　　　　The use of fabricated documents by itself shows that defendants acted with scienter.  See

S.E.C. v. Musella, 748 F. Supp. 1028, 1040 (S.D.N.Y. 1989) ("This false exculpatory statement

evidences consciousness of guilt and has independent probative value of scienter."); accord

United States v. Spectrum Painting Corp., 2020 WL 5026815, at *9 (S.D.N.Y. Aug. 25, 2020);

United States v. Taylor, 767 F. Supp. 2d 428, 434 (S.D.N.Y. 2010) ("It is well-settled in the

Second Circuit that evidence of a false exculpatory statement is admissible as circumstantial

evidence of consciousness of guilt.").  Also, as noted, it has been established on summary

judgment that defendants attempted to prevent certain investors from communicating with the

SEC regarding securities violations.  See 21F-17 Decision.  This is further evidence that the

defendants wished to conceal them from authorities and other investors and thus were aware of

the illicit nature of their actions.

　　　　Furthermore, defendants could not have labored under the impression that the misleading

statements were true when they were made.  Kontilai and CCI commissioned the supposed $36

million dollar valuation for the Jackie Robinson Contracts; therefore, they knew at the time they

touted it that it was neither impartial nor a true appraisal.  Likewise, defendants could not have

mistakenly believed that they had between 400 and 580 "Master Dealers" under contract when

they had not in fact offered the Master Dealer contract to even a single dealer.  Nor could they

reasonably have believed that this information would be unimportant to investors and

prospective investors, and their knowledge of its importance is evidenced by the repeated

inclusion of misleading or false statements in the PPMs, which were designed to entice potential

investors.  Such knowing falsehoods are sufficient support for the SEC's allegation that Kontilai

and CCI acted with scienter.  See S.E.C. v. Universal Exp., Inc., 475 F. Supp. 2d 412, 424

(S.D.N.Y. 2007) ("Representing information as true while knowing it is not, recklessly

misstating information, or asserting an opinion on grounds so flimsy as to belie any genuine

belief in its truth, are all circumstances sufficient to support a conclusion of scienter."), aff'd sub

nom. S.E.C. v. Altomare, 300 F. App'x 70 (2d Cir. 2008); see also CKB168 Holdings, Ltd., 210

F. Supp. 3d at 446 (scienter existed where defendant "helped to create [a company] and directed

its promotional efforts[,]" "other defendants and victims describe[d] him as the source of the key

misrepresentations in this case[,]" and "[m]ore than anyone, he knew those misrepresentations

were false").

      Finally, these misrepresentations and omissions were conducted as part of Kontilai and

CCI's recruitment of investors for the company.  Because the statements related to shares in the

company, they were made "in connection with the purchase or sale of securities."  See Landreth

Timber Co. v. Landreth, 471 U.S. 681, 687 (1985) ("[T]he sale of stock in a corporation . . . is

typical of the kind of context to which the [Securities] Acts normally apply.").

      In sum, we find that the SEC has shown that defendants made material

misrepresentations or omissions, with scienter, in connection with the purchase or sale of securities, and has thus demonstrated a likelihood of success on the merits of its claims under 17 C.F.R. § 240.10b-5(b) and 15 U.S.C. § 77q(a)(2).

Likewise, the SEC has shown "that defendants: (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter." See Sason, 433 F. Supp. 3d at 508. Kontilai's misuse of funds from CCI's coffers constitutes a "deceptive or manipulative act" in light of his and CCI's representations to investors and the apparent lack of any authority to use company funds in such a way. See S.E.C. v. Sugarman, 2020 WL 5819848, at *10 (S.D.N.Y. Sept. 30, 2020) ("[W]hile there is nothing 'inherently deceptive' about stealing money, the misappropriation of funds — when accomplished by deceptive acts — may be indicative of scheme liability.") (emphasis in original); see also S.E.C. v. Zandford, 535 U.S. 813, 819-20 (2002) (deferring to the SEC's position that "a broker who accepts payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, violates § 10(b) and Rule 10b-5"). Defendants here obscured the misuse of investor money through cash transactions, false notations on check and wire transfer memos, and by routing funds through Gail Holt. Further, they relied on fabricated documents and made false exculpatory statements in failed efforts to show that the transfers to Kontilai were authorized. This reliance on fabricated documents, too, constitutes deceptive conduct. See, e.g., S.E.C. v. Cole, 2015 WL 5737275, at *8 (S.D.N.Y. Sept. 19, 2015) (listing "backdating and fabricating work papers to deceive the PCAOB" among defendant's "several deceptive acts"); see also S.E.C. v. Mizrahi, 2019 WL 3241185, at *3 (C.D. Cal. Apr. 10, 2019) ("The record before the Court shows that Defendants attempted to keep their scheme undetected by encouraging clients to lie to SEC investigators and that Defendants used fabricated documents

