# 23-7537

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

Securities and Exchange Commission,

Plaintiff-Appellee,

v.

Mykalai Kontilai,

Defendant-Appellant,

Collector's Coffee, Inc., Los Angeles Dodgers LLC, Doe Individuals 1
through 50, Roe Corporations 1 through 50, Jackie Robinson Foundation,
Inc., SDJ Investments, LLC, Adobe Investments, LLC, Darren Sivertsen,
Trustee of Sivertsen Family Trust U/A/D 10/01/2002,

Defendants.

———————————

On Appeal from an Interlocutory Order of the
U.S. District Court, Southern District of New York (Gorenstein, M. J.)

———————————

## BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION, APPELLEE

———————————

MEGAN BARBERO
  General Counsel
DOMINICK V. FREDA
  Assistant General Counsel
EMILY TRUE PARISE
  Senior Appellate Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-5169
parisee@sec.gov

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iii

INTRODUCTION .................................................................................1

COUNTERSTATEMENT OF JURISDICTION ..............................................3

COUNTERSTATEMENT OF THE ISSUES ..................................................3

COUNTERSTATEMENT OF THE CASE .....................................................4

    A.    Nature of the Case ....................................................................4

    B.    Facts .......................................................................................4

           1.    Kontilai made false statements to investors and misappropriated investor funds. ...................................5

           2.    Kontilai took steps to conceal the fraud. .........................6

    C.    Proceedings .............................................................................7

           1.    Proceedings Before the Preliminary Injunction Hearing ............................................................. 7

           2.    The Preliminary Injunction Hearing and Post-Hearing Developments ..................................12

           3.    The Preliminary Injunction Decision ............................ 14

           4.    The Jury Trial ................................................................ 18

STANDARD OF REVIEW ....................................................................19

SUMMARY OF ARGUMENT .................................................................19

ARGUMENT ......................................................................................21

i

I.    The district court acted within its discretion in determining the asset freeze's scope. .............................................................21

        A.    Tracing is not required. ....................................................21

        B.    The assets were not acquired after the TRO. .................26

II.   The district court was within its discretion to deny as premature carveouts from the asset freeze for unspecified living expenses and hypothetical criminal defense costs. ..........................................27

III.  The district court was within its discretion in determining that $46 million was a reasonable approximation of what Defendants may be required to pay in disgorgement and civil penalties. ..........................................................................................29

CONCLUSION ..............................................................................................34

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Deckert v. Indep. Shares Corp.*,
   311 U.S. 282 (1940) .......................................................... 23, 25

*FTC v. Bronson Partners, LLC*,
   654 F.3d 359 (2d Cir. 2011) ........................................ 21, 22, 30

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999) ................................................... 24-25, 33

*Liu v. SEC*,
   140 S. Ct. 1936 (2020) ............................................................ 25

*Luis v. United States*,
   578 U.S. 5 (2016) ............................................................. 25-26

*SEC v. Ahmed*,
   72 F.4th 379 (2d Cir. 2023) ..................................... 20, 22, 25

*SEC v. Amerindo Inv. Advs. Inc.*,
   2014 WL 2112032 (S.D.N.Y. May 6, 2014) ............................ 32

*SEC v. Banner Fund Int'l*,
   211 F.3d 602 (D.C. Cir. 2000) ............................................... 22

*SEC v. Cavanagh*,
   155 F.3d 129 (2d Cir. 1998) ............................................ 19, 23

*SEC v. Cole*,
   661 F. App'x 52 (2d Cir. 2016)) .............................................. 31

*SEC v. de Maison*
   2021 WL 5936385 (2d Cir. 2021) .......................................... 30

*SEC v. ETS Payphones, Inc.*,
   408 F.3d 727 (11th Cir. 2005) (per curiam) .......................... 24

*SEC v. Fowler*,
   6 F.4th 255 (2d Cir. 2021) ..................................................... 31

*SEC v. Liu*,
   851 F. App'x 665 (9th Cir. 2021) .................................... 32, 33

*SEC v. Miller,*
   808 F.3d 623 (2d Cir. 2015) ............................................................. 19, 23

*SEC v. Pentagon Capital Management PLC,*
   725 F.3d 279 (2d Cir. 2013) ...................................................... 31

*SEC v. Unifund SAL,*
   910 F.2d 1028 (2d Cir. 1990) ...................................... 11, 22, 23

*SEC v. Xia,*
   2022 WL 17539124 (E.D.N.Y. Dec. 8, 2022) .......................... 25

*Shannon v. Gen. Elec. Co.,*
   186 F.3d 186 (2d Cir. 1999) ...................................................... 33

*Smith v. SEC,*
   653 F.3d 121 (2d Cir. 2011).......................................... 22, 23, 24

*United States v. Bonventre,*
   720 F.3d 126 (2d Cir. 2013) ...................................................... 29

## Statutes

Securities Act of 1933, 15 U.S.C. 77a, et seq.
   Section 17(a), 15 U.S.C. §§ 77(a)(1) ...................................... 7
   Section 17(a), 15 U.S.C. §§ 77(a)(2) ...................................... 7
   Section 17(a), 15 U.S.C. §§ 77(a)(3) ...................................... 7
   Section 20(b), 15 U.S.C. § 77t(b) .................................... 3, 23
   Section 20(d), 15 U.S.C. § 77t(d) .......................................... 3
   Section 22(a), 15 U.S.C. § 77v(a) .......................................... 3

Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.
   Section 27, 15 U.S.C. § 78aa ................................................... 3
   Section 10(b), 15 U.S.C. § 78j ................................................ 7
   Section 21(d),  15 U.S.C. § 78u(d)(1) .................................... 3
   Section 21(d),  15 U.S.C. § 78u(d)(1) .................................. 23
   Section 21(d), 15 U.S.C. § 78u(d)(5) .............................. 17, 23

28 U.S.C. § 1292(a) ................................................................. 3

iv

**Rules and Regulations**

Fed. R. Civ. P. 65 ........................................................................ 9

<u>Rules under the Secruities Exchange Act of 1934</u>

Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a) .................................... 7

Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b) .................................... 7

Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c) .................................... 7

Rule 21-F-17, 17 C.F.R. § 240.21F-17 ................................... 7, 18

23-7537

————————————

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

————————————

Securities and Exchange Commission,

Plaintiff-Appellee,

v.