to perpetuate the fraudulent scheme, which courts have found violates Rules 10b-5(a) and (c).")
(citation omitted).  It is self-evident that these acts were in furtherance of defendants' scheme to
defraud investors because the misappropriation of funds (and later, the attempts to avoid
discovery or liability) directly led to the transfer of those funds to Kontilai for his personal use.

Finally, Kontilai acted with scienter with regard to this set of claims as well.  As
explained above, Kontilai and CCI's actions themselves speak to scienter.  The fact that Kontilai
— despite his present argument that the transactions were lawful — appears to have never
disclosed any of the transactions at issue to investors or even members of the board, strongly
suggests that he was aware of their wrongfulness, as does the fact that he obtained a substantial
personal benefit.  See S.E.C. v. Xia, 2022 WL 17539124, at *24 (E.D.N.Y. Dec. 8, 2022)
(scienter existed where, inter alia, "[t]he evidence show[ed] that [d]efendant . . . directly
benefited from the alleged fraud by singlehandedly controlling millions of dollars of investor
funds, which [defendant] transferred, without oversight or documentation, between the . . . bank
accounts he and [another individual] controlled[,]" "th[e] record show[ed] a stunning lack of
accounting as to how investor funds were spent or used[,]" and defendant "failed to disclose to
investors that he was misusing and misdirecting their funds on a daily, ad hoc basis.").  Because
Kontilai controlled CCI, the same scienter can be imputed to the company.  See Manor Nursing
Ctrs., 458 F.2d at 1089 n.3; accord S.E.C. v. Treadway, 430 F. Supp. 2d 293, 337 (S.D.N.Y.
2006) ("It is settled that the scienter of executives can be imputed to corporate entities.").  In
sum, we find that the SEC has shown that defendants undertook deceptive acts in furtherance of
their scheme, with scienter, and has thus demonstrated a likelihood of success on the merits of its
claims under 17 C.F.R. §§ 240.10b-5(a) & (c) and 15 U.S.C. §§ 77q(a)(1) & (3).

2.    Reasonable Likelihood of Future Violations

44

**S.A.0044**

Because we have found that the SEC is likely to prevail on its Rule 10b-5 and Rule 10b claims at trial, we next consider whether there is a "reasonable likelihood of future violations in the absence of an injunction." Gonzalez, 145 F. Supp. 2d at 414. "In deciding this question, it is appropriate to weigh the degree of a defendant's scienter, the sincerity of any assurances that the violation will not be repeated, whether the violation was an isolated one, any acknowledgement by a defendant of the wrongful nature of his conduct, and the defendant's opportunity because of his profession to repeat the violation." S.E.C. v. Cavanagh, 1 F. Supp. 2d 337, 373 (S.D.N.Y. 1998) (citing S.E.C. v. Universal Major Indus., 546 F.2d 1044, 1048 (2d Cir. 1976)); accord S.E.C. v. Morgan, 2019 WL 2385395, at *10 (W.D.N.Y. June 5, 2019).

Defendants have acted with a high degree of scienter evidenced by, among other things, the fabrication of documents to justify theft of company funds and the circuitous transactions apparently designed to conceal Kontilai's use of investor funds for his personal use. There are no assurances that violations will not be repeated. The violations are not isolated given that the fraudulent statements and scheme continued over a period of at least four years, including through transactions made after Kontilai was aware that the SEC was investigating his conduct. Defendants have made no acknowledgment of the wrongful nature of their conduct and have made no representations that assure the Court they intend to cease their activity. Kontilai has forcefully denied any wrongdoing. See generally Kontilai Proposed Findings. We find that the weight of the remaining factors is sufficient to justify an injunction against future violations.