Mykalai Kontilai,

Defendant-Appellant.

————————————

On Appeal from an Interlocutory Order of the
U.S. District Court, Southern District of New York (Gorenstein, M. J.)

————————————

**BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION,
APPELLEE**

————————————

**INTRODUCTION**

In this civil enforcement action brought by the Securities and
Exchange Commission for alleged securities fraud, Defendant-Appellant
Mykalai Kontilai appeals from the district court's order granting the
Commission's motion for a preliminary injunction and asset freeze and
denying Kontilai's motion to modify the freeze. After having stipulated for
two-and-a-half years to a $46 million asset freeze, Kontilai filed opposition
papers to the Commission's years-old motion for a preliminary injunction
and demanded an evidentiary hearing. The district court held such a

1

hearing over several days, taking testimony from numerous witnesses. Ultimately, the court found that the Commission was likely to succeed on the merits of its securities fraud claims and that an asset freeze in the originally agreed-upon amount of $46 million was warranted to preserve the status quo, prevent asset dissipation, and protect the court's jurisdiction to enter an eventual judgment for the benefit of investors.

Kontilai does not contest the district court's finding that the Commission was likely to succeed on the merits of its claims, nor does he contend that an asset freeze was unwarranted. That is understandable, since a jury subsequently found Kontilai and his company, defendant Collector's Coffee, Inc., liable for engaging in a wide-ranging fraud involving the misappropriation of investor funds, misrepresentations to prospective investors, attempts to impede the Commission's investigation of those violations, and fabricated evidence in support of their position.[1] (The Commission's motion for remedies for those violations is pending before the district court.) Instead, Kontilai challenges only the scope of the asset freeze. But Kontilai misunderstands the nature of the district court's decision as well as the law of remedies for Commission civil enforcement

---

[1] We use "Kontilai" to refer to both the individual and the business that he controlled, unless context indicates otherwise.

2

actions.  Unable to show any abuse of discretion on the part of the district court, Kontilai's challenges to the scope of the asset freeze should be rejected and the district court's ruling should be affirmed.

## COUNTERSTATEMENT OF JURISDICTION

The district court had jurisdiction over this civil enforcement action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a), and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.  The parties consented to have the Commission's motion for a preliminary injunction determined by a magistrate judge.  Dkt. 143.[2]  Magistrate Judge Gorenstein issued the order on appeal granting the Commission's motion on October 4, 2023.  SA 1–58 (Dkt. 1284).  This Court has jurisdiction over Kontilai's timely filed notice of appeal from that order under 28 U.S.C. § 1292(a).

## COUNTERSTATEMENT OF THE ISSUES

Whether the district court acted within its discretion when it ordered an asset freeze to prevent the dissipation of assets, preserve the status quo,

---

[2] "Dkt." refers to the entries on the district court's docket, "SA" refers to the Special Appendix submitted with Kontilai's opening brief, "JA" refers to the parties' Joint Appendix, and "Br." refers to Kontilai's opening brief.

3

and protect the court's jurisdiction to enter judgment against Kontilai for the benefit of investors.

## COUNTERSTATEMENT OF THE CASE

### A.  Nature of the Case

Kontilai seeks review of the district court's October 4, 2023 decision granting the Commission's motion for a preliminary injunction and freezing assets held by Defendants.  SA 1–58.  Following a three-day evidentiary hearing, the district court found that the Commission had made a substantial showing of likelihood of success on the merits of its claims that Kontilai defrauded more than 200 investors of over $23 million, misappropriated investor funds, and attempted to cover up his actions.  The court also found that an asset freeze in the amount of $46,121,649.68 was necessary and appropriate to preserve the full amount of assets necessary to satisfy an eventual judgment for the benefit of investors.  SA 58.

### B.  Facts

Kontilai (formerly known as Michael Contile) was a Las Vegas resident and is the founder, president, and chief executive officer of defendant Collector's Coffee, Inc. (d/b/a/ Collectors Café, hereinafter "CCI"), an entity that Kontilai controlled and used to solicit investments.  JA 200 (Amended Compl., Dkt. 134 ¶ 20).  Kontilai owns 100% of the voting

4

shares of CCI. *Id.* CCI started in 2007 with a business plan to build brick-and-mortar coffee houses where collectors of memorabilia could congregate and purchase collectibles, but in 2009, the business plan changed to involve the creation of an online website for collectibles and an associated television show. JA 200-01 (Amended Compl., ¶¶ 22-23). Unless otherwise noted, the following facts are derived from the district court's findings in support of its preliminary injunction ruling (SA 1–58).

### 1. Kontilai made false statements to investors and misappropriated investor funds.

From April 2014 through 2018, Kontilai fraudulently raised over $23 million from investors. SA 47. Kontilai would typically give potential investors a high-level overview of the company, set up a video call through which investors could see a mock-up of the website, and then send them offering documents if the investors were interested. JA 203 (Amended Compl., ¶ 32(a)). Kontilai often sent private placement memoranda and investment information directly to investors. SA 6.

Kontilai convinced investors that large amounts of revenue were just months away by falsely claiming that there were hundreds of dealers and billions of dollars' worth of collectibles ready to sell on CCI's website. In fact, Kontilai never had more than a handful of dealers committed for a short time. SA 32-34. Kontilai also told investors that CCI had acquired

5

certain contracts relating to Jackie Robinson that had been appraised at between $25 million and $36 million, when, in fact, no such bona fide appraisals existed.  SA 34-36.