B.    Asset Freeze

Our determination that the SEC has demonstrated a likelihood of success on the merits of its claims satisfies the standard for the SEC's requested asset freeze as well. See Smith, 653 F.3d at 128 ("Where an asset freeze is involved, the SEC must show either a likelihood of success on

the merits, or that an inference can be drawn that the party has violated the federal securities laws."). Thus, the questions remaining are the scope of that asset freeze, whether Kontilai should be allowed to access certain assets due to professed need, and whether the freeze should apply to assets claimed by relief defendant Veronica Kontilai. See Kontilai Proposed Findings at 113-128; Veronica Kontilai Mem.; Kontilai Freeze Mem. We address each issue next.

### 1.    Scope of the Asset Freeze

Kontilai argues that the existing asset freeze, which restrains Kontilai's assets up to the amount of $46,121,649.68, "ignores the distinction between investor funds received by CCI and investor funds received by [] Kontilai, . . . [and] ignores the question of how much Mr. Kontilai personally might have been unjustly enriched." Kontilai Proposed Findings at 113. Thus, Kontilai proposes that the asset freeze be limited to a "maximum of $7.27 million," or twice that, if the Court "accepts the SEC's request to add a penalty amount equal to the disgorgement amount." Id. at 114, 117 n.25. Kontilai further argues that "the entirety of the asset freeze levied against Mr. Kontilai can be secured by the Jackie Robinson contracts alone," and thus no further asset freeze is justified. Id. at 117. Finally, Kontilai argues that the asset freeze should not include "untainted" or "after-acquired" assets, including the proceeds of two outstanding lawsuits arising from the death of Kontilai's mother, id. at 118-122; see also Kontilai Freeze Mem., and should not be extended to Kontilai's future earnings, id. at 123-124.

We begin with the amount of the asset freeze. The original amount of the asset freeze — $46,121,649.68 — was calculated by taking the total amount CCI raised from investors and adding an additional equal amount on the ground that the additional amount could be assessed against defendants as a civil penalty should the SEC prevail. See TRO; Memorandum of Law, filed May 15, 2019 (Docket # 9), at 26 (asset freeze amount was intended "to cover

disgorgement . . . and a civil penalty in the amount equal to disgorgement"). Neither Kontilai

nor CCI disputes that CCI raised at least $23,060,824.84 from investors.[14] As the SEC contends,

Kontilai's personal misappropriations are not the sole assets that he can be ordered to disgorge.

The Supreme Court has indicated that partners in wrongdoing — as Kontilai and the company he

solely controlled have been shown to be here — may be held jointly and severally liable for

disgorgement, if equitable. See Liu v. S.E.C., 140 S. Ct. 1936, 1949 (2020); see also Fed. Tr.

Comm'n v. Shkreli, 581 F. Supp. 3d 579, 642 (S.D.N.Y. 2022) ("Joint and several liability for

disgorgement is properly imposed when multiple defendants have collaborated in an illegal

scheme."); S.E.C. v. Penn, 2021 WL 1226978, at *13 (S.D.N.Y. Mar. 31, 2021) (noting that "Liu

permits joint and several liability" where defendants "were partners engaged in concerted

wrongdoing"). Joint and several liability is appropriate here given that "an individual defendant

[may be] required to disgorge net profits accruing to his company where he was 'primarily

liable' for the fraud that created these profits, was 'intimately involved' in the perpetration of the

fraud, and was a 'controlling person' of the company." Shkreli, 581 F. Supp. 3d at 642 (citing

S.E.C. v. First Jersey Secs., Inc., 101 F.3d 1450, 1475 (2d Cir. 1996)); see also S.E.C. v.

Bronson, 602 F. Supp. 3d 599, 618-19 (S.D.N.Y. 2022) (joint and several liability for

disgorgement was appropriate where defendant "was integral to the scheme, which he ran

through the companies that he controlled"). Thus, the asset freeze is warranted for, at minimum,

the amount that the SEC may prove at trial is subject to disgorgement, namely the

---

[14] Vranca's report contends that CCI in fact raised $23,183,438.30 from investors between 2014 and 2018. See Vranca Report ¶ 33. However, the SEC does not seek to increase the amount of the asset freeze.