Despite repeatedly telling investors that he would not take a salary from the business, Kontilai misappropriated approximately $6 million from the company and charged at least another $1.17 million in personal expenses to the company's credit card.  SA 21-25.  For example, at trial, Kontilai's employee Gail Holt testified that in August 2016, Kontilai put $770,000 in a large trash bag and paid her $1,000 to $1,500 to walk it out of a bank and into Kontilai's hotel suite.  Kontilai then directed Holt to return to the bank to exchange $60,000 in marked bills for unmarked bills and to meet him at a Red Lobster to give him the unmarked bills.  Dkt. 1481 (Trial Tr. 385:9-389:13).  Kontilai also transferred $336,000 of investors' money to his wife, Relief Defendant Veronica Kontilai; Veronica, who had no role at the company, charged another $29,000 to the company's credit card.  SA 54-55.

### 2.    Kontilai took steps to conceal the fraud.

When investors began accusing Defendants of fraud, Kontilai had the company condition the return of the accusers' investments on promises that they refrain from contacting the Commission.  Dkt. 976 (Summary

6

Judgment Decision) at 4-6. Kontilai also attempted to cover up the fraud by fabricating documents and impeding the Commission's investigation. Kontilai falsely characterized payments as salary or compensation on the company's books and records. SA 21-25. When the Commission began questioning CCI's use of investor funds, Kontilai fabricated two agreements purportedly signed by Gail Holt as the company chair, as well as a bank statement, in a failed attempt to trick investigators into believing the payments to Kontilai were authorized. SA 27-28.

### C. Proceedings

#### 1. Proceedings Before the Preliminary Injunction Hearing

The Commission filed its complaint alleging violations of the securities laws based on the above conduct on May 14, 2019. *See* Dkt. 1 (alleging, among other things, violations of the Exchange Act, 15 U.S.C. § 78j, Section 10(b); 17 C.F.R. § 240, Rules 10b-5(a)-(c) and Rule 21F-17; and Section 17(a) of the Securities Act, 15 U.S.C. §§ 77(a)(1)-(3)). On the same day, the district court granted the Commission's *ex parte* motion for a temporary restraining order ("TRO"). JA 185-94 (Dkt. 12).

Finding it "necessary to preserve the *status quo* and to protect th[e] Court's ability to award equitable relief … and civil penalties," the district court froze the "assets, funds, or other property held by or under the direct

or indirect control of Defendants Collectors' Café or Mykalai Kontilai ... wherever located, up to the amount of $46,121,649.68" based on "good cause to believe that, unless restrained and enjoined ... the Defendants will dissipate, conceal, or transfer from the jurisdiction of this Court assets that could be subject to ... disgorgement or the payment of civil monetary penalties[.]" *Id.* ¶¶ 3, I.A.

The court thus directed CCI and Kontilai to "hold and retain within their control, and otherwise prevent any disposition ... or other disposal whatsoever of any of their funds or other assets or things of value presently held by them ... in whatever form such assets may presently exist and wherever located." *Id.* ¶ I.B. The court also ordered CCI and Kontilai to refrain from "tak[ing] any action to interfere with the asset freeze, including, but not limited to, the filing of any lawsuits, liens, or encumbrances ... provided, however, that any party or non-party may seek leave from this order upon a proper showing." *Id.* ¶ I.D.[3]

---

[3] Shortly after the court entered the TRO, in August 2019, Kontilai fled the United States while under investigation by the Department of Justice. After the DOJ unsealed two indictments that overlapped with the Commission's claims, *see United States v. Kontilai*, 20-cr-00083 (D. Colo.); *United States v. Kontilai*, 20-cr-00109 (D. Nev.), Kontilai prevented the criminal cases against him from proceeding for years by refusing to return to the United States. Kontilai has not appeared in either case.

Pursuant to Federal Rule of Civil Procedure 65, the court set a hearing date for ten days later for the Defendants to contest a contemplated preliminary injunction motion "extending the asset freeze and other ancillary relief entered in this Order until final adjudication of this case on the merits." *Id.* ¶ VI.  The parties jointly requested the district court to vacate that hearing date and reset it to a later date, and agreed "that by operation of the terms in the TRO, the asset freeze ... remain[s] in force pending the Court's adjudication of the SEC's Motion for a Preliminary Injunction or hearing on the merits."  Dkt. 17 at 2.

The district court granted the request, adjourned the hearing, and referred the contemplated motion for a preliminary injunction to Magistrate Judge Gorenstein.  The parties consented to Magistrate Judge Gorenstein ruling on the motion.  Dkts. 52, 56, 59, 138.  Magistrate Judge Gorenstein set December 13, 2019, as the new hearing date on the motion for a preliminary injunction.  Dkt. 139.  The Commission filed its renewed motion for a preliminary injunction on November 12, 2019, requesting that the court issue a "preliminary injunction continuing the asset freeze and other relief previously obtained, as well as additional relief, for the pendency of this litigation against Defendants [CCI] and Mykalai Kontilai, and Relief Defendant Veronica Kontilai."  Dkt. 141 at 1.

9

Several weeks later, the Defendants (along with relief Defendant Veronica Kontilai) requested a stay of the case to obtain new counsel. Dkts. 171, 172. After a conference on December 6, 2019 to discuss the application, the parties submitted a joint letter and proposed order stipulating to "the relief sought in the Renewed [Preliminary Injunction] Motion on a temporary basis pending a hearing on the Renewed Motion." Dkt. 174 (Order at 1). The district court signed the proposed order attached to the joint letter on the same day. JA 236-43 (Dkt. 175). This stipulated order continued the asset freeze from the TRO and also included provisions freezing Veronica Kontilai's assets up to the amount of $313,622. *Id.*

Nearly a year later, on November 1, 2020, Kontilai requested an emergency pre-motion conference to seek "dissolution" of the TRO and "clarify that the asset freeze entered in this matter does not prevent Kontilai from using any untainted funds earned or received and/or using untainted funds for hiring criminal defense and extradition counsel and criminal defense experts of his choice." Dkt. 612 at 1, 3. Kontilai argued that he "ha[d] a Sixth Amendment right to use untainted assets to pay for criminal defense counsel." *Id.* at 1.