S.A.0047

$23,060,824.84 raised from investors.[15]

As to the penalty portion, the SEC is entitled to an asset freeze "sufficient to preserve its disgorgement remedy as well as assets necessary to pay civil monetary penalties." SEC v. Maillard, 2014 WL 1660024, at *4 (S.D.N.Y. April 23, 2014) (citing Unifund, 910 F.2d at 1041-42). Kontilai contends that the SEC alleges only $7.27 million in misappropriations by Kontilai, and would thus be limited to a civil penalty of the same amount. See Kontilai Proposed Findings at 114-15. Unlike the disgorgement amount, the Second Circuit has held that the civil penalty the SEC seeks here — derived from section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), see SEC Proposed Findings at 74-75 — may not be imposed jointly and severally. See Pentagon, 725 F.3d at 287-88 ("The statutory language allowing a court to impose a civil penalty plainly requires that such awards be based on the 'gross amount of pecuniary gain to such defendant.' This language does not provide room for the district court's interpretation that the civil penalty be imposed jointly and severally." (emphasis in original) (citing 15 U.S.C. § 77t(d)(2))). However, "where multiple defendants mutually benefitted from the same gains, the best calculation of a single defendant's gain may be the total gains obtained by the group through that defendant's violations," which may result in "some overlap among defendants' gains, and the gains attributed to each defendant may add up to over 100% of total gains." S.E.C. v. Amerindo Inv. Advs. Inc., 2014 WL 2112032, at *11 (S.D.N.Y. May 6, 2014), aff'd, 639 F. App'x 752 (2d Cir. 2016). As the Second Circuit has explained, this means that because "multiple defendants can 'each benefit from the

---

[15]  Although Kontilai argues that the asset freeze must account for deductions that will be assessed against the disgorgement amount for legitimate costs incurred by CCI and Kontilai, see Kontilai Proposed Findings at 54; see also Liu, 140 S. Ct. at 1950 ("[C]ourts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)."), Kontilai has not offered any competent testimony as to what expenses are actually legitimate.

same dollar of gain,' . . . each can be penalized for that gain." S.E.C. v. Cole, 661 F. App'x 52, 55 (2d Cir. 2016) (quoting Amerindo, 2014 WL 2112032, at *11 n.11).  Here, given Kontilai's total control of the operations of CCI, the SEC has shown that Kontilai benefitted from investor funds to the same extent as CCI, and thus that the civil penalty may be as much as the total intake from investors.  Because we have found that the SEC is likely to succeed on the merits of its claims, the SEC is entitled to an asset freeze that accounts for the maximum possible civil penalty of $23,060,824.84.

As to Kontilai's claim that the value of the Jackie Robinson Contracts should be deducted from the amount of the asset freeze, the Court has recently ruled that the ownership of the Contracts remains in dispute, and it is possible that a trial will result in ownership by a party other than CCI.  See United States S.E.C. v. Collector's Coffee, 2023 WL 3575428 (S.D.N.Y. May 22, 2023), adopted, 2023 WL 3862662 (S.D.N.Y. June 7, 2023).  Thus, it is impossible to say whether the Contracts could be used to satisfy a judgment against CCI, much less whether they could be applied to disgorgement owed by Kontilai personally, and their value warrants no reduction in the amount of the asset freeze.

Kontilai also contends that particular assets should be excluded from the freeze because they were acquired after the initiation of the asset freeze and are therefore "untainted."  Kontilai Proposed Findings at 118-124.  These funds include the proceeds and potential future proceeds of two outstanding lawsuits, one arising from the death of Kontilai's mother and one "arising out of legal malpractice," id. at 120, as well as any future earnings Kontilai may obtain, id. at 123.