The district court rejected Kontilai's arguments, holding that "the Asset Freeze covers *all* of '[t]he assets, funds, or other property held by or

10

under the direct or indirect control of Defendants ...' but gives Mr. Kontilai the opportunity to 'seek leave from th[e] order upon a proper showing.'" JA 247 (Dkt. 658 at 4 (quoting Dkt. 12)) (emphasis in original).  The court further found that Kontilai "failed to show his Sixth Amendment right to counsel ha[d] attached" because Kontilai "ha[d] not shown that [he] -- at this stage of the criminal proceedings -- needs counsel to assure a meaningful defense."  JA 248.

Approximately one year later, on October 1, 2021, Kontilai moved, again, for an order "clarifying" that, among other things, "the asset freeze, by its own terms, does not apply to after-acquired assets such as any proceeds from [] lawsuit[s]" related to his mother's wrongful death action and legal malpractice claims.  Dkt. 958 at 1.  The district court rejected Kontilai's argument on both the law and the facts, explaining that it "was made clear decades ago" that "[a] court's equitable powers in a securities fraud case are not limited solely to the unlawful gains acquired as a result of the underlying fraud."  Dkt. 988 at 15-16 (citing *SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990)).  Further, the court found that the right to file a lawsuit was a property interest and "[t]he 'property' interest represented by the lawsuits existed before the date the TRO was entered," meaning that the funds received from the lawsuits were not "after-acquired" as Kontilai

contended because "[p]rosecuting or settling a lawsuit is akin to converting one asset, a legal claim, into another asset, cash." *Id.* at 15.

### 2. The Preliminary Injunction Hearing and Post-Hearing Developments

After the issuance of the Stipulated Order in December 2019, no party sought a hearing date or adjudication of the preliminary injunction motion for approximately two-and-a-half years. Discovery proceeded and the Defendants changed counsel several times. As the district court explained, "injecting inefficiency" into this litigation was "Defendants' very objective" given their "well-documented litigation strategy to delay this matter and run up costs wherever possible." JA 256 (Dkt. 875 at 8).

In May 2022, Kontilai filed opposition papers to the Commission's November 2019 preliminary injunction motion that sought to continue relief that Kontilai had stipulated to for those intervening two-and-a-half years, and he requested an evidentiary hearing on the motion. Dkts. 1014, 1028. Magistrate Judge Gorenstein held the requested hearing over three days (November 7, 2022, January 24, 2023, and February 21, 2023) and heard testimony from eight witnesses. *See* SA 3; *see also* Dkt. 1129; Dkt. 1161; Dkt. 1168.

In March 2023, after the preliminary injunction hearing and while the parties were filing post-hearing briefs, Kontilai made an application to

12

the district court to modify the asset freeze then in place to allow for the release of funds to, among other things, pay Kontilai's living expenses and to permit him to seek employment during the pendency of the case. JA 3131-34 (Dkt. 1188). The application also repeated Kontilai's argument that the assets derived from the lawsuit involving his mother's estate should be excluded from the asset freeze. *Id.*

The Commission agreed to allow Kontilai to spend up to $3,000 per month of money earned from employment after the entry of the TRO, provided that the employment did not violate the securities laws and that the earnings be deposited into a bank account for which Kontilai would provide monthly account statements to the Commission. JA 3135-37 (Dkt. 1189). The Commission explained that it "ha[d] consistently told Kontilai that it would be willing to stipulate to a modification of the asset freeze that would permit him to use funds obtained from future employment with safeguards to prevent him from consuming investor funds under the guise of employment earnings," and, in fact, had "stipulated to such a modification to an order freezing Veronica Kontilai's assets the day that she asked for it." Dkt. 1186 at 1-2.

The district court ordered Kontilai to respond to the Commission's proposal and provide "any reason why the Court should not order the relief

13

offered ... (even if he is not consenting to it) given that he will be free to seek any further modification of the TRO that he wishes." JA 3139 (Dkt. 1190). Kontilai rejected the proposed conditions, claiming that $3,000 was "not tenable" and refusing to provide bank statements to the Commission, and reiterated his request to have funds relating to his mother's estate unconditionally released. JA 3140-42 (Dkt. 1194 at 1-3).

In April 2023, Kontilai's counsel informed the court that Kontilai had been arrested by German authorities and was in custody in Germany. Dkt. 1210. In May 2023, Kontilai filed a motion reiterating his request for the release of the assets relating to Kontilai's mother's estate and also requesting a carveout from the freeze for "funds to pay for any expenses related to his criminal defense—both in the United States and in Germany— if and when insurance proceeds are for any reason unavailable." Dkt. 1219 at 2. The motion did not specify an amount for such criminal defense expenses, nor did it provide any information as to how Kontilai's recent detention in Germany impacted his pending request for living expenses. *Id.*

### 3. The Preliminary Injunction Decision

In October 2023, the district court issued a 58-page opinion granting the Commission's motion for a preliminary injunction and asset freeze, and denying Kontilai's motion to modify the freeze. SA 1-58. The court

14

concluded that the Commission had shown a likelihood of success on the merits based on the following conduct: "that Kontilai repeatedly claimed he was not taking a salary, but in fact received money from the company on numerous occasions;" "that Kontilai and CCI claimed they had secured a large number of 'master dealers' who were contractually bound to sell products on CCI's website, though such contracts did not exist;" "that Kontilai and CCI represented that the company had 'no debt' and was initially funded by Kontilai's investments, but made substantial payments to Kontilai that they now attribute to purported loans;" "that Kontilai and CCI falsely represented that the sale of the Jackie Robinson Contracts was likely to generate between $25 and $36 million for CCI and its investors;" and that Kontilai and CCI misappropriated investor funds, which was initially concealed via Kontilai's fabrication of documents. SA 20-21. The court further concluded that an injunction was necessary because, among other things, "[t]here are no assurances that violations will not be repeated," and "Defendants have made no acknowledgment of the wrongful nature of their conduct and have made no representations that assure the Court they intend to cease their activity." SA 45.