As an initial matter, Kontilai is incorrect that "untainted" assets may not be frozen.  As the Court has previously held in this case, "the Court has statutory authority to freeze untainted assets prejudgment in securities actions" because "[t]he Second Circuit has long recognized that

49

**S.A.0049**

Congress authorized courts to freeze assets unconnected to the fraud pursuant to 15 U.S.C. [§] 78u(d)." United States S.E.C. v. Collector's Coffee, 602 F. Supp. 3d 488, 494 (S.D.N.Y. 2022) (citing Unifund, 910 F.2d at 1035, 1041). That statute allows the SEC to seek, "and any Federal court [to] grant, any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). Courts have long recognized that this statutory grant gives the Court "the authority to freeze assets at an amount that will cover the maximum civil penalty available under applicable law should securities law violations be proven at trial." S.E.C. v. Schiffer, 1998 WL 307375, at *7 (S.D.N.Y. June 11, 1998). Cases relating to the Court's inherent equitable power to freeze assets are not the appropriate limiting factor where such a statutory grant exists. See Collector's Coffee, 602 F. Supp. 3d at 504 n.5.[16] Although Kontilai argues extensively that the Court's prior assessment of the law was incorrect and the statutory authority does not extend to untainted assets, see Kontilai Freeze Mem. at 10-11, he has not identified any intervening change in the law that should cause the Court to revisit its rulings on this point.[17] Accordingly, the asset freeze appropriately encompasses purportedly untainted assets such as those identified by Kontilai.

---

[16]  Luis v. United States, 578 U.S. 5 (2016), on which Kontilai relies for this point, see Kontilai Proposed Findings at 119-20, held only that "insofar as innocent (i.e., untainted) funds are needed to obtain counsel of choice . . . the Sixth Amendment prohibits the [asset freeze] that the Government [sought]." Luis, 578 U.S. at 18. We discuss Kontilai's claimed need for these funds to obtain counsel below.

[17]  Kontilai engages in extensive analysis of Liu, 140 S. Ct. 1936 (2020), a case decided nearly two years before the ruling he now challenges, but identifies no case applying Liu that suggests its holding was intended to alter the SEC's ability to freeze untainted assets where necessary to protect the availability of a civil penalty or otherwise act in the interest of investors. See Kontilai Freeze Mem. at 11, 13; Kontilai Proposed Findings at 119, 121. In fact, case law holds the opposite. See Bronson, 602 F. Supp. 3d at 616 ("Liu did not disturb courts' authority to impose § 5 injunctions under 15 U.S.C. § 78u(d)(1)[.]") (collecting cases), aff'd, 2022 WL 5237474 (2d Cir. Oct. 6, 2022).

Likewise, we have already determined that the lawsuits and their proceeds identified by Kontilai as "after-acquired" assets were not, in fact, acquired after the commencement of the asset freeze currently in place.  See Collector's Coffee, 602 F. Supp. 3d at 503-04.  As we explained, "[t]he 'property' interest represented by the lawsuits existed before the date the TRO was entered," id. at 503, and thus it was unnecessary to decide whether the asset freeze extended to after-acquired assets, see id.  Despite Kontilai's protest that he is not seeking reconsideration of that order, see Kontilai Freeze Reply at 10, he indeed challenges the Court's determination that the lawsuits and their proceeds are assets acquired before the initial freeze, see Kontilai Freeze Mem. at 4-5.  We decline to revisit the issue in the absence of new facts or an intervening change in law, and continue to hold that the lawsuits represent assets acquired before the asset freeze.

As to Kontilai's speculative future earnings, these would indisputably constitute "after-acquired" assets.  The statutory authority for the asset freeze allows for "any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5).  The SEC has raised the concern that Kontilai may "consume or transfer investor funds under the guise of employment earnings," SEC Freeze Opp. at 4, and has proposed an exception to the freeze that would allow Kontilai to use funds from any future employment subject to a monthly cap and certain safeguards, see Proposed Stipulation, filed Mar. 28, 2023 (Docket # 1189-1) ("Proposed Freeze Modification").  Kontilai has proposed no alternative restrictions and favors an entirely unrestricted ability to use future earnings.  See Kontilai Freeze Mem. at 7-8.  Given that an asset freeze is designed to "ensure that any funds that may become due can be collected," Smith, 653 F.3d at 127 (quoting Unifund, 910 F.2d at 1041), it would be completely contrary to the purpose of the freeze if a defendant were given an avenue under which to potentially spend existing