The court also rejected Kontilai's arguments regarding the scope of the asset freeze. As the Court explained, the stipulated-to $46 million had

15

been calculated "by taking the total amount CCI raised from investors and adding an additional equal amount on the ground that the additional amount could be assessed against defendants as a civil penalty should the SEC prevail." SA 46. The district court found that amount remained appropriate since "[n]either Kontilai nor CCI disputes that CCI raised at least $23,060,824.84 from investors." SA 47.

The court rejected Kontilai's argument that the freeze should cover, at most, two times $7.27 million, the amount the Commission had shown that Kontilai himself had personally misappropriated. SA 45-48. The court explained that "Kontilai's personal misappropriations are not the sole assets that he can be ordered to disgorge" because "partners in wrongdoing — as Kontilai and the company he solely controlled have been shown to be here — may be held jointly and severally liable for disgorgement, if equitable." SA 47. The court therefore concluded that "the asset freeze is warranted for, at minimum," the over $23 million that Defendants raised from investors. SA 47-48. The court likewise rejected Kontilai's argument that any civil penalty would be limited to the amount he personally misappropriated. *Id.* The court explained that, "given Kontilai's total control of the operations of CCI, the SEC has shown that Kontilai benefitted

16

from investor funds to the same extent as CCI, and thus that the civil penalty may be as much as the total intake from investors." SA 48-49.

The district court rejected Kontilai's argument that the asset freeze should be reduced by the amount of legitimate business expenses that would be deducted from an ultimate disgorgement award, finding that "Kontilai has not offered any competent testimony as to what expenses are actually legitimate." SA 48 n.15; *see also* SA 13 (noting that the report of Defendants' expert witness was "essentially worthless" because "his method of determining that CCI expenses were for the benefit of CCI consisted of simply questioning whether such an expense could conceivably be made for the benefit of a company CCI's size, without any sort of investigation or analysis as to whether the expenses were legitimate or actually made for CCI's benefit").

In addition, the court again refused to carve out the proceeds that Kontilai claimed he acquired after the entry of the TRO. As the court explained, the law was clear that Congress authorized the district courts to freeze assets for the benefit of defrauded investors that was not limited to tainted proceeds that could be traced to the fraud itself. SA 49-50 (discussing 15 U.S.C. §78u(d)(5)). And in any event, the court reiterated "that the lawsuits and their proceeds identified by Kontilai as 'after-

17

acquired' assets were not, in fact, acquired after the commencement of the asset freeze currently in place."  SA 51.

Finally, the district court found that Kontilai's requests for carveouts were premature.  SA 51-54.  Given Kontilai's German imprisonment, the court found "no need to make a ruling on the question of new earnings" or on a carveout for living expenses, but left the door open for future carveouts if circumstances changed.  *Id.*  And the court likewise left the door open for a future carveout to fund Kontilai's criminal defense because Kontilai's insurance policy covered his current expenses and he "avers only that he 'may' be forced to hire different counsel 'if ... for any reason' the insurance policy does not cover certain expenses."  SA 53.

### 4.    The Jury Trial

Two months after issuing the order on review, the district court presided over a jury trial on the Commission's claims that Defendants committed securities fraud.[4]  The jury returned a verdict finding Defendants liable on all of the Commission's claims.  Dkt. 1489 (Trial Tr.

---

[4] The court had already granted summary judgment to the Commission on its claim that Kontilai and CCI violated Rule 21F-17 of the Exchange Act, 17 C.F.R. § 240, which prohibits actions taken "to impede an individual from communicating directly with the [Commission] ... about a possible securities law violation."  Dkt. 976.

1331-35). The Commission submitted a motion for remedies on March 1, 2024, seeking, among other things, over $23 million in disgorgement as to Kontilai and CCI, jointly and severally, as well as civil penalties for Defendants' violations equal to Defendants' pecuniary gain. Dkt. 1513. Kontilai and CCI filed their responses on April 12, 2024, Dkt. 1522, 1523, and the Commission's reply brief is due on April 26, 2024.

## STANDARD OF REVIEW

This Court reviews for abuse of discretion the district court's imposition of a preliminary injunction freezing assets. *SEC v. Miller*, 808 F.3d 623, 630 (2d Cir. 2015); *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998).

## SUMMARY OF ARGUMENT

Kontilai does not dispute the district court's findings that the Commission showed a likelihood of success on the merits or that an asset freeze was necessary to prevent dissipation of assets, preserve the status quo, and protect the court's jurisdiction to enter judgment for the benefit of investors. And although he objects to the scope and amount of the asset freeze, Kontilai's arguments misunderstand the governing legal and

equitable principles and fail to show any abuse of discretion by the district court in making those determinations.

1.    Kontilai incorrectly argues that the district court abused its discretion in freezing assets (that he claims were acquired after the freeze was first entered) without tracing them to the alleged fraud.  Kontilai is not only wrong on the law, since, as this Court has made clear, a "district court is not required to 'trace' ill-gotten gains to specific assets in [defendant's] possession," *SEC v. Ahmed*, 72 F.4th 379, 407 (2d Cir. 2023), but also factually inaccurate.  As the court correctly found, none of the assets he identifies were acquired after the asset freeze was imposed.