hidden assets on the pretense that these were expenditures derived from new earnings. This is of particular concern here given that Kontilai has identified no actual prospective earnings, and in fact is unlikely to earn money prior to trial because he is imprisoned in Germany. See Notification of Arrest. Although Kontilai dismisses the SEC's concerns that the exclusion of after-acquired assets may allow Kontilai to disguise the use of allegedly pilfered assets, arguing that "these [after-acquired] assets can easily be segregated into separate accounts," Kontilai Freeze Mem. at 6, Kontilai contends that he is not able to open new bank accounts at present, and will not consent to the SEC's monitoring of any existing accounts, see id. at 7-8. Under these circumstances, we see no need to make a ruling on the question of new earnings. If the circumstances change, and Kontilai is in a position to earn money and open a bank account, he will be free to approach the Court with a plan that ensures the freeze of existing assets is maintained.

### 2.    Exceptions to Asset Freeze

Kontilai states that he seeks a release of assets "to pay for any expenses related to his criminal defense" "if and when insurance proceeds are for any reason unavailable." Kontilai Freeze Mem. at 2. Kontilai asserts that he "may be forced to hire less expensive counsel if that is the only counsel he is able to afford," Kontilai Proposed Findings at 127, and claims without explanation that the insurance policy upon which he has insofar relied "do[es] not cover all elements of his criminal defense," id. at 128.

When determining whether to release assets from a freeze to accommodate the needs of a criminal defendant, "a court must determine whether (1) the defendant has demonstrated a need for the relief; (2) if so, the [government] has demonstrated that the assets for which release is sought are traceable to criminal activity; and (3) the defendant has shown that the value of the

assets sought to be released is reasonable." S.E.C. v. McGinn, 2012 WL 1142516, at *3

(N.D.N.Y. Apr. 4, 2012)) (citing United States v. Monsanto, 491 U.S. 600, 603 (1989)); S.E.C.

v. Coates, 1994 WL 455558, at *3 (S.D.N.Y. Aug. 23, 1994)); accord Fed. Tr. Comm'n v. 4 Star

Resolution, LLC, 2016 WL 768656, at *1 (W.D.N.Y. Feb. 29, 2016).  Kontilai accepts that these

factors should be considered, see Kontilai Freeze Mem. at 14 (citing 4 Star, 2016 WL 768656, at

*1), but fails to note the caveat, included on the very same page of the cited case, that "[t]his

requires a full accounting, and not simply general assertions that [the defendant] 'does not have

adequate assets with which to fund his criminal defense apart from' the frozen assets," 4 Star,

2016 WL 768656, at *1 (quoting United States v. All Funds on Deposit, 2012 WL 2900487, at

*1 (S.D.N.Y. July 6, 2012), aff'd, 720 F.3d 126 (2d Cir. 2013)).  Kontilai has provided no such

accounting of his need.  If anything, he has suggested that he has no current need in that he

repeatedly indicates that his insurance policy is currently covering his criminal defense needs,

and avers only that he "may" be forced to hire different counsel "if . . . for any reason" the

insurance policy does not cover certain expenses.  See Kontilai Proposed Findings at 127-29;

Kontilai Freeze Mem. at 2.  This is a far cry from a demonstration of need, and demonstrates no

need at the present moment.  While an application may be appropriate in the future, his request

on the current record is denied.  See United States v. Bonventre, 720 F.3d 126, 131 (2d Cir.

2013) ("[A] defendant's constitutional right to use his or her own funds to retain counsel of

choice. . . . is not implicated unless the restraint actually affects the defendant's right to choose

counsel and present a defense.").[18]

---

[18]  Kontilai's proposed findings ask the Court to release the "funds necessary for any expenses associated with basic necessities, including, but not limited to, food, shelter, and healthcare."  Kontilai Proposed Findings at 126.  However, this request appears nowhere in the memorandum dedicated to the asset freeze issue, see Kontilai Freeze Mem., and it appears that Kontilai's needs with regard to "basic necessities" have drastically changed now that he is in

3.    Veronica Kontilai

Veronica Kontilai contends that "the Court should exclude [her] from any future [preliminary injunction]."  Veronica Kontilai Mem. at 2.  While she presented no evidence at the preliminary injunction hearing, Veronica argues that she did not receive any net gain from CCI, despite her alleged receipt of investor funds, because she "paid, in reverse" an amount greater than she received.  Id.[19]  She further argues that she was entitled to withdraw funds from CCI because she was "entitled to 50% rights for the return and interest on [Mykalai's purported] investment [in CCI]."  Id. at 3.