2.    Kontilai's complaint regarding the district court's refusal to carve out certain unspecified amounts for living expenses and criminal defense expenses fares no better.  Kontilai ignores the district court's reasonable determination that such carveouts were premature—due to Kontilai's imprisonment and his insurance policy—but could be the subject of future modification requests.

3.    Nor has Kontilai demonstrated that the district court incorrectly approximated the amount of potential disgorgement and civil penalties in setting the asset freeze amount.  Here too, Kontilai's argument flies in the face of this Court's well-settled law that disgorgement is not limited to

20

misappropriated funds (*see FTC v. Bronson Partners, LLC*, 654 F.3d 359, 368–74 (2d Cir. 2011)) but may include the entire $23 million that Defendants received from investors as the profits causally connected to the fraud. The district court was well within its discretion at the preliminary injunction stage to find that joint and several liability may be appropriate since Kontilai controlled CCI. And Kontilai's control of CCI likewise supports the district court's ruling that he may be subject to a civil penalty of an equal amount.

## ARGUMENT

### I. The district court acted within its discretion in determining the asset freeze's scope.

Kontilai's argument (Br. 27-32) that the district court abused its discretion in entering an asset freeze that reaches assets that are claimed to be "untainted" or acquired after the imposition of the original TRO (such as any proceeds from a lawsuit involving his mother's wrongful death or any hypothetical future earnings Kontilai may make during the pendency of the freeze), is wrong on both the law and facts.

### A. Tracing is not required.

Kontilai ignores this Court's well-established precedents, properly cited and explained by the district court, *e.g.,* SA 37, 51, holding that asset freezes are *not* limited only to funds that are tainted and traceable to the

21

fraud.  Instead, "any of [the defendant's] assets may be liquidated to satisfy his disgorgement obligation," *Ahmed*, 72 F.4th at 407, *petition for cert. docketed*, No. 23-741 (U.S. Jan. 9, 2024), and asset freezes are authorized up to an amount "sufficient to pay the amounts that might eventually be due" upon final judgment, including disgorgement and civil penalties.  *SEC v. Unifund SAL*, 910 F.2d 1028, 1042 (2d Cir. 1990).  Just as there is no requirement "to 'trace' ill-gotten gains to specific assets in [defendant's] possession," *Ahmed*, 72 F.4th at 407, assets frozen to "ensure that any funds that may become due can be collected" are likewise not required to be traceable to the fraud.  *Smith v. SEC*, 653 F.3d 121, 127 (2d Cir. 2011) (quoting *Unifund*, 910 F.2d at 1041); *see also SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) ("[D]isgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset."); *FTC v. Bronson Partners*, 654 F.3d at 374 ("[I]t is by now so uncontroversial that tracing is not required in disgorgement cases that we recently rejected an argument to the contrary via summary order.").

This result flows from an asset freeze's purpose and equitable origins. Congress has authorized district courts in Commission actions to enjoin illegal acts or practices and to enter, "upon a proper showing, a permanent

or temporary injunction or restraining order." 15 U.S.C. §§ 77t(b), 78u(d)(1). In addition, in any action or proceeding brought by the Commission under any provision of the federal securities laws, the Commission may seek, and a federal court may grant, "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5).

An asset freeze ordered under the securities laws "in aid of the recovery sought" and to prevent asset "dissipation or depletion" is appropriate prejudgment "equitable relief." *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 288–90 (1940). Accordingly, this Court has long held that, once the Commission properly invokes the federal courts' equity jurisdiction, the district court may enter a preliminary injunction in the form of an asset freeze to "preserve the status quo by preventing the dissipation and diversion of assets." *Smith*, 653 F.3d at 127 (internal quotation omitted); *see also Miller*, 808 F.3d at 637; *Cavanagh*, 155 F.3d at 132.

As a preliminary remedy, a freeze thus "functions like an attachment[,]" not to finally adjudicate liability, but to preserve the status quo by ensuring that "any funds that may become due can be collected." *Unifund*, 910 F.2d at 1041. A freeze "seeks not to modify or transfer assets

23

in any way, but rather, merely to preserve the status quo in anticipation of a final judgment." *Miller*, 808 F.3d at 632 (internal quotation omitted). To obtain a preliminary injunction freezing assets, the Commission "must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the securities laws." *Smith*, 653 F.3d at 127–28 (internal quotation omitted). Kontilai does not dispute that this standard has been met here.

Nor does Kontilai cite any cases contradicting these longstanding and well-established equitable principles, and the cases Kontilai does cite are inapposite. For example, while Kontilai claims (Br. 28-29) that *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), and similar cases support his position, *Grupo* is widely understood to limit the availability of asset freezes when private parties seek money damages and not equitable relief, and nothing in *Grupo* suggests that, in Commission cases such as this, asset freezes are limited to funds traceable to the violations. *See, e.g.*, *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005) (per curiam) (holding that district court did not abuse its discretion in ordering pre-judgment asset freeze because *Grupo* did not control where the Commission sought equitable relief in addition to money

24

damages).  Indeed, *Grupo* itself distinguished cases like this one (including *Deckert*, *supra*), which involve equitable relief.  *Grupo*, 527 U.S. at 324-25.

Kontilai is likewise incorrect in arguing (Br. 28-29) that the Supreme Court's decision in *Liu v. SEC* has altered these well-established principles. *Liu* did not address the propriety of asset freezes.  *See, e.g., Ahmed*, 72 F.4th at 394-95 (affirming denial of motion to unfreeze assets post-*Liu*); *SEC v. Xia*, 2022 WL 17539124, at *12 (E.D.N.Y. Dec. 8, 2022) ("[T]he growing consensus is that *Liu* merely clarified the scope of disgorgement as a remedy, and said nothing about, let alone eliminated, asset-freezing injunctions.").  Rather, the *Liu* Court held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief[.]" 140 S. Ct. 1936, 1940 (2020).  By situating disgorgement "within the heartland of equity," *id*. at 1943; *see generally id*. at 1942-46, *Liu* reinforces that a preliminary injunction in the form of an asset freeze that preserves a court's authority to enter a disgorgement award is consistent with *Grupo*.