It is well established that "[t]he plenary powers of a federal court to order an asset freeze are not limited to assets held solely by an alleged wrongdoer, who is sued as a defendant in an enforcement action."  S.E.C. v. I-Cubed Domains, LLC, 664 F. App'x 53, 55 (2d Cir. 2016).  "Those powers extend as well to a person not accused of wrongdoing, a relief defendant, 'where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds.'"  Id. (quoting Cavanagh, 155 F.3d at 136).  Where these conditions are met, the SEC need only show "that it is likely to succeed on the merits."  Cavanagh, 155 F.3d at 136.  "The receipt of property as a gift without payment of consideration does not create a legitimate claim under the Cavanagh test."  I-Cubed Domains, 664 F. App'x at 55.

To prove these elements, the SEC points to bank records compiled by Vranca and summarized by the SEC, which indicate that accounts held by Veronica received more than

---

custody.  Accordingly, we do not assess whether the asset freeze should be modified to allow for such expenses.

[19]  Veronica Kontilai's brief inexplicably fails to cite even once to the appropriate standard under which a relief defendant's assets may be frozen or to discuss that standard in any way.  See Veronica Kontilai Mem.  We address only her arguments that actually bear on that analysis.

$336,000 in cash deposits or transfers between April 2014 and October 2018.  See Veronica

Kontilai Spreadsheet, annexed as Ex. 60 to PHPFF (Docket # 1052-64); see also Bank

Transaction Master File, annexed as App'x C to Vranca Report (Docket # 1094-1).[20]  Vranca's

compilations also establish that Veronica spent more than $29,000 using CCI credit cards in that

period, despite having no role with the company.  See Credit Card Transactions Master File,

annexed as App'x E to Vranca Report (Docket # 1094-1), Lines 2083-2156.  Mykalai Kontilai

has conceded that he had no source of income other than from Collector's Coffee between 2007

and May 2019.  See Request for Admission, filed June 8, 2020 (Docket # 366-1) ("Kontilai

RFAs"), ¶ 38; Order, dated Jan. 27, 2021 (Docket # 768), at 6 ("[A]ll the requests for admission

are deemed admitted.").  Veronica invoked her Fifth Amendment privilege at her deposition as to

all questions regarding the sources of her income.  See Deposition of Veronica Kontilai, annexed

as Ex. 24 to PHPFF (Docket # 1052-24) ("V. Kontilai Dep."), at 21:25-26:13.  Thus, the SEC is

entitled to an adverse inference as to the matter.[21]  See Ahmed, 72 F.4th at 409 n.19 ("[C]ourts in

civil cases can draw adverse inferences against relief defendants should they invoke their Fifth

Amendment privilege not to testify.") (citation omitted).  We find any funds transferred to

Veronica in this period likely came from CCI.  We have already found that Kontilai

---

[20]  Although the Court did not allow the SEC to offer Exhibit 60 at the preliminary injunction hearing, the Court instructed that the SEC should rely upon the totals therein if submitted without objection in briefing.  See Jan. 24 Tr. at 94:16-20.  No defendant has objected to the calculations or submitted an alternate summary.

[21]  At her deposition, Veronica Kontilai was represented by counsel and repeatedly and explicitly invoked her right to remain silent under the Fifth Amendment.  See V. Kontilai Dep. at 21:5-26:13 (stating "I plead the Fifth" in response to at least fifteen questions).  Despite this, Veronica Kontilai now argues that she intended to instead invoke spousal privilege, and thus no adverse inference should be drawn.  Veronica Kontilai Mem. at 14.  This claim is made without citation to any admissible evidentiary matter.  Moreover, the court previously ruled that Veronica was not entitled to invoke spousal privilege with respect to the deposition at issue.  See Order, dated June 19, 2019 (Docket # 43).

misappropriated such funds.  Thus, these funds were "ill-gotten," and Veronica has no legitimate claim to them.