Finally, Kontilai relies on *Luis v. United States*, 578 U.S. 5 (2016), to argue (Br. 29) that courts can only freeze tainted funds; but *Luis* held only that "insofar as innocent (*i.e.*, untainted) funds are needed to obtain counsel of choice ... the Sixth Amendment prohibits the [asset freeze] that

the Government [sought]." 578 U.S. at 18. As discussed *infra* pp. 28-29, the district court did not abuse its discretion in finding that Kontilai had not demonstrated any present need for funds for his criminal defense, and this case is thus of no help to him.

### B. The assets were not acquired after the TRO.

Even if there were some question as to whether an asset freeze can apply to untainted funds (and there is not), Kontilai's argument fails on the facts as well. As the district court explained, the factual premise behind Kontilai's claim—that any proceeds from the lawsuits relating to his mother's wrongful death action or malpractice action are "after-acquired" and thus not properly subject to the asset freeze—is incorrect. The property interest represented by the lawsuits existed before the TRO was entered, and thus the proceeds of those suits are not "after-acquired." SA 51. Kontilai provides no basis for challenging that conclusion.

Similarly, while Kontilai argues on appeal that he "desires to find a job, [and] receive gifts and/or loans from family and friends," Br. 31, the district court noted that the Commission had previously *agreed* to allow Kontilai to use such funds, subject to a monthly cap and certain safeguards, and Kontilai rejected such modest conditions. SA 51-52. The district court did not abuse its discretion in concluding that "it would be completely

26

contrary to the purpose of the freeze if a defendant were given an avenue under which to potentially spend existing hidden assets on the pretense that these were expenditures derived from new earnings," and that "[t]his is of particular concern here given that Kontilai has identified no actual prospective earnings, and in fact is unlikely to earn money prior to trial because he is imprisoned in Germany." *Id.*

Kontilai makes no attempt to identify any source of future earnings that could even possibly be subject to a carve-out from the asset freeze, nor does he even mention his imprisonment. He thus has not come close to identifying any abuse of discretion by the district court. Indeed, as the district court specified in the order on review, "[i]f the circumstances change, and Kontilai is in a position to earn money and open a bank account, he will be free to approach the Court with a plan that ensures the freeze of existing assets is maintained." SA 52. Kontilai remains free to make that application to the district court if his circumstances change, and he needs no relief from this Court to do so.

## II. The district court was within its discretion to deny as premature carveouts from the asset freeze for unspecified living expenses and hypothetical criminal defense costs.

The district court rejected Kontilai's motion to modify the asset freeze to allow to him to use unspecified amounts of funds for living expenses and

criminal defense costs, not because such carveouts are *per se* inappropriate, but because Kontilai had not provided any indication of, or support for, the amounts needed for either category.

Kontilai has no answer for the district court's conclusion (SA 53-54 n.18) that it was premature to "assess whether the asset freeze should be modified to allow for [living] expenses" since Kontilai is in custody in Germany. He continues to ignore his actual circumstances and the impact of his imprisonment, arguing on appeal that the asset freeze makes it so that he "cannot obtain a safe place to sleep at night." Br. 34. Given his confinement, Kontilai's suggestion that "[a]t a minimum, this Court should reverse … and remand for further proceedings to determine an appropriate amount to release from the asset freeze to account for necessary living expenses," Br. 35, makes no sense. That is particularly so, since the district court has made clear that Kontilai may seek a modification of the asset freeze if circumstances change. *See* SA 51-53, *see also* JA 3139 (Kontilai is "free to seek any further modification of the TRO that he wishes").

Kontilai's argument with respect to a carveout from the asset freeze for criminal defense expenses is likewise without merit. Kontilai suggests (Br. 38-41) that the district court concluded that he had not shown a need for the funds based on the stage of the criminal proceedings against him.

28

Not so.  The district court found that any such carveout was premature because Kontilai admitted that he had an insurance policy that was currently covering his criminal defense needs, and had not shown a need to go above and beyond what that policy covered.  SA 51-53.  Kontilai identifies no good reason to second-guess that conclusion.

Indeed, the law is clear that a "defendant's constitutional right to use his or her own funds to retain counsel of choice … is not implicated unless the restraint actually affects the defendant's right to choose counsel and present a defense."  *United States v. Bonventre*, 720 F.3d 126, 131 (2d Cir. 2013).  But nowhere in Kontilai's brief does he ever claim that he has a present need for *any* such funds.  As before the district court, he speculates (Br. 36) only that at some uncertain future time, he "may" be forced to hire less experienced counsel, or he "may" not be able to hire counsel with relevant experience.  Such speculation is insufficient to show any abuse of discretion by the district court.

### III. The district court was within its discretion in determining that $46 million was a reasonable approximation of what Defendants may be required to pay in disgorgement and civil penalties.

The district court appropriately determined the amount of assets necessary to preserve the status quo and satisfy a potential judgment against Defendants "by taking the total amount CCI raised from investors

29

and adding an additional equal amount on the ground that the additional amount could be assessed against defendants as a civil penalty should the SEC prevail." SA 46. The district court concluded that because "[n]either Kontilai nor CCI disputes that CCI raised at least $23,060,824.84 from investors," SA 47, a freeze in the amount of just over $46 million was necessary and appropriate to preserve the status quo for the benefit of investors. On appeal, Kontilai does not dispute the amount Defendants raised from investors; instead, he repeats (Br. 42) his incorrect arguments that he made to the district court that the amount of the freeze is "overbroad" because it should be based only on the amount of money that Kontilai himself was found to have personally appropriated and because the district court refused at this stage to deduct business expenses from the approximated disgorgement amount.