Veronica Kontilai contends that the funds she is alleged to have received "as coming to her from the investors' money[] were surpassed [by] the amounts she paid for CCI's business," and thus Veronica is somehow able to "defeat the SEC's claim to freeze or collect any amount from Ms. Kontilai."  Veronica Kontilai Mem. at 12.  Setting aside the question of whether there is any relationship between alleged contributions by Veronica Kontilai to CCI and the amount the SEC would be entitled to recover from her in disgorgement, we reject the contention that the record shows any sort of "debt" owed by CCI to Veronica.  The calculation used by Veronica is based entirely upon the conclusion drawn by defendants' expert, Vranca, that roughly $327,000 of expenditures by Veronica from personal accounts "appear to be business-related."  Vranca Report at 7, 7 n.17.  Veronica argues that CCI owes this amount to her and thus she properly received the $313,000 in investor funds.  Veronica Kontilai Mem. at 12.  But as noted in Section II.B.1 above, we reject Vranca's conclusions regarding "business-related" expenses because those conclusions were made without any proper methodological basis.  Thus, we similarly reject Veronica's contention that CCI owes her money

More relevant to the <u>Cavanagh</u> test, Veronica argues that the SEC has failed to trace her income, and thus cannot "prov[e] the flow of investors' funds to Ms. Kontilai's use."  Veronica Kontilai Mem. at 3.  But the only evidence in the record as to CCI's inflow of cash during the relevant period is that it came from investors.  CCI's expert identifies no revenues in his report, <u>see</u> Vranca Report, and Kontilai testified that CCI was "a pre-revenue company the entire way through" and was never "dealing with profits," Second Kontilai Dep. Excerpt at 106:19-21. Additionally, Mykalai Kontilai has conceded that he had no source of income between 2007 and

May 2019 other than payments from CCI.  <u>See</u> Kontilai RFAs ¶ 38.  Thus, any funds contributed

to Veronica by CCI or Mykalai Kontilai in this period were necessarily "ill-gotten" investor

funds.

While Veronica claims that the SEC's conclusion that "all her income came from CCI's

investors" is "overreaching," Veronica Kontilai Mem. at 1, she provided no evidence at the

hearing that she actually received income from any other source.  When deposed, she refused to

testify as to the source of these funds.  <u>See</u> V. Kontilai Dep. at 21:25-26:13.  There is thus no

identifiable source of Veronica's income other than CCI and Mykalai Kontilai.  We find that the

SEC is likely to prove that the funds received by Veronica were derived from CCI and its

investors.

As to the second element, the SEC has demonstrated that Veronica did not have a

legitimate claim to CCI investors' funds.  Mykalai Kontilai admitted that Veronica had no

entitlement to CCI funds and had provided no service to the company.  <u>See</u> Kontilai RFAs ¶¶ 39-

41.  Veronica has not disputed this, and avers that she "was not an officer, shareholder, or

employee" of CCI.  Veronica Kontilai Mem. at 1.  The sole justification Veronica proposes for

her use of CCI funds is that, as Mykalai's spouse, she would be entitled to "half of the

investments made by the couple."  <u>Id.</u> at 18.  To the extent that this can be read as an argument

that Veronica was entitled to use company or investor funds for personal use in repayment of an

investment or loan, we reject it for the same reasons articulated above with respect to Mykalai

Kontilai.  <u>See</u> Section IV.A.1.b.iv.

In sum, we find that the SEC is likely to prove that Veronica Kontilai received ill-gotten

funds and did not have a legitimate entitlement to such payments.  Accordingly, we grant the

SEC's request to freeze Veronica Kontilai's assets up to the amount of $313,622.00.

Conclusion

For the foregoing reasons, the SEC's motion for a preliminary injunction and asset freeze (Docket #141) is granted.  Mykalai Kontilai's motion to modify the terms of the asset freeze (Docket # 1218) is denied.

Defendants Mykalai Kontilai and Collector's Coffee, Inc., are enjoined from future violations of the securities laws of the United States under the terms set forth in Docket # 175. The assets of Mykalai Kontilai and Collector's Coffee, Inc., are ordered frozen up to the amount of $46,121,649.68, on the terms set forth in Docket # 12.  The assets of relief defendant Veronica Kontilai are ordered frozen up to the amount of $313,622.00, on the terms set forth in Docket # 175.

SO ORDERED.

Dated: October 4, 2023
       New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

S.A.0058