Kontilai is wrong in arguing (Br. 42-45) that his ultimate disgorgement liability is limited to the purportedly lesser amounts that he misappropriated for his personal benefit. *See FTC v. Bronson Partners, LLC*, 654 F.3d 359, 368–74 (2d Cir. 2011); *SEC v. deMaison*, 2021 WL 5936385, at *2 (2d Cir. 2021) (summary order). The district court is currently considering the Commission's pending motion for remedies, and in so doing, it will have discretion to conclude that the entire $23 million

30

that Defendants received from investors is a "reasonable approximation" of the profits causally connected to the fraud. *SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021). The district court correctly recognized that joint and several liability may be appropriate where, as here, Kontilai controlled CCI as the president, CEO, and 100% shareholder, *see supra* pp. 4-5, and Kontilai points to nothing in the record demonstrating any abuse of discretion in the district court's conclusion.

Kontilai also makes the related argument, citing *SEC v. Pentagon Capital Management PLC*, 725 F.3d 279, 285 (2d Cir. 2013), that the $23 million of the asset freeze that covers a possible civil penalty was overbroad because civil penalties may *not* be imposed jointly and severally. Br. 53-58. But the district court correctly applied *Pentagon Capital* and did not use joint and several liability as the basis for the amount in the asset freeze relating to the civil penalty approximation. SA 48-49. Instead, the court correctly concluded that, "given Kontilai's total control of the operations of CCI, the SEC has shown that Kontilai benefitted from investor funds to the same extent as CCI, ... the civil penalty may be as much as the total intake from investors," which was over $23 million. *Id.*; *see SEC v. Cole*, 661 F. App'x 52, 55 (2d Cir. 2016) (summary order) ("multiple defendants can each benefit from the same dollar of gain, ... each can be penalized for that

31

gain") (internal quotation marks omitted); *SEC v. Amerindo Inv. Advs. Inc.*, 2014 WL 2112032, at \*11 (S.D.N.Y. May 6, 2014) ("where multiple defendants mutually benefitted from the same gains, the best calculation of a single defendant's gain may be the total gains obtained by the group through that defendant's violations," which may result in "some overlap among defendants' gains, and the gains attributed to each defendant may add up to over 100% of total gains"), *aff'd,* 639 F. App'x 752 (2d Cir. 2016).

Finally, Kontilai takes issue with the fact that the amount of the asset freeze did not include any deductions for legitimate business expenses pursuant to *Liu*, Br. 46-53, but *Liu* did not address the propriety of asset freezes. After the Supreme Court decision in *Liu*, the case was ultimately remanded to the district court, which continued the preliminary injunction freezing appellants' assets pending a decision on the proper amount of disgorgement. Appellants challenged that renewed asset freeze in the Ninth Circuit. *SEC v. Liu*, 851 F. App'x 665, 667 (9th Cir. 2021) (unpublished). Like Kontilai, Liu argued that the district court should have calculated an amount of net profit disgorgement before entering the asset freeze. *Id.* at 668. The Ninth Circuit disagreed, holding that requiring a finding of the specific amount of equitable relief "would be premature at this stage of the proceedings" because a district court is not required "to

32

make a finding as to the amount of equitable remedies prior to final judgment." *Id.* at 668-69. Given that disgorgement had not yet been determined, the court reasoned, "it would be impossible to tailor this injunction solely to those assets that are net profits from the use of investor funds[.]" *Id.* Here, the district court currently has before it the parties' post-trial remedies briefing, and the district court will be able to consider Kontilai's asserted claim for a deduction for legitimate business expenses at that point.[5]

In any event, Kontilai's claims fail because, as the district court found, "Kontilai ha[d] not offered any competent testimony as to what expenses are actually legitimate." SA 48 n.15. The district court did not "ignore[]" the report of Kontilai's expert, Br. 53, but found it "essentially worthless" because the expert's "method of determining that CCI expenses were for the

---

[5] As discussed *supra* p. 19, the district court currently has before it the parties' briefing on remedies. If the district court rules on the remedies motion and enters final judgment against Kontilai before this Court considers this interlocutory appeal as to the preliminary injunction, this entire appeal will be rendered moot. *See Grupo*, 527 U.S. at 314 ("Generally, an appeal from the grant of a preliminary injunction becomes moot when the trial court enters a permanent injunction, because the former merges into the latter."); *Shannon v. Gen. Elec. Co.*, 186 F.3d 186, 192 (2d Cir. 1999) ("When a district court enters a final judgment in a case, interlocutory orders rendered in the case typically merge with the judgment for purposes of appellate review.").

33

benefit of CCI consisted of simply questioning whether such an expense could conceivably be made for the benefit of a company CCI's size, without any sort of investigation or analysis as to whether the expenses were legitimate or actually made for CCI's benefit." SA 13; *see also* SA 11-13. Given the lack of record evidence regarding legitimate business expenses, the district court did not abuse its discretion in declining to deduct business expenses from the amount of the asset freeze at the preliminary injunction stage.

## CONCLUSION

This Court should affirm the order of the district court granting the Commission's motion for a preliminary injunction and asset freeze and denying the motion to modify the freeze.

Respectfully submitted,

MEGAN BARBERO
   General Counsel
DOMINICK V. FREDA
   Assistant General Counsel
EMILY TRUE PARISE
   Senior Appellate Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-5169
parisee@sec.gov

April 2024

34

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7) because this brief contains 7,321 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using 14-point Georgia font.

/s/*Emily True Parise*
Emily True Parise

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/Emily True Parise*
Emily True Parise